# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| JAMES LUTZ, individually and on behalf of all others similarly situated, | ) ) ) | **Case No.:** |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, | ) ) ) | |
| Defendants. | ) ) ) ) ) ) | |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................... 6

III.   TRADE AND COMMERCE ................................................................................ 7

IV.   THE PARTIES ..................................................................................................... 7

      A.    Plaintiff ....................................................................................................... 7

      B.    Defendants ................................................................................................. 8

      C.    Coconspirators .......................................................................................... 9

V.     BACKGROUND ON NAR AND THE REAL ESTATE INDUSTRY ....................................... 10

      A.    NAR and Affiliated MLSs ....................................................................... 10

      B.    Broker Compensation ............................................................................... 12

VI.   DEFENDANTS POSSESS MARKET POWER IN THE MARKET FOR THE PROVISION OF BUYER-AGENT SERVICES ........................................................ 14

VII.  THE ANTICOMPETITIVE AGREEMENTS .................................................. 16

      A.    The Buyer-Agent Commission Rule ........................................................ 17

      B.    The Commission Concealment Rule ........................................................ 22

      C.    NAR's Free-Service Rule ......................................................................... 23

      D.    NAR's Commission Filter Rules .............................................................. 24

      E.    Commission Modification Rules .............................................................. 24

      F.    NAR's Lockbox Policy ............................................................................ 26

VIII. NAR REQUIRES LOCAL ASSOCIATIONS TO PARTICIPATE IN THE CONSPIRACY ..... 27

IX.   DEFENDANTS PARTICIPATE IN, FACILITATE, AND IMPLEMENT THE CONSPIRACY

                                     .................................................................................... 29

X.      EFFECTS OF THE CONSPIRACY ................................................................................ 30

XI.     CONTINUOUS ACCRUAL ...................................................................................... 36

XII.    STATUTE OF LIMITATIONS ................................................................................... 36

XIII.   CLASS ACTION ALLEGATIONS ............................................................................ 37

XIV.    CLAIMS FOR RELIEF ........................................................................................... 40

        CLAIM I: Violation of Section 1 of the Sherman Act, 15 U.S.C. §1 ......................... 40

        CLAIM II: Violation of State Antitrust Statutes ...................................................... 42

        CLAIM III: Violation of State Consumer Protection Statutes .................................... 45

        CLAIM IV: Unjust Enrichment .............................................................................. 48

XV.     REQUESTED RELIEF ........................................................................................... 49

        DEMAND FOR JURY TRIAL ................................................................................ 50

## CLASS ACTION COMPLAINT

Plaintiff James Lutz ("Plaintiff"), individually and on behalf of all others similarly situated, asserts the following against Defendants HomeServices of America, Inc.; BHH Affiliates, LLC; and HSF Affiliates, LLC (collectively, "Defendants") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## I.     INTRODUCTION

1.      For decades, home buyers across America have been unwittingly paying too much for, and receiving too little from, services offered to them by Defendants and other real estate agent members of National Association of Realtors ("NAR"). Despite agent representations (which NAR permits and encourages) that such services do not cost home buyers anything, home buyers in fact pay a hefty cost for these services—namely, supracompetitive commissions at levels fixed by the Defendants, NAR; and other real estate brokers, which in turn lead to higher home prices paid by buyers.

2.      Most people purchase and sell homes only a few times in their lives. Consequently, home buyers and sellers often depend on brokers to assist them with the process. Hundreds of thousands of brokers are members of NAR. NAR membership comes with multiple benefits for brokers, including access to the key listing services that contain information about homes for sale. However, as part of their membership, brokers must also agree to follow NAR's rules, practices, and guidelines. These rules, which include a requirement that sellers set aside a portion of the purchase price for buyer-agent commissions, prohibitions on modifying the commission, and permission to filter listings by commission, all enable NAR and its members to maintain buyer-agent commissions at supracompetitive levels unrelated to brokers' experience or the services provided, steer home buyers away from lower commission homes, and drive out discounters—among other harms.

1

3.      Brokers use Multiple Listing Services ("MLSs") to share information about homes for sale. An MLS is a database of and the marketplace for properties listed for sale in a particular geographic region. The vast majority of homes in the United States are sold on an MLS. The home seller's broker (the "seller-broker") lists her client's home on the MLS, and the home buyer's broker (the "buyer-agent") uses the MLS to locate homes for her clients. In order to effectively market properties to buyers, seller-brokers must list their clients' properties on an MLS.

4.      Plaintiff and Class Members are home buyers who purchased their homes on MLSs affiliated with and governed by NAR. Plaintiff brings this action against Defendants for agreeing, combining, and conspiring to impose, implement, and enforce anticompetitive restraints that reduce price competition in the markets for buyer-agent services in violation of federal antitrust law and state antitrust statutes, consumer protection laws, and common law. Defendants' unlawful, anticompetitive conduct causes America's home buyers to pay inflated commissions for broker services they misrepresent are free, to pay inflated prices for the homes they purchase, and to receive reduced quality broker services.

5.      NAR is a trade association of real estate professionals with over 1.4 million members. NAR, Defendants, and their coconspirators collectively possess market power in the market for buyer-agent services through their control of NAR-affiliated MLSs. The MLSs at issue in this case ("NAR MLSs") are those controlled by local NAR associations. NAR MLSs are the dominant MLSs in the United States. Even some independent MLSs require brokers to be members of NAR to access their database. Over 200,000 real estate professionals across the United States have registered with NAR to access its benefits, including MLSs, which are essential to selling and finding homes for their clients. Pursuant to the conspiracy, however, NAR members may access NAR's benefits, including the right to list their properties on NAR MLSs, only if they agree

2

to adhere to and implement NAR's rules, policies, and practices. NAR and Defendants have adopted a series of rules, policies, and practices that significantly restrain competition.

6.      On November 19, 2020, the Department of Justice ("DOJ") filed an antitrust complaint in the District of Columbia against NAR alleging that NAR's rules, policies, and practices "governing, among other things, the publication and marketing of real estate, real estate broker commissions, as well as real estate broker access to lockboxes" where keys required to gain access to a property are stored were "widely adopted by NAR's members resulting in a lessening of competition among real estate brokers to the detriment of American home buyers." Simultaneously with the complaint, the DOJ announced a proposed settlement with NAR pursuant to which NAR committed to modifying its rules to provide greater transparency to home buyers. Assistant Attorney General Makan Delrahim explained that the settlement "prevents traditional brokers from impeding competition—including by internet-based methods of home buying and selling—by providing greater transparency to consumers about broker fees. This will increase price competition among brokers and lead to better quality of services for American home buyers and sellers."

7.      On July 1, 2021, the DOJ sought to withdraw its consent to the proposed settlement with NAR.[1] The DOJ wanted to ensure it would be able to conduct a "broader investigation of NAR's rules and conduct to proceed without restriction."[2] The DOJ further explained, "we cannot

---

[1] Notice of Withdrawal of Consent, *United States v. Nat'l Ass'n of REALTORS®*, No. 1:20-cv-3356 (D.D.C. July 1, 2021), ECF. No. 14.
[2] Press Release, "Justice Department Withdraws from Settlement with the National Association of Realtors", Dep't of Justice (Jul. 1, 2021), https://www.justice.gov/opa/pr/justice-department-withdraws-settlement-national-association-realtors.

be bound by a settlement that prevents our ability to protect competition in a market that profoundly affects Americans' financial well-being."[3]

8.    Subsequently, on October 31, 2023, a jury found HomeServices, NAR, and Keller Williams liable for conspiring to inflate broker commissions, causing home sellers to pay more for real estate brokerage services. Defendants were ordered to pay damages totaling $1.78 billion.[4]

9.    NAR imposes certain anticompetitive rules, policies, and practices on NAR MLSs. NAR also recommends certain rules, policies, and practices that NAR MLSs have widely adopted. NAR's anticompetitive rules, policies, and practices include:

a.    requiring every seller-broker, when listing a property on an MLS, to make a "blanket unilateral offer[] of compensation" to any buyer-agent who may find a buyer for the home;

b.    requiring that the offer of compensation to the buyer-agent be a blanket offer – *i.e.*, the exact same compensation terms must be simultaneously offered to every buyer-agent without regard to their experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer;

c.    prohibiting the disclosure of the total commission—the commission due to the seller-broker and the portion of the commission earmarked for the buyer-agent—for any listing on a NAR MLS;

d.    permitting buyer-agents to misrepresent to buyers that a buyer-agent's services are free;

---

[3] *Id.*
[4] *Sitzer et al. v. National Association of Realtors et al.*, 4:19-cv-00332 (W.D. Mo. Oct. 31, 2023), ECF No. 1294.

    e.   permitting and enabling buyer-agents to filter MLS listings based on the offered commissions and to exclude lower-commission homes from consideration by prospective home buyers;

    f.   severely restricting brokers' ability to modify the buyer-agent commission after the buyer-agent conveys a purchase offer; and

    g.   limiting access to the lockboxes that provide physical access to homes to members of NAR.

10.    NAR's rules, policies, and practices have been adopted and enforced by NAR members, including NAR MLSs, and are, therefore, agreements among competing real estate brokers. Defendants' implementation of and adherence to these agreements is manifestly anticompetitive.

11.    Because the Defendants are among the leading real estate firms in the United States, their participation in the conspiracy is essential to its success. The Defendants have agreed to participate in, facilitate, and implement the conspiracy. Each of the Defendants play an active role in NAR and has required franchisees, brokerages, and individual realtors to join in and implement NAR's anticompetitive agreements as a condition to receiving the benefits of each Defendant's brand, brokerage infrastructure, and other support. Defendants use their control of the MLSs and their own governing policies to ensure adherence to NAR rules.

12.    Defendants and their coconspirators further implement the conspiracy by reviewing and reissuing NAR's rules at yearly NAR meetings and serving on the boards and committees that enforce compliance with NAR's rules.

13.    Defendants' conspiracy has substantially reduced competition in the market for buyer-agent services to the detriment of American home buyers. Specifically, Defendants'

conspiracy enables brokers to raise, fix, and maintain buyer-agent compensation at artificially high levels that would not exist in a competitive marketplace, which in turn causes home buyers to pay higher prices. The conspiracy also enables brokers to "steer" home buyers away from lower commission homes. As a result, home buyers are harmed in at least the following ways:

    a.  the conspiracy has inflated the cost of buyer-agent services by inflating buyer-agent commissions;

    b.  since buyer-agent commissions are paid out of the price buyers pay for their homes, inflated buyer-agent commissions in turn have inflated home prices; and

    c.  the conspiracy has reduced the quality of services provided by buyer-agents by, for example, facilitating the steering of home buyers by their brokers towards higher-commission homes and away from lower-commission homes, even though such homes may otherwise match buyers' criteria.

14.    Plaintiff and the other class members have each incurred at least thousands of dollars in overcharges as a result of Defendants' conspiracy.

15.    Defendants' agreements individually and collectively unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26; state antitrust laws; consumer protection laws; and common law. Plaintiff, on behalf of himself and the classes, sues Defendants for these violations and seeks treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

## II.    JURISDICTION AND VENUE

16.    The Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337. This case arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

17.     This Court also has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a State different from Defendants.

18.     This Court has personal jurisdiction over Defendants. Defendants have: (1) transacted business in the United States, including in this District; (2) transacted with members of the Classes throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

19.     Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d). Each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.   TRADE AND COMMERCE

20.     The NAR's anticompetitive rules apply to and have been implemented and enforced by Defendants and coconspirators nationwide. These rules govern the conduct of local NAR associations, local brokers, and local realtors across the United States. Defendants' conduct alleged herein has, among other harms, inflated buyer-agent commissions nationwide, including in the areas in which the NAR MLSs operate. Coconspirator NAR, through its members and other coconspirators, and Defendants, through their franchisees, brokers, and other coconspirators, are engaged in interstate commerce and activities affecting interstate commerce.

## IV.   THE PARTIES

### A.     Plaintiff

21.     Plaintiff James Lutz is a resident of Colorado. In 2021, Mr. Lutz purchased a home in Key Colony, Florida using a buyer-agent broker that is a franchise of Defendant and that

operates under Defendants' "Berkshire Hathaway HomeServices" brand name. The home Mr. Lutz purchased was listed on the Florida Keys multiple listing service ("FLKMLS").[5] Upon information and belief, the FLKMLS is owned and/or run by the Florida Keys Board of REALTORS®, a NAR member that must adhere to NAR's guidelines and policies.[6]

**B.      Defendants**

22.      Defendant HomeServices of America, Inc. is one of the nation's largest real estate brokerages and a member of NAR. It is a Delaware Corporation with its principal place of business in Minneapolis, Minnesota and an affiliate of Berkshire Hathaway. HomeServices owns Defendants HSF Affiliates, LLC ("HSF") and BHH Affiliates, LLC ("BHH"), as well as dozens of brokerages across the country, including in Florida. HomeServices' Florida brokerages include EWM Realty, Florida Realty, Florida Network Realty, Beach Properties of Florida, and Roberts Brothers.

23.      HomeServices also establishes real estate broker franchises throughout the United States, including in this District. Upon information and belief, HomeServices provides financing to its franchisees, provides them with marketing materials and support, conducts on-site and group visits with franchisees, provides training materials and mandatory curriculum, and much more to its franchises, including those in Florida.

24.      HSF and BHH are both Delaware limited liability companies headquartered in Irvine, California and wholly owned by HomeServices. HSF operates and manages real estate brokerages across the country, including in Florida, such as Real Living Estate, a full-service real estate brokerage franchise company. BHH is a residential real estate franchisor.

---

[5] https://www.redfin.com/FL/Key-Colony-Beach/12-7-St-33051/home/139603903
[6] https://realtyna.com/mls-coverage/mls/florida-keys-mls-flkmls/

25.     HomeServices sets financial goals and provides legal and risk oversight and input to its brokerages and subsidiaries. In 2023, HomeServices' annual sales were $136.1 billion.

26.     This Complaint refers to HomeServices, HSF and BHH as "HomeServices."

**C.     Coconspirators**

27.     Defendants' coconspirators include the four largest real estate brokers in the country: Anywhere Real Estate Inc. (f/k/a Realogy Holdings Corp.), Inc., RE/MAX Holdings, Inc., Keller Williams. Their coconspirators further include Compass, Inc. ("Compass"), ExP World Holdings, Inc., Redfin Corporation, Weichert Realtors, United Real Estate Group, Howard Hanna Real Estate Services, and Douglas Elliman Inc. Plaintiff's counsel has brought suit against these coconspirators, as well as NAR, in two related litigations.

28.     Multiple local realtor associations not named as Defendants participated as coconspirators in the violations alleged herein and performed acts in furtherance thereof. Specifically, each of the local realtor associations that own and operate the NAR MLSs agreed to, complied with, and implemented the "Buyer-Agent Commission Rule," which requires a seller-broker to specify the blanket, unilateral commission to be paid to the buyer-agent upon sale in terms of a definite dollar amount or percentage of the sale price.

29.     The NAR MLSs, among others, have participated as coconspirators in the violations alleged herein and performed acts in furtherance thereof, including by adopting the Buyer-Agent Commission Rule in their individual rules and regulations.

30.      Franchisees and brokers of Defendants also participated as coconspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each complied with and implemented the Buyer-Agent Commission Rule in the geographic areas where the NAR MLSs operate. In addition, other brokers in these areas have participated as coconspirators in the violations alleged herein and performed acts and made

statements in furtherance thereof. These other brokers complied with and implemented the Buyer-Agent Commission Rule in these geographic areas.

31.     Defendants are jointly and severally liable for the acts of their coconspirators, whether named or not named as defendants in this Complaint.

## V.     BACKGROUND ON NAR AND THE REAL ESTATE INDUSTRY

### A.     NAR and Affiliated MLSs

32.     NAR is the largest trade association in America, composed of REALTORS® (real estate agents registered with NAR), including residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry across the United States. Members belong to one or more of NAR's approximately 1,200 local associations or boards and/or 54 state and territory associations. NAR's local associations and affiliated MLSs govern the conduct of NAR's 1.4 million member REALTORS®.

33.     Among other activities, NAR establishes and enforces rules, policies, and practices that are adopted by NAR's local associations and their affiliated MLSs and, in turn, must be complied with by REALTORS®. Membership in NAR provides real estate professionals with a number of benefits, including liability insurance, access to MLSs, trainings, and more.

34.     Home sellers and buyers are typically represented by brokers, including those registered with NAR. According to NAR, in 2020, 89% of sellers sold their home with assistance from a seller-broker, and 88% of buyers purchased their home with assistance from a buyer-agent.

35.     State licensing laws regulate who can represent sellers and buyers in the real estate market. Two categories of entities may be licensed under state law: (1) the real estate broker (also known as a "brokerage firm"); and (2) the individual real estate licensee or agent. Real estate brokers are legally responsible for the activities of their licensed agents.

36.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. For that reason, all contracts for real estate services must be with brokers, not agents, and all payments are made to brokers, not agents. Brokerage firms pay their individual agents. For ease of reference, this Complaint generally refers to brokers and agents interchangeably.

37.     Brokers typically share and find information about houses for sale on an MLS. An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their individual realtors so long as they comply with the rules of the MLS. MLSs function as joint ventures between real estate brokers to publish and share information about property listings in specified geographic areas.

38.     MLSs also act as the main sources of listings for online websites, such as Zillow, through which many prospective home buyers find homes. However, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.

39.     Due to near industry-wide participation and control over important data, brokers offering MLSs possess and exercise power in the markets for the provision of real estate brokerage services to home buyers and sellers throughout the country. If a seller-broker does not list a client's property on an MLS, many buyer-agents will not show that property to prospective buyers.

40.     NAR controls a substantial number of the MLSs in the United States. The NAR MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR. NAR's map of affiliated MLSs reflects NAR's wide reach.

**Figure 1**[7]



41.     NAR promulgates rules, policies, and practices that govern the conduct of NAR-affiliated MLSs that are set forth annually in NAR'S Handbook on Multiple Listing Policy ("Handbook"). Under the terms of the Handbook, NAR members and MLSs must conform their policies with those established by NAR's Board of Directors.

**B.     Broker Compensation**

42.     The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price. Commissions are paid when the home sells.

43.     The seller-broker's compensation is specified in a listing agreement, a contract between the seller and the seller-broker that details the terms of the seller-broker services, such as requiring that property be listed on an MLS. The listing agreement specifies the total commission

---

[7] MLS Map of the National Association of REALTORS®, NAR, https://www.nar.realtor/mls-map-of-the-national-association-of-realtors (last accessed Jan. 12, 2021).

that a home seller will pay to the seller-broker, often with a portion of that amount earmarked to be paid to the buyer-agent in the event the buyer has a broker.

44.     The buyer-agent is typically compensated with a portion of the total commission paid to the seller-broker, which the buyer-agent receives if her client purchases the seller's home. When a buyer retains a broker, the buyer enters into a contract with that broker, which typically discloses that the buyer-agent will be compensated out of the total commission.

45.     The following example illustrates how this process typically works:

- A homeowner enters into a contract with a seller-broker, in which the seller agrees to pay the seller-broker six percent in total commissions in exchange for marketing and facilitating the sale of the home.

- The seller-broker then makes a blanket, unilateral offer of a three percent commission to every buyer-agent when it lists the home on the MLS.

- A buyer-agent shows the property to a buyer client, who buys the home for $500,000.

- The buyer pays the $500,000 purchase price into an escrow account. The escrow company then simultaneously transmits the seller-broker's commission (three percent of the sales price or $15,000) to the seller-broker, the buyer-agent commission (three percent of the sales price or $15,000) to the buyer-agent, and the net amount due to the seller.

46.     Buyer-agent fees are paid out of the funds from the purchase price of the house—a price the home buyer pays. But, because the buyer-agent commission is ostensibly paid by the seller, buyers do not necessarily realize that the broker commission is added to the purchase price of the home such that buyers are sharing the cost of the commission with the seller. This fact is

13

obscured further by NAR's Code of Ethics, which permits and encourages buyer-agents to tell their clients that their services are free. In fact, home buyers pay a high price for these "free" services in the form of supracompetitive purchase prices and buyer-agent commission rates as well as reduced quality of buyer-agent services.

## VI.    DEFENDANTS POSSESS MARKET POWER IN THE MARKET FOR THE PROVISION OF BUYER-AGENT SERVICES

47.    The relevant service market for the claims asserted herein is the market for buyer-agent services. The relevant geographic markets for the claims asserted herein are the geographic areas in which NAR MLSs operate. This market comprises the bundle of services provided to home buyers by residential real estate brokers with access to the NAR MLSs. Defendants' and their coconspirators' control of the NAR MLSs gives Defendants the ability to impose the Buyer-Agent Commission Rule and other anticompetitive NAR rules on class members and other market participants. Access to NAR MLSs is critical for brokers to compete and to assist home buyers where those MLSs operate.

48.    Upon information and belief, NAR and the Defendants, through their coconspirator franchisees and other conspiring brokers where the NAR MLSs operate, collectively provide the majority of the residential real estate broker services in these areas.

49.    Defendants and their coconspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

50.    Any buyer-agents in the areas in which the NAR MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' control of the NAR MLSs through themselves and their coconspirators means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring

14

brokers, or alternatively, attempt to compete without access to a listing service. A seller-broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a buyer-agent who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

51.     For an alternative listing service to compete effectively with one of the NAR MLSs, the alternative would require listings as comprehensive as the NAR MLS. Brokers and their individual realtors who currently profit from inflated buyer-agent commissions have minimal incentives to participate in an alternative listing service that would generate lower buyer-agent commissions and lower total commissions. Further, many buyers would be very reluctant to retain a buyer-agent operating on an alternative listing service that required them to pay the buyer-agent commission when other buyer-agents operating on the NAR MLSs represent that they are entirely compensated by home sellers. Accordingly, seller-brokers on an alternative listing service would struggle to attract buyer-agents and their buyer clients. And buyer-agents would be reluctant to use a listing service with limited properties. Accordingly, a listing service attempting to compete with any of the NAR MLSs would likely fail to attract enough property listings to operate profitably and act as a competitive constraint on the incumbent MLSs. The absence of listing services that effectively compete with the NAR MLSs (or other MLSs) reflects substantial barriers to entry.

52.     NAR also advises MLSs that non-compete agreements are a "critical component" of any agreement between MLSs and third-party websites, such as Zillow, that may wish to access the MLSs data. NAR's checklist of "critical components" states that any non-compete should include provisions that the third-party website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of

cooperation and compensation." Further, NAR advises that the non-compete agreement should require the third-party website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." Thus, NAR, in furtherance of the conspiracy, has advised MLSs to take affirmative steps to prevent third-party websites from becoming competitors.

## VII.   THE ANTICOMPETITIVE AGREEMENTS

53.     NAR's Handbook, Code of Ethics, and Standards of Practice, among other policies, impose rules, policies, and practices on all NAR members, including NAR MLSs. Certain of these rules, practices, and policies significantly restrain competition for the provision of buyer-agent services and harm home buyers across the United States.

54.     Compliance with NAR's rules is mandatory for NAR membership. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

55.     Additionally, NAR's Handbook on Multiple Listing Policy provides that "Association and Association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."

56.     NAR's rules and policies include: (i) the Buyer-Agent Commission Rule; (ii) a prohibition on disclosing to buyers the total commissions paid to brokers upon the sale of a house ("Concealment Rule"); (iii) rules permitting and encouraging buyer-agents to represent to home buyers that their services are free ("Free-Service Rule"); (iv) rules allowing and making it easy for buyer-agents to filter MLS listings to only those with high commissions ("Filter Rules"); (v) rules

restricting sellers and seller-brokers' ability to modify the commissions offered to buyer-agents after an offer to purchase the listed home has been made ("Commission Modification Rules"); and (vi) the restriction of access to lockboxes, which hold the keys to houses for sale, to only NAR members ("Lockbox Policy").

57.     NAR and its affiliates have a clear agreement: NAR members can participate in the MLS, and gain the benefits provided by NAR and the NAR MLS, as long as they agree to adhere to and enforce the anticompetitive restraints set forth in NAR's rules, practices, and policies. Thus, NAR and the NAR MLSs' adoption and enforcement of these rules, policies, and practices reflect concerted action between horizontal competitors and constitute agreements among competing real estate brokers that reduce price competition among brokers and lead to higher prices and lower quality service for American home buyers and others.

### A.     The Buyer-Agent Commission Rule

58.     The Handbook sets forth the Buyer-Agent Commission Rule as follows: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants."

59.     The Handbook further states that "multiple listing services shall not publish listings that do not include an offer of compensation *expressed as a percentage of the gross selling price or as a definite dollar amount*, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

60.     This practice is virtually universally adopted. Indeed, "[e]very MLS in the U.S. requires that listing brokers offer compensation to buyer-agents."

61.     As a result of the Rule, seller-brokers must make "blanket unilateral unconditional offers of compensation to their adversarial buyer-agents." These blanket offers relieve buyer-agents of the need to compete on things like price and quality of services. Thus, the Buyer-Agent Commission Rule reduces competition in the market for buyer-agent services and harms home buyers in a number of ways.

62.     First, through the Buyer-Agent Commission Rule, Defendants act to sustain high commission rates for broker services. This commission rate is then baked into the price of the house, artificially raising home prices.

63.     The Consumer Federation of America has explained, "[t]ypically, on either a 5% or 6% commission, 3% will be offered to brokers with buyer clients, and that commission split is disclosed to brokers on real estate firm and multiple listing service databases." The listing of the 3% split "then acts as a powerful force to discourage lower splits of 2% or even 1% because listing brokers, and their sellers, fear that properties carrying these lower splits will not be shown. As a result, 'a listing broker lists a split below' the standard industry level 'at their, and their clients', peril because of the risk that traditional brokers working with buyers will avoid this property. . . . This informal discrimination against price competitors is the most important factor that allows dominant brokers to maintain high and uniform prices." As coconspirator Keller Williams has acknowledged in its instructions to seller-brokers regarding what to tell home sellers: "[y]ou're putting yourself at a disadvantage competitively when you reduce your commission."

64.     Additionally, because NAR and its members offer blanket, unilateral, unconditional commissions, brokers need not compete with respect to the quality of services in order to obtain higher commissions. For example, novice brokers who have just received their licenses can charge the same prices as highly skilled, long-practicing brokers. Similarly, to the extent a broker

18

commission is calculated as a "percentage of the gross selling price," a buyer-agent who facilitates the purchase of an $800,000 home will receive potentially two times as much as a buyer-agent who facilitates the purchase of a $400,000 home, regardless of whether the higher compensation is commensurate with the amount and type of services provided.

65.     Indeed, the Consumer Federation has called brokers "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive." But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."

66.     Second, buyer-agents "steer" home buyers to residential properties that offer higher commissions. Steering of home buyers to high commission homes reinforces high commission rates. It also reduces the quality of buyer-agent services by incentivizing buyer-agents to limit the homes they show prospective buyers to those that offer high commissions. Home buyers are therefore both more likely to pay a higher price for their home (since the buyer-agent commission is baked into the sale price), and less likely to be matched with the optimal home—the exact task the buyer-agent is paid to do.

67.     Fear of having buyers steered away from a property is also a strong deterrent to sellers who would otherwise offer lower buyer-agent commissions, which further contributes to higher prices for buyer-agent services.

68.     The prevalence of such steering has been widely reported in government reports, economic research, and the trade press.

69.     Steering is made easy for buyer-agents by the fact that the blanket commission offer must be made available to every buyer-agent using the MLS. NAR's requirement that offers of compensation be expressed in specific dollar or percentage terms enables buyer-agents to easily

19

compare the financial compensation offered to them by home sellers and steer their clients to higher commission homes.

70.     Thus, the Rule is designed to create tremendous pressure on sellers to offer the high, standard commission and to act as a powerful deterrent to anyone who may attempt to offer a discounted commission. As one commentator explained: "[e]ssentially, the MLS listing acts as a tool which competing brokers can use to help enforce a near uniform commission rate and drive out discounters."

71.     The Defendants' franchisees, agents, and other coconspirators have also utilized software technology to help facilitate steering based on MLS commission data and to impede buyers from learning about properties that offer discount buyer-agent commissions. For example, NAR's affiliate, the Greater Las Vegas Association of REALTORS ("GLVAR") uses for its MLS a software program called Matrix, which was designed and sold by CoreLogic. CoreLogic provides software and data services to most, if not all, of the NAR MLSs. Matrix allows brokers to provide tailored electronic listings to their buyer clients. Matrix automatically generates and regularly sends emails to buyer clients that describe properties for sale that match their search criteria. When brokers set up the Matrix program for their buyer clients, one of the fields in the software allows the brokers to filter listings according to the value of the buyer-agent commission being offered. In other words, brokers can program the software to only send property listings to buyers that promise buyer-agent commissions above a specified value.

72.     GLVAR elected to adopt a version of the Matrix software that permitted brokers to exclude properties offering discount buyer-agent commissions from Matrix-generated emails to buyer clients. A number of franchisees and broker agents, including coconspirator Compass, in at least the area covered by Greater Las Vegas have trained their realtors to insert 2.5 percent or

higher as the minimum permissible buyer-agent commission when using the Matrix system to send property listings to buyer clients. As a consequence, unbeknownst to them, buyer clients of those realtors often do not receive Matrix-generated emails that include properties offering a buyer-agent commission of less than 2.5 percent, even if that property perfectly matches the buyers' search criteria. Compass is not the only one. In fact, Defendants have implemented a policy requiring a minimum buyer-agent commission of 2.7 percent.[8]

73.     As part of the DOJ's investigation into NAR and anticompetitive practices in the real estate industry, the DOJ served a Civil Investigative Demand ("CID") on CoreLogic directing it to produce "all documents relating to any MLS member's search of, or ability to search, MLS listings on any of the Company's multiple listing platforms, based on (i) the amount of compensation offered by listing brokers to buyer-agents; or (ii) the type of compensation, such as a flat fee, offered by listing brokers to buyer-agents."

74.     By encouraging and facilitating steering, and adhering to the "standard real estate commission," the Buyer-Agent Commission Rule deters downward departures from the standard commission and enables brokers to avoid doing business with, or otherwise retaliate against, buyer-agents who try to compete by offering significant discounts.

75.     There is no pro-competitive justification for the Buyer-Agent Commission Rule. Until the early 1990s, all brokers were seller-brokers or subagents of seller-brokers. Under this "almost universal sub agency system . . . brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers." Because "nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing [*i.e.*,

---

[8] *Burnett et al. v. National Association of Realtors et al.,* No. 19-cv-00332-SRB (W.D. Mo. Oct. 12, 2023), ECF No. 1220, Exhibit 1.

seller's] broker," the seller's broker was paid by the seller and would then compensate the subagent working with the buyer.

76.     With the emergence of brokers who were no longer sub-agents of the seller's broker but were instead working for the buyer, there was no justification for requiring buyer-agents' commissions to be paid as a portion of the total commission. One industry participant acknowledged, "[w]ith the demise of subagency, there is little reason to keep interbroker compensation. . . . It does not make sense for listing brokers to pay buyers' brokers for the services the latter provides to buyers." As another commentator has written: the practice of "sellers' brokers specifying the fees that buyers' brokers charge to the latter's own clients, should be recognized" as "at least an attempt to fix market prices. . . . There is no longer any reason to permit listing brokers [*i.e.*, seller-brokers] to set the default prices that these competing buyers' brokers charge to serve their own customers. . . . The elimination of interbroker compensation would diminish the ability of traditional brokers to frustrate vigorous price competition, and thus likely lead to a dramatic fall in broker revenues."

77.     The reason for the Buyer-Agent Commission Rule is clear: to maintain high broker commissions for NAR members at the expense of home buyers. In the absence of the Rule, buyers rather than sellers would negotiate buyer-agent commissions, and brokers would compete with each other by offering lower commission rates and/or higher quality services.

        **B.     The Commission Concealment Rule**

78.     The anticompetitive effects of NAR's Buyer-Agent Commission Rule are magnified by additional rules adopted and enforced by Defendants. NAR's Commission Concealment Rule prohibits disclosing to prospective buyers the total commissions offered to buyer-agents. So, while buyer-agents can see the commission they will earn if their client

purchases a property, NAR MLSs conceal this fee from the home buyers who will actually pay the commission through the home purchase price.

79.     NAR has instituted a series of rules ensuring commission concealment from buyers. These rules are laid out in several places in NAR's Handbook, including Policy Statement 7.23, which states "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."

80.     Simultaneously, the NAR rules mandate price information sharing among brokers through its MLS rules. This type of one-way information exchange agreement eliminates the need for buyer-agents to compete on price by offering rebates or accepting lower commissions. It also encourages and enables brokers to set persistently high commission offers, leading to higher prices for buyer-agent services. Additionally, since buyers cannot see commission offers, they cannot detect or resist steering. As explained above, steering results in higher prices and reduces the quality of buyer-agent services for home buyers.

### C.     NAR's Free-Service Rule

81.     NAR's Free-Service Rule, which has been widely adopted by NAR MLSs, encourages buyer-agents to mislead buyers into thinking that the buyer-agent's services are free when they are not.

82.      Until January 2021, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer-agents governed by NAR are technically paid through the seller-broker, those buyer-agents can always tell their buyer clients

that their services are free. As a result, buyers think they are paying nothing for buyer-agent services.

83.     Because buyers do not believe they are paying anything for brokerage services, they are unlikely to (1) attempt to negotiate a lower buyer-agent commission and/or (2) search for or find attractive buyer-agent rebate offers or other discounts. In these ways, NAR's Free-Service Rule leads to higher prices for services provided by buyer-agents.

### D.     NAR's Commission Filter Rules

84.     NAR's Commission Filter Rules allow buyer-agents to filter MLS listings that will be shown to buyers based on the level of buyer-agent commissions offered. Some MLSs further permit buyer-agents not to show certain homes to potential home buyers if the buyer-agent will make less money because of lower commissions, even though those homes otherwise meet the buyer's search criteria.

85.     For example, according to Policy Statement 7.58 of NAR's Handbook "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers."

86.     These Filter Rules, which have been widely adopted by NAR MLSs, facilitate steering by helping buyer-agents selectively conceal from potential home buyers any property listings offering lower buyer-agent commissions. This reduces the quality of buyer-agent services and raises prices for buyer-agent services for home buyers.

### E.     Commission Modification Rules

87.     Even if a home buyer were to obtain enough information to negotiate a lower buyer-agent commission, NAR's ethics rules expressly prohibit buyer-agents from attempting to reduce buyer-agent commissions offered on MLSs through the submission of purchase offers. While NAR claims that brokers can negotiate their compensation at any time during the transaction, NAR's

24

Standard of Practice 16-16 states: "REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation." In other words, it is an unequivocal violation of NAR's ethics rules for a buyer-agent to even present an offer to a seller that is conditional on the seller reducing the buyer-agent commission.

88.     To the extent buyer-agents do seek to modify buyer-agent commissions, NAR illogically instructs buyer-agents to attempt those modifications before even showing the property to any potential buyers. By requiring buyer-agents willing to reduce buyer-agent commissions to request those reductions prior to even showing the property to a potential buyer, NAR forecloses virtually all negotiation over the buyer-agent commission. To comply, a buyer-agent would effectively need to contact a seller-broker on his own to negotiate a reduction to his own commission before his client has even seen the potential home.

89.     NAR's rules also restrain negotiation of the buyer-agent commission by providing that after the seller has received purchase offers, the seller-broker is prohibited from attempting to unilaterally modify the buyer-agent commission that was offered on the MLS. NAR Standard of Practice 3-2 states: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction."

90.      Consistent with NAR's rule, the New Jersey MLS Rules and Regulations, for example, state that a listing broker may only offer a buyer-agent compensation that differs from the compensation indicated on the listing if the seller-broker "informs the other broker in writing in advance of submitting an offer to purchase." As another example, MLSListings Inc., one of the largest MLSs in Northern California, states the following on its website to help explain the governing NAR rules:

> **Can I change my offer of compensation that I had offered to the cooperating agent in the MLS after the agent produces an offer signed by the buyer?**
>
> No. In no event shall the listing broker revoke or modify the offer of compensation later than the time the cooperating broker produces a prospective buyer who has signed an offer to purchase the property for which the compensation has been offered through the MLS (9.8).

91.      NAR imposes yet another restraint on negotiation by making it unethical for a buyer-agent to urge the buyer to negotiate directly with the seller to reduce commissions. Since the vast majority of home buyers have limited or no familiarity with this market and believe that the buyer-agent's services to them are "free," this restriction further restrains negotiations regarding buyer-agent commissions.

**F.      NAR's Lockbox Policy**

92.      NAR and its members have further reduced competition for buyer-agent services by limiting access to lockboxes to only those real estate brokers who are members of a NAR MLS. Real estate brokers keep, with permission from the sellers, keys to the houses for sale in lockboxes. This allows brokers to provide potential buyers with access to the homes while keeping the homes secure. The lockboxes are accessed by a real estate broker using a numerical code or digital Bluetooth® 'key'.

93.     NAR and NAR MLSs have adopted a series of rules (set forth in the NAR Handbook, Policy Statement 7.31) that limit access to lockboxes only to those real estate brokers that are members of NAR and subscribe to the NAR MLS. Brokers that are not affiliated with NAR cannot access the lockboxes and cannot show their clients the homes listed for sale, thereby lessening competition for buyer-agent services.

94.     As described in more detail below, each of these rules and practices have operated to maintain high commission rates and degrade the quality of the services that home buyers retain buyer-agents to receive. The rules have imposed higher buyer-agent commissions, maintained (and even increased) those overcharges over time notwithstanding technology and other changes that should have substantially reduced commissions, and significantly impeded the ability of lower-cost alternatives to create a more competitive marketplace.

## VIII.  NAR REQUIRES LOCAL ASSOCIATIONS TO PARTICIPATE IN THE CONSPIRACY

95.     NAR requires its members, including state and local realtor associations, as well as non-member brokers and agents operating in areas with NAR MLSs, to comply with the above anti-competitive rules, and with other rules contained in NAR's rules, practices and policies, including the NAR Handbook and the NAR Code of Ethics.

96.     NAR requires NAR members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics and the intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

97.     NAR threatens its individual and association members with expulsion if they fail to comply with the Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

98.     A local realtor association owns each of the NAR MLSs, and those realtor associations are required by NAR to ensure that their MLS and the MLS's participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy. Because access to the NAR MLSs and other MLSs is commercially necessary, brokers and agents must comply with the mandatory provisions in NAR's Handbook. Without access to a local MLS, including the NAR MLSs, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

99.     The role of a local realtor association is particularly important for home buyers as the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings. Listing brokers will use the MLS to market sellers' properties to other broker and agent participants in the MLS and, through those brokers and agents, to potential home buyers.

100.    Further, one of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatens to withhold these insurance benefits from realtor associations and MLSs that do not comply with NAR's mandatory provisions. NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National

Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

101.    NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules. NAR also requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

## IX.    DEFENDANTS PARTICIPATE IN, FACILITATE, AND IMPLEMENT THE CONSPIRACY

102.    As alleged above, NAR requires its members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. NAR and its affiliated associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices codified in NAR's Code of Ethics.

103.    Defendants and their coconspirators orchestrated and participated in the conspiracy alleged herein by at least: (1) requiring their franchisees (and the agents employed by those franchisees) to comply with NAR rules including the Buyer-Agent Commission Rule; (2) supervising, through their executives, NAR's operations including NAR's adoption, maintenance, and enforcement of rules like the Buyer-Agent Commission Rule; and (3) controlling local realtor associations by, for example, participating in the governance and management of those associations and encouraging the adoption of NAR's rules, including the Buyer-Agent Commission Rule.

104.    Defendant HomeServices, for example, has explicitly stated that "[a]s an industry leader, we have a responsibility to actively participate in shaping our industry and its current and future business model. The HomeServices executive leadership and CEOs of our operating companies drive these important discussions as leaders within the National Association of Realtors . . . and at the regional and local levels of the MLS organizations."

29

105.    Defendants' rules and policies require their franchises and agents to (1) comply with NAR's Code of Ethics; (2) join and comply with the rules of the local realtor association; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

106.    Indeed, HomeServices requires its franchisees and subsidiaries to join NAR or an MLS and to follow and enforce the Buyer-Agent Commission Rule and other NAR rules policies. President of Berkshire Hathaway HomeServices Alliance Real Estate, Kevin Goffstein, confirmed as much, testifying that "[a]ctive [HomeServices] agents are obligated to have a NAR, a MAR and whatever local board it is they're members of, membership."[9]

107.    Additionally, the Real Living Franchise Disclosure Document makes clear that franchisees must "at all times comply with the Code of Ethics of the National Association of Realtors and other appropriate organizations." Franchisees are also required to provide "electronic feeds of all real estate listings and other information available from the multiple listing services" and must do so in compliance with "standards adopted by the National Association of Realtors® or such other standards that we may periodically specify."[10] BHH Affiliates has specifically required its Florida-based franchisees to comply with the NAR Code of Ethics.

## X.    EFFECTS OF THE CONSPIRACY

108.    Defendants' conspiracy has had the following anticompetitive effects, among others, in each area in which a NAR MLS operates, and nationwide:

---

[9] *Id.*

[10] Franchise Disclosure Document, Berkshire Hathaway (issued May 1, 2023, as amended November 28, 2023), available at
https://www.wdfi.org/apps/FranchiseSearch/MainSearch.aspx?W7chLupbe6aeUGgSRi4ZpKTdr RIoo2LzTk5OM5n2qDe8dVumyvYwjkCb2HTcokECACFCmLsi4CSTARXZqeugqoN1qikUke NVbEiO8heWYS7LjC1Ccc5eDA%3d%3d.

- Home buyers have paid, through the purchase price of their homes, inflated buyer-agent commissions and inflated total commissions;

- Inflated total commissions are incorporated into the home purchase price, thereby causing buyers to pay higher prices for homes;

- The retention of a buyer-agent has been severed from the setting of the broker's commission; the home buyer retains the buyer-agent, while the home seller sets the buyer-agent's compensation;

- Price competition among brokers to be retained by home buyers has been restrained;

- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-agent commission; and

- The quality of buyer-agent services has been reduced, as buyer-agents are incentivized to steer their clients to higher commission homes;

- The quality of buyer-agent services has also been reduced through barriers that prevent buyer-agents from presenting and receiving purchase proposals that reduce the buyer-agent commission, thus making the proposals more attractive to and more likely to be accepted by sellers; and

- Defendants have increased their profits substantially by receiving inflated buyer-agent commissions and inflated total commissions.

109. There is no pro-competitive benefit to Defendants' conspiracy. Defendants have successfully stabilized buyer-agent commissions and significantly increased the dollar cost charged despite the diminishing role of buyer-agents. According to data from NAR, many home buyers no longer locate prospective homes with the assistance of a broker, but rather independently

through online services. Buyer-agents increasingly have been retained after their client has already found the home the client wishes to buy. "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees." Despite their diminishing role, buyer-agents continue to receive the same artificially elevated commission, due to Defendants' conspiracy.

110.    Defendants' success in maintaining (and, in inflation-adjusted dollar terms, substantially increasing) the charge imposed by buyer-agents despite the advent of new technologies stands in stark contrast to other industries. "[I]n almost every other consumer industry—booksellers, retailers, home appliances, insurance, banking, stock brokers—the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. . . . Economists call this process of squeezing out transaction costs 'disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."[11] Despite technological advances that have lessened the role of brokers and widespread fluctuations in housing prices, brokerage fees have failed to reflect these changes.

111.    Moreover, there is a disconnect between buyer-agent costs and buyer-agent commissions. Competition normally pushes firms to adopt fee structures that approximate their costs, but this trend is absent real estate brokerage fees. For example, buyer-agent costs are similar regardless of the price of the home. As the Wall Street Journal has explained, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should

---

[11] *The Realtor Racket*, WALL ST. J. (Aug. 12, 2005), https://www.wsj.com/articles/SB112381069428011613.

fall as home price rises."[12] Instead, broker commissions remain divorced from the quantity, quality, and value of the services.

112.    Even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.

113.    There is substantial economic evidence that Defendants' conspiracy has resulted in buyer-agent commissions and total commissions that are inflated well above a competitive level nationwide.

114.    Defendants' conspiracy has maintained broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the internet and the diminishing role of buyer-agents. Between 2000 and 2017, the average commission nationally has been stable at a supracompetitive rate of between 5 and 5.4 percent regardless of changing market conditions.

115.    Moreover, because housing prices have increased substantially in recent years (at a rate significantly exceeding inflation), and commissions are charged on a percentage of a home's sale price, the actual dollar commissions have become even higher. "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics." As the Consumer Federation of America has observed, "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[13]

---

[12] *Id.*
[13] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.

116.    The standard total broker commissions (*i.e.*, the aggregate commission paid to the seller-broker and buyer-agent) in areas where the NAR MLSs operate is between five and six percent, substantially higher than in countries with competitive markets for residential real estate brokerage services. In a 2002 study titled "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," economists Natalya Delcoure and Norm Miller concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2% . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%."[14] They also found variation within countries; in the United Kingdom, for example, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5- 0.75%; in low priced areas [for homes] as high as 3.5%."[15] Ultimately, the economists concluded that, "[b]ased on global data … [total] US residential brokerage fees should equal something closer to 3.0%."[16]

117.    The adverse economic impact of the conspiracy's restraints on price competition have been severe. The Consumer Federation of America indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[17]

---

[14] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INTL. REAL ESTATE REV. 12, 14 (2002).
[15] *Id.* at 17.
[16] *Id.* at 29.
[17] Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED. OF AM., at 4 (June 2006), https://consumerfed.org/wp-content/uploads/2006/06/6-19-06-Real-Estate-Cartel_Report.pdf.

118.    Brian Larson, an attorney who has represented many MLSs, has observed that "[w]ith the demise of subagency, there is little reason to keep interbroker compensation."[18] According to Larson, "[g]etting rid of interbroker compensation" [*i.e.*, payments from seller-brokers to buyer-agents] would improve the market in several areas, including:

- "Buyer broker fees can be commensurate with the skill and experience of the broker and with the buyer's needs."

- "The market benefits from price competition for buyer-broker services."

- "The dangers of price fixing, and the claims by industry watchdogs that it exists now, will largely be addressed. Brokers will really be unable to tell what their competitors are charging for services, and there will be no incentive for commissions to be 'standard.'"[19]

119.    Because of the scope and magnitude of the overcharges at issue here, the economic cost to the plaintiff classes and other consumers is enormous. Experts have suggested that the amount of "annual broker fees consumers might save if there was effective price competition is as much as $30 billion or more annually."[20]

120.    Economists Chang-Tai Hsieh and Enrico Moretti have suggested that more than half of current commissions might be eliminated by competition.[21] And as noted above, Natalya

---

[18] Brian Larson, *The End of MLS as We Know It (Redux) – Part I*, Larson Skinner (Dec. 15, 2010), https://larsonskinner.com/2010/12/15/the-end-of-mls-as-we-know-it-redux-part-i/.

[19] Brian Larson, *The End of MLS as We Know It (Redux) – Part II*, LARSON SKINNER (Dec. 20, 2010), https://larsonskinner.com/2010/12/20/the-end-of-mls-as-we-know-it-redux-part-ii/.

[20] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure (Abridged)*, 5 CORNELL REAL ESTATE REV. 26, 26 n.1 (2007).

[21] *See* Chang-Tai Hsieh & Enrico Moretti, *Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry*, 111 J. POL. ECON. 1076, 1116 (2003).

Delcoure and Norm Miller found that U.S. broker fees should equal something closer to three percent.[22]

## XI.   CONTINUOUS ACCRUAL

121.     During the years preceding the filing of this complaint, Defendants and NAR repeatedly engaged in anticompetitive conduct, including implementing and enforcing the Buyer-Agent Commission Rule and other anticompetitive NAR rules nationwide. The Defendants continue to do so.

122.     As a result of their conspiracy, Defendants repeatedly charged and received, and continue to charge and receive, inflated buyer-agent commissions and total commissions that were paid by Plaintiff and the Classes in connection with the purchase of residential real estate listed on one of the NAR MLSs. Each payment of these inflated commissions by Plaintiff and Class Members during the class period injured them and gave rise to a new cause of action.

## XII.  STATUTE OF LIMITATIONS

123.     The running of the statute of limitations begins when the Plaintiff discovers the existence of a cause of action.

124.     Plaintiff and the Classes had no knowledge of Defendants' unlawful conspiracy and could not have discovered it by the exercise of due diligence until, at the earliest, November 19, 2020, the date the DOJ announced the settlement of its antitrust claims against NAR.

125.     Moreover, it was reasonable for Plaintiff and Class Members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior. Plaintiff and Class Members are unsuspecting home buyers who do not have in-depth knowledge or information about the real estate industry and are not well-versed with NAR's framework. Additionally, as alleged herein,

---

[22] Delcoure & Miller, *supra* n. 8, at 29.

NAR's policies, rules and practices specifically prohibit the disclosure of total broker commissions to home buyers and encourage buyer-agents to represent to their clients that they are receiving the brokers' services for free. As a result, the average home buyer does not appreciate that buyer-agent services cost them anything, let alone that Defendants actively conspire together to maintain supracompetitive broker commissions.

126.    For these reasons, the statutes of limitation applicable to Plaintiff's and Class Members' claims have been tolled with respect to the claims asserted herein.

127.    Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitation on Plaintiff's and the Class Members' claims until at least November 19, 2020.

128.    Defendants actively concealed their conspiracy by, for example, prohibiting the disclosure of total commissions to home buyers and encouraging brokers to represent to home buyers that their services are free of charge.

129.    Moreover, Defendants' anticompetitive conduct was inherently self-concealing because NAR tightly controls its regulated MLSs, agents, and brokers, and a reasonable buyer under the circumstances would not have had reason to suspect that they were being subjected to anticompetitive conduct. The conduct prohibiting NAR MLSs from disclosing to prospective buyers the amount of commission that the buyer-agent will earn if the buyer purchases a home listed on the MLS is inherently self-concealing, as is the conduct allowing buyer-agents to misrepresent to buyers that a buyer-agent's services are free. Likewise, conduct by the Defendants to filter MLS listings based on the level of buyer-agent commissions and to exclude homes with lower commissions is inherently self-concealing.

## XIII.   CLASS ACTION ALLEGATIONS

130.    Plaintiff brings this action on behalf of himself and as a class action under

Federal Rules of Civil Procedure 23(a) and (b)(2) seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> **Nationwide Class:** All persons who, since December 1, 1996 through the present, purchased in the United States residential real estate that was listed on a NAR MLS.

131.    Plaintiff brings this action on behalf of himself and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) seeking damages pursuant to antitrust, unfair competition, consumer protection, and unjust enrichment laws, on behalf of the following class (the "Damages Class"):

> **Damages Class:** All persons who, since December 1, 1996 through the present, purchased in the Indirect Purchaser States[23] residential real estate that was listed on a NAR MLS.

132.    Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which any Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

133.    **Ascertainability**: Membership of the Classes is defined based on objective criteria, and individual members will be identifiable from Defendants' and public records.

134.    **Numerosity**: The exact number of members of the Classes is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Classes

---

[23] The "Indirect Purchaser States" are the states listed in the Second, Third, and Fourth claims for relief.

likely consist of at least thousands of individuals, and the members can be identified through Defendants' and public records.

135.    **Predominant Common Questions:** The Classes' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Classes include, but are not limited to, the following:

a.    Whether Defendants conspired as alleged herein;

b.    Whether the conspiracy was implemented in the areas in which the NAR MLSs operate;

c.    Whether the conspiracy harmed competition as alleged herein;

d.    Whether home buyers were harmed as a result of Defendants' anticompetitive conduct as alleged herein;

e.    Whether buyer-agent commissions were inflated as a result of the conspiracy;

f.    Whether the quality of buyer-agent services was diminished as a result of the conspiracy;

g.    Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits; and

h.    The appropriate class-wide measures of damages.

136.    **Typicality:** Plaintiff's claims are typical of the claims of the other members of the proposed Classes. Defendants' conduct that gave rise to Plaintiff's claims is the same for all members of the Classes.

137.    **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained counsel competent and

39

experienced in complex litigation and class actions, including antitrust violations. Plaintiff has no interest that is antagonistic to those of the Classes. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Classes.

138.   **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

139.   Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

### XIV.  CLAIMS FOR RELIEF

<u>CLAIM I</u>
**Section 1 of the Sherman Act, 15 U.S.C § 1**
**(On Behalf of the Nationwide Class for Injunctive and Equitable Relief)**

140.   Plaintiff repeats and incorporate by reference each of the foregoing allegations of this Complaint.

141.    Beginning in at least 1996, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

142.    The misrepresentation as to the payment of brokerage commissions and the value of houses sold is an actual and proximate cause of harm to home buyers. The contract, combination, or conspiracy alleged herein has consisted of continuing agreements among Defendants and their coconspirators to set, raise, and maintain the level of broker commissions.

143.    In furtherance of the contract, combination, or conspiracy, Defendants and their coconspirators have committed one or more of the following overt acts:

a.   participated in the establishment, maintenance, and implementation of the Buyer-Agent Commission Rule and other anticompetitive NAR rules;

b.   participated in the establishment, maintenance, and implementation of rules by NAR associations and MLSs that implemented the Buyer-Agent Commission Rule and other anticompetitive NAR rules; and

c.   used their control over the NAR MLSs to force affiliated brokers, members, and franchisees of Defendants to implement and adhere to the Buyer-agent Commission and other anticompetitive NAR rules in the areas in which the NAR MLSs operate.

144.    Defendants' conspiracy has caused buyer-agents to conceal total commissions, to misrepresent to buyers that buyer-agents' services are free, to steer home buyers towards high commission listings, and to diminish the value of buyer-agent services by restraining competition on buyer-agent commission fees in the home buying process. Defendants' conspiracy has also had the effect of excluding non-NAR-affiliated brokers from competing in the market for buyer-agent

services by restricting access to lockboxes, which is required in order for buyer-agents to show houses for sale to their clients.

145.    Defendants' conspiracy has also reduced competition among buyer-agents, thereby requiring buyers to pay inflated prices for their homes and inflated buyer-agent commissions. Reduced price competition among buyer-agents has also reduced the quality of broker services provided to home buyers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

146.    Plaintiff and Class Members paid inflated home purchase prices and broker commissions throughout the class period in connection with the purchase of residential real estate listed on the NAR MLSs. Absent Defendants' conspiracy, Plaintiff and the other class members would have paid lower prices for their homes and lower commissions.

147.    Plaintiff and Class Members also received diminished services from buyer-agents as a result of the conspiracy. Absent this conspiracy, Plaintiff would have received improved services in negotiating and reducing the purchase prices of their homes.

148.    As a direct and proximate result of Defendants' past and continuing violations, Plaintiff and Class Members have been injured in their business and property.

149.    Plaintiff and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**CLAIM II**
**Violation of State Antitrust Statutes**
**(On Behalf of the Damages Class)**

150.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

151.    Beginning at least in 1996, Defendants engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in each of the Indirect Purchaser Sates. Defendants conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in each of the Indirect Purchaser States.

152.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

153.    As a result of Defendants' unlawful conduct, Plaintiff and other Indirect Purchasers in the Damages Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in each of the Indirect Purchaser States.

154.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a)   Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to home purchases in Arizona by Class Members and/or home purchases by Arizona residents;

b)   Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to home purchases in California by Class Members and/or home purchases by California residents;

c)   Conn. Gen. Stat. §§ 35-24, *et seq.*, with respect to home purchases in Connecticut by Class Members and/or home purchases by Connecticut residents;

d)   D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to home purchases in District of Columbia by Class Members and/or home purchases by District of Columbia residents;

e)   Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Class Members and/or purchases by Florida residents;

f)   Haw. Rev. Stat. § 480-3, *et seq.*, with respect to purchases in Hawaii by Class Members and/or purchases by Hawaii residents;

43

g) 740 Ill. Comp. Stat. Ann. 10/7 *et seq.*, with respect to purchases in Illinois by Class Members and/or purchases by Illinois residents;

h) Iowa Code §§ 553.1, *et seq.*, with respect to home purchases in Iowa by Class Members and/or home purchases by Iowa residents;

i) Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to home purchases in Kansas by Class Members and/or home purchases by Kansas residents;

j) Me. Rev. Stat. Ann. tit. 10, § 1104(1), *et seq.*, with respect to home purchases in Maine by Class Members and/or home purchases by Maine residents;

k) Md. Com'l Law Code Ann. § 11-204, *et seq.*, with respect to purchases in Maryland by Class Members and/or purchases by Maryland residents;

l) Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to home purchases in Michigan by Class Members and/or home purchases by Michigan residents;

m) Minn. Stat. Ann. § 325D.57, *et seq.*, with respect to home purchases in Minnesota by Class Members and/or home purchases by Minnesota residents;

n) Mo. Rev. Stat. §§ 416.011, *et seq.*, with respect to purchases in Missouri by Class Members and/or purchases by Missouri residents;

o) Neb. Code Ann. §§ 59-801, *et seq.*, with respect to home purchases in Nebraska by Class Members and/or home purchases by Nebraska residents;

p) Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to home purchases in Nevada by Class Members and/or home purchases by Nevada residents;

q) N.H. Rev. Stat. § 356:1, *et seq.*, with respect to home purchases in New Hampshire by Class Members and/or home purchases by New Hampshire residents;

r) N.M. Stat. Ann. § 57-1-1, *et seq.*, with respect to home purchases in New Mexico by Class Members and/or home purchases by New Mexico residents;

s) N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to home purchases in New York by Class Members and/or home purchases by New York residents;

t) N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to home purchases in North Carolina by Class Members and/or home purchases by North Carolina residents;

u) N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to home purchases in North Dakota by Class Members and/or home purchases by North Dakota residents;

v)  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to home purchases in Oregon by Class Members and/or home purchases by Oregon residents;

w)  R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to home purchases in Rhode Island by Class Members and/or purchases by Rhode Island residents;

x)  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to home purchases in Tennessee by Class Members and/or home purchases by Tennessee residents;

y)  Utah Code 76-10-3101, *et seq.*, with respect to home purchases in Utah by Class Members and/or home purchases by Utah residents;

z)  Vt. Stat. Ann. tit. 9, § 2453 et *seq.*, with respect to home purchases in Vermont by Class Members and/or home purchases by Vermont residents;

aa) W. Va. Code § 47-18-1, *et seq.*, with respect to home purchases in West Virginia by Class Members and/or home purchases by West Virginia residents;

bb) Wis. Stat. §§ 133.03, *et seq.*, with respect to home purchases in Wisconsin by Class Members and/or home purchases by Wisconsin residents.

155.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

156.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and the Damages Class Members.

**CLAIM III**
**Violation of State Consumer Protection Statutes**
**(On Behalf of Plaintiff and the Damages Class)**

157.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

158.    Beginning at least in 1996, Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in the states pleaded below.

159.    As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and the Damages Class Members have been

harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in each of the Indirect Purchaser States.

160.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

a) Ariz. Rev. Stat. §§ 44-1521, *et seq*., with respect to home purchases in Arizona by Class Members and/or purchases by Arizona residents;

b) Cal. Bus. and Prof. Code §§ 17200, *et seq.*, with respect to home purchases in California by Class Members and/or purchases by California residents;

c) Colo. Rev. Stat §§ 6-1-105, *et seq*., with respect to purchases in Colorado by Class Members and/or purchases by Colorado residents;

d) Conn. Gen. Stat. §§ 42-110A, *et seq.*, with respect to purchases in Connecticut by Class Members and/or purchases by Connecticut residents;

e) D.C. Code §§ 28-3901, *et seq*.; with respect to purchases in the District of Columbia by Class Members and/or purchases by District of Columbia residents;

f) Fla. Stat. §§ 501.201, *et seq.*, with respect to home purchases in Florida by Class Members and/or purchases by Florida residents;

g) Iowa Code §§ 714H.1, *et seq*.; with respect to purchases in Iowa by Class Members and/or purchases by Iowa residents;

h) Kan. Stat. §§ 50-623, *et seq*., with respect to home purchases in Kansas by Class Members and/or purchases by Kansas residents;

i) Mass. Gen. Laws ch. 93A, § 9 *et seq.*, with respect to home purchases in Massachusetts by Class Members and/or purchases by Massachusetts residents;

j) Mich. Comp. Laws Ann. § 445.901, *et seq.*, with respect to home purchases in Michigan by Class Members and/or purchases by Michigan residents;

k) Mo. Stat. §§ 407.010, *et seq*., with respect to home purchases in Missouri by Class Members and/or purchases by Missouri residents;

l) Mont. Code Ann. § 30-14-101, *et seq.*, with respect to home purchases in Montana by Class Members and/or purchases by Montana residents;

46

m) Neb. Rev. Stat. § 59-1601, *et seq.*, with respect to home purchases in Nebraska by Class Members and/or purchases by Nebraska residents;

n) Nev. Rev. Stat. §§ 598.0903, *et seq.*, with respect to home purchases in Nevada by Class Members and/or purchases by Nevada residents;

o) N.H. Rev. Stat. § 358:1, *et seq.*, with respect to home purchases in New Hampshire by Class Members and/or home purchases by New Hampshire residents;

p) N.J. Stat. Ann. § 56:8-1, *et seq.*, with respect to home purchases in New Jersey by Class Members and/or home purchases by New Jersey residents;

q) N.Y. Gen. Bus. Law § 349, *et seq.*, with respect to home purchases in New York by Class Members and/or purchases by New York residents;

r) N.C. Gen. Stat. §§ 75-1.1, *et seq.*, with respect to home purchases in North Carolina by Class Members and/or purchases by North Carolina residents;

s) Or. Rev. Stat. §§ 646.605, *et seq.*, with respect to homes purchases in Oregon by Class Members and/or purchases by Oregon residents;

t) 73 Pa. Stat. Ann. §§ 201–1 *et seq.*, with respect to homes purchases in Pennsylvania by Class Members and/or purchases by Pennsylvania residents;

u) R.I. Gen Laws § 6-13.1-1, *et seq.*, with respect to homes purchases in Rhode Island by Class Members and/or purchases by Rhode Island residents;

v) S.C. Code Ann. § 39-5-140(a), *et seq.*, with respect to home purchases in South Carolina by Class Members and/or purchases by South Carolina residents;

w) Tenn. Code §§ 47-18-101, *et seq.,* with respect to home purchases in Tennessee by Class Members and/or purchases by Tennessee residents;

x) Va. Code §§ 59.1-196, *et seq.*, with respect to home purchases in Virginia by Class Members and/or purchases by Virginia residents;

y) Wisconsin - Wisc. Stat. § 100.18, *et seq.*, with respect to homes purchases in Wisconsin by Class Members and/or purchases by Wisconsin residents;

161.   Plaintiff and members of the Damages Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injury consists of paying higher prices for buyer-agent services than they would

have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct. On behalf of themselves and the Damages Class, Plaintiff seeks all appropriate relief provided for under the foregoing statutes.

## CLAIM IV
### Unjust Enrichment
### (On Behalf of Plaintiff and the Damages Class)

162.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

163.    Defendants received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense. For example, Plaintiff and Class Members paid supracompetitive commissions to agents employed by Defendants or their coconspirators. Defendants' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for buyer-agent commissions by Plaintiff and Class members.

164.    Additionally, Defendants promulgated and enforced anticompetitive rules, including the Buyer-Agent Commission Rule, Concealment Rules, Free-Service Rule, Commission Modification Rule, Filter Rule and Lockbox Policy in order to raise, set, and maintain high commission rates and otherwise reduce competition in the market for buyer-agent services for their own gain, providing Defendants with economic, intangible, and other benefits.

165.    Defendants unjustly retained those benefits at the expense of Plaintiff and Class members because Defendants' conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and the Classes.

166.    The benefits that Defendants derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

167.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds they received, and such other relief as the Court may deem just and proper.

<h3 style="text-align:center">XV.    REQUESTED RELIEF</h3>

Plaintiff requests relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the state antitrust and unfair competition and consumer protection laws as set forth herein;

D.    That the Court award Plaintiff and the other members of the Damages Class damages and/or restitution in an amount to be determined at trial;

E.    That the Court award Plaintiff pre- and post-judgment interest;

F.    That the Court award Plaintiff their costs of suit, including reasonable attorney's fees and expenses;

G.     That the Court award Plaintiff and the Class a permanent injunction to permanently

enjoin and restrain Defendants from establishing the same or similar rules, policies, or practices as

those challenged in this action in the future; and

H.     That the Court award such other relief as the Court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial

as to all issues triable by a jury.


Dated: April 29, 2024                         **/s/ Randall P. Ewing, Jr.**
                                              George A. Zelcs
                                              gzelcs@koreintillery.com
                                              Randall P. Ewing, Jr. (Florida Bar Number: 76879)
                                              rewing@koreintillery.com
                                              Ryan Z. Cortazar
                                              rcortazar@koreintillery.com
                                              **KOREIN TILLERY, LLC**
                                              205 North Michigan Avenue, Suite 1950
                                              Chicago, IL 60601
                                              Telephone: (312) 641-9750

                                              Michael E. Klenov
                                              mklenov@koreintillery.com
                                              Carol O'Keefe
                                              cokeefe@koreintillery.com
                                              **KOREIN TILLERY, LLC**
                                              505 North 7th Street, Suite 3600
                                              St. Louis, MO 63101
                                              Telephone: (314) 241-4844

                                              Vincent Briganti
                                              vbriganti@lowey.com
                                              Christian Levis
                                              clevis@lowey.com
                                              Noelle Forde
                                              nforde@lowe.com
                                              **LOWEY DANNENBERG, P.C.**
                                              44 South Broadway, Suite 1100

White Plains, NY 10601
Telephone: (914) 997-0500

*Attorneys for Plaintiff and the Proposed Classes*