# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JAMES LUTZ, SCOTT DAVIS, NIALL ADAMS, MYA BATTON, THEODORE BISBICOS, AARON BOLTON, JASON BOOMSMA, MICHAEL BRACE,THOMAS BRAUN, TIMOTHY CARUSO, SABRINA CLARK, COLLEEN DUVAL, JAMES EDWARDS, RYAN EISNER, STEVEN EWALD, CARSON FAIRBOURN, JOHN GARRETT, BRENNON GROVES, DARIN HENDRY, ANNA JAMES, DO YEON IRENE KIM, JORDAN KULLMANN, JAMES MULLIS, DANIEL PARSONS, JOSHUA PUTT, JOHN SANNAR, ROBERT SAYLES, BEN SHADLE, LISA SHANKUS, BRENT STRINE, CHRISTINE VAN WOERKON, and SHERRIE WOHL, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, and DOUGLAS ELLIMAN INC., | ) ) ) ) |
| Defendants. | ) |

Case No.: 4:24-cv-10040-KMM

**THIRD AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   JURISDICTION AND VENUE ......................................................................... 9

III.  THE PARTIES ..................................................................................................... 9

    A.   PLAINTIFFS ..................................................................................................... 9
    B.   DEFENDANTS .................................................................................................. 16
    C.   COCONSPIRATORS ......................................................................................... 18

IV.   BACKGROUND ON NAR AND THE REAL ESTATE INDUSTRY ........... 19

    A.   NAR AND AFFILIATED MLSS ...................................................................... 19
    B.   NAR'S HISTORY OF ANTICOMPETITIVE RESTRAINTS. ............................... 22

V.    THE CHALLENGED RESTRAINTS ............................................................. 27

    A.   THE BUYER-AGENT COMMISSION RULE ..................................................... 29
       1. The Clear Cooperation Policy was Enacted to Bolster the Buyer-Agent Commission
         Rule. ............................................................................................................. 31
    B.   THE COMMISSION CONCEALMENT RULE ..................................................... 33
    C.   NAR'S FREE-SERVICE RULE ....................................................................... 35
    D.   NAR'S COMMISSION FILTER RULES ............................................................ 39
    E.   COMMISSION MODIFICATION RULES ............................................................ 40

VI.   HOMESERVICES AND DOUGLAS ELLIMAN PARTICIPATED IN,
      FACILITATED, AND IMPLEMENTED THE CONSPIRACY ................... 42

    A.   HOMESERVICES AND DOUGLAS ELLIMAN WERE INVOLVED IN ISSUING AND MAINTAINING
       THE CHALLENGED RESTRAINTS. .................................................................. 42
    B.   HOMESERVICES AND DOUGLAS ELLIMAN REQUIRED THEIR AGENTS TO FOLLOW THE
       CHALLENGED RESTRAINTS. .......................................................................... 45
    C.   HOMESERVICES AND DOUGLAS ELLIMAN ENFORCED THE NAR RULES BY TRAINING THEIR
       AGENTS ON COMMISSIONS. .......................................................................... 50

VII.  DEFENDANTS POSSESS MARKET POWER IN THE MARKET FOR THE
       PROVISION OF BUYER-AGENT SERVICES ............................................. 53

VIII. THE CHALLENGED RESTRAINTS HARMED HOMEBUYERS ........... 56

    A.   BROKER COMPENSATION .............................................................................. 57
    B.   THERE WAS NO PRO-COMPETITIVE JUSTIFICATION FOR THE CHALLENGED RESTRAINTS ... 58
    C.   THE CHALLENGED RESTRAINTS INFLATED BUYER-BROKER COMMISSIONS AND HOME
       PRICES PAID BY HOMEBUYERS .................................................................... 60

IX.   CONTINUOUS ACCRUAL ............................................................................. 72

X.    STATUTE OF LIMITATIONS ......................................................................... 72

XI.   CLASS ACTION ALLEGATIONS ................................................................. 74

i

**XII. CLAIMS FOR RELIEF** .................................................................................................. **76**

**XIII. REQUESTED RELIEF** .................................................................................................. **141**

**DEMAND FOR JURY TRIAL** .............................................................................................. **141**

**THIRD AMENDED CLASS ACTION COMPLAINT**

Plaintiffs James Lutz, Scott Davis, Niall Adams, Mya Batton, Theodore Bisbicos, Aaron Bolton, Jason Boomsma, Michael Brace, Thomas Braun, Timothy Caruso, Sabrina Clark, Colleen Duval, James Edwards, Ryan Eisner, Steven Ewald, Carson Fairbourn, John Garrett, Brennon Groves, Darin Hendry, Anna James, Do Yeon Irene Kim, Jordan Kullmann, James Mullis, Daniel Parsons, Joshua Putt, John Sannar, Robert Sayles, Ben Shadle, Lisa Shankus, Brent Strine, Christine Van Woerkon, and Sherrie Wohl ("Plaintiffs"), individually and on behalf of all others similarly situated, asserts the following against Defendant HomeServices of America, Inc.; BHH Affiliates, LLC; and HSF Affiliates, LLC ("HomeServices"), and Douglas Elliman Inc. ("Douglas Elliman") (collectively, "Defendants") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## I.     INTRODUCTION

1.      This case challenges Defendants' unlawful agreements with the National Association of Realtors ("NAR") and other coconspirator brokerages with whom Defendants ostensibly compete to reduce competition amongst real estate agents assisting homebuyers. Defendants and their coconspirators unlawfully agreed to implement, maintain, and abide by anti-competitive rules ("Challenged Restraints") that encouraged overuse of buyer agents, increased their cost to homebuyers, and reduced the quality of their services. The net result of Defendants' conspiracy was that buyers overpaid for their homes.

2.      NAR is a trade association of real estate professionals with over 1.4 million members. Each of those members competes with the others in the business of helping buyers find homes to purchase. NAR also oversees local realtor associations throughout the country (e.g., MIAMI Association of Realtors). Each local realtor association is itself composed of local real

estate agents who ostensibly compete with one another in the business of helping buyers find homes to purchase.

3.      Brokers use Multiple Listing Services ("MLSs") to share information about homes for sale. An MLS is a database of properties listed for sale in a particular geographic region. The vast majority of homes in the United States are sold on an MLS. The home seller's broker (the "seller-broker") lists her client's home on the MLS, and the home buyer's broker (the "buyer-agent") uses the MLS to locate homes for her clients. In order to effectively market properties to buyers, seller-brokers must list their clients' properties on an MLS.

4.      The vast majority of MLSs are owned and operated by one or more local realtor associations governed by NAR. NAR Local realtor associations are themselves operated by NAR member real estate agents who compete with one another for business in helping buyers find homes to purchase.

5.      NAR issues mandatory policies that apply to NAR-affiliated MLS and NAR members through its Board of Directors and various committees, such as the Multiple Listing Policy Committee, the Professional Standards Committee, and the MLS Technology and Emerging Issues Advisory Board. NAR's Board of Directors, and each relevant committee, is composed of real estate agents who compete with one another for business in helping buyers find homes to purchase.

6.      In turn, the local realtor associations and the competitor brokerages who ran them agreed to restrict access to and use of their own particular MLS to only NAR members, or, at bare minimum, those following NAR's Code of Ethics and MLS Rules.

7.      For most of the 20th Century up through the 1970s, MLSs published commission schedules for all competitors to abide by, and NAR's Code of Ethics required agents to comply with the commission schedules.

8.      Faced with antitrust challenges to their commission schedules, NAR and the competitor brokerages who comprise NAR, agreed in the 1970s to include offers of compensation to other agents who procured a buyer to purchase the property, but only to agents who were working as "subagents" of the seller with no duty of loyalty to the buyer. There was no mechanism in the NAR or MLS Rules to permit offers of compensation to real estate agents who wanted to owe their duty of loyalty to the buyer instead.

9.      Prior to widespread adoption of the internet in the mid-1990s, MLSs maintained their listings primarily in hard copies that could only be accessed by other MLS members, which ensured that buyers wanting to see available homes for sale needed to work with an MLS participant. For the vast majority of MLSs, realtors could become participants only if they were NAR members and/or agreed to NAR's rules and the MLS's rules.

10.     By 1992, NAR and its membership of competitor brokers recognized that they were facing two existential threats: (1) following governmental investigation and other legal challenges, "subagency" with a duty of loyalty to the seller's agent was no longer a tenable model for guaranteeing compensation to agents that procured a buyer or for encouraging the use of buyer agents; and (2) technological advances, including the internet, opened the possibility for consumers to search databases of homes for sale and thereby bypass MLSs and buyer-brokers altogether. As NAR's President said to its members at the time in a since memorialized speech, "the lions were coming over the hill."

11.    To counteract these competitive threats, HomeServices and Douglas Elliman entered into agreements with their competitor brokerages to impose and abide by a series of anticompetitive restraints issued through NAR that would encourage overuse of buyer-brokers, restrict homebuyers' ability to view offered commissions, heavily restrict if not outright eliminate the ability for either sellers or buyers to negotiate the cost of buyer-brokers, remove incentives for buyer-brokers to compete based on price or quality, and permit real estate agents to misrepresent the cost of their services to homebuyers ("Challenged Restraints").

12.    The Challenged Restraints include:

    a.   requiring every seller-broker, when listing a property on an MLS, to make a "blanket unilateral offer[] of compensation" to any buyer-agent who may find a buyer for the home;

    b.   requiring the offer of compensation to the buyer-agent to be a blanket offer— i.e., the exact same compensation terms must be simultaneously offered to every buyer-agent without regard to their experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer;

    c.   prohibiting disclosure of the total commission—the commission due to the seller-broker and the portion of the commission earmarked for the buyer-agent—for any listing on a NAR MLS;

    d.   permitting buyer-agents to misrepresent to buyers that a buyer-agent's services are free, when in fact the buyer-agent is receiving a portion of the total commission that comes from the buyer's pocket;

    e.   enabling buyer-agents to filter MLS listings based on the offered commissions and to exclude lower-commission homes from consideration by prospective home buyers; and

    f.   severely restricting brokers' ability to modify the buyer-agent commission after the buyer-agent conveys a purchase offer.

13.    The Challenged Restraints were codified by Defendants and their co-conspirators in Former MLS Policy Statement 7.23, Former Standard of Practice 3-2, Former Standard of Practice 16-16, Former Standard of Practice 3-1, Former Standard of Practice 16-11, Former MLS Standard of Conduct 16.18, Former NAR Case Interpretation # 3-7, Former NAR Case Interpretation #16-16, Former NAR Case Interpretation #16-17, Former NAR Case Interpretation #16-15, Former MLS Policy Statement 7.58, Former MLS Rule Section 18.2.4, Former Model MLS Rule Section 19.12, Former Model MLS Rule Section 19.15, Former MLS Policy Statement 7.91, Former MLS Policy Statement 18.3.1, Model MLS Rule Section 10, Former MLS Policy Statement 7.3, Former Standard of Practice 12-1, and Former Standard of Practice 12-2.

14.    To become effective, the unlawful restraints were first agreed upon by the relevant NAR subcommittees, composed of real estate agents who would otherwise compete for the business of representing homebuyers, and then approved by NAR's Board of Directors and Executive Committee, also composed of real estate agents who would otherwise compete for the business of representing homebuyers.

15.    To be effective, all coconspirators had to abide by the rules and impose them throughout each NAR-affiliated MLS, which constituted an overwhelming majority of MLSs in the country. Absent an agreement to make the Rules mandatory, and for all major real estate brokers to abide by the Rules, it would have been in HomeServices' and Douglas Elliman's

economic self-interest to obtain market share by competing on price and quality of service for homebuying services and listings available for sale.

16.     Because HomeServices and Douglas Elliman are among the leading real estate firms in the United States, their participation in the conspiracy was essential to its success. Each plays an active role in NAR and has required franchisees, brokerages, and individual realtors to join in and implement NAR's anticompetitive agreements as a condition to receiving the benefits of their brand, brokerage infrastructure, and other support. HomeServices, Douglas Elliman, and their coconspirators used their control of the MLSs and their own governing policies to ensure adherence to NAR rules. Absent an agreement among their coconspirators, it would not have been HomeServices' and Douglas Elliman's economic self-interest to refrain from competing for homebuyers based on price and quality of service.

17.     HomeServices, Douglas Elliman, and their coconspirators further enforced the conspiracy by reviewing and reissuing NAR's rules at yearly NAR meetings and serving on the boards and committees that enforce compliance with NAR's rules. And their agents did so on a daily basis via the hundreds of real estate transactions that took place every day.

18.     On November 19, 2020, the Department of Justice ("DOJ") filed an antitrust complaint in the District of Columbia against NAR alleging that NAR's rules, policies, and practices "governing, among other things, the publication and marketing of real estate, real estate broker commissions, as well as real estate broker access to lockboxes" where keys required to gain access to a property are stored were "widely adopted by NAR's members resulting in a lessening of competition among real estate brokers to the detriment of American home buyers."[1]

---

[1] Complaint, *United States v. Nat'l Ass'n of REALTORS®*, No. 1:20-cv-3356 (D.D.C. July 1, 2021), ECF No. 1 at 1.

Simultaneously with the complaint, the DOJ announced a proposed settlement with NAR pursuant to which NAR committed to modifying its rules to provide greater transparency to home buyers. Assistant Attorney General Makan Delrahim explained that the settlement "prevents traditional brokers from impeding competition—including by internet-based methods of home buying and selling—by providing greater transparency to consumers about broker fees. This will increase price competition among brokers and lead to better quality of services for American home buyers and sellers."

19.     On July 1, 2021, however, the DOJ sought to withdraw its consent to the proposed settlement with NAR.[2] The DOJ wanted to ensure it would be able to conduct a "broader investigation of NAR's rules and conduct to proceed without restriction."[3] The DOJ further explained "we cannot be bound by a settlement that prevents our ability to protect competition in a market that profoundly affects Americans' financial well-being."[4]

20.     The conspiracy has substantially reduced competition in the market for buyer-agent services to the detriment of American home buyers. Specifically, the conspiracy causes overuse of buyer-agents and compensation at artificially high levels, which in turn causes home buyers to pay higher prices. The conspiracy also enabled brokers to "steer" home buyers away from lower commission homes. As a result, home buyers have been harmed in at least the following ways:

   a.   the conspiracy has inflated the cost of buyer-agent services by inflating buyer-agent commissions;

---

[2] *Id.*, Notice of Withdrawal of Consent, ECF. No. 14.

[3] Press Release, "*Justice Department Withdraws from Settlement with the National Association of Realtors*," Dep't of Justice (Jul. 1, 2021), https://www.justice.gov/opa/pr/justice-department-withdraws-settlement-national-association-realtors.

[4] *Id.*

b.   inflated buyer-agent commissions in turn have inflated home prices; and

c.   the conspiracy has reduced the quality of services provided by buyer-agents by, for example, facilitating the steering of home buyers by their brokers towards higher-commission homes and away from lower-commission homes, even though such homes may otherwise match buyers' criteria.

21.   The agreements individually and collectively among HomeServices, Douglas Elliman, and their coconspirators, unreasonably restrained trade in violation of state antitrust and consumer protection laws. Plaintiffs, on behalf of themselves and the Class, sue Defendants for these violations and seek treble damages and the costs of this lawsuit, including reasonable attorneys' fees.

22.   Plaintiffs and Class Members are home buyers who purchased their homes on MLSs affiliated with and governed by NAR. Plaintiffs bring this action against Defendant for agreeing, combining, and conspiring to enact impose, implement, and enforce anticompetitive restraints that reduced competition in the markets for buyer-agent services in violation of state antitrust statutes and consumer protection laws. Defendant's unlawful, anticompetitive conduct caused America's home buyers to pay inflated commissions for broker services misrepresented as free, to pay inflated prices for the homes they purchase, and to receive reduced quality broker services.

23.   Plaintiffs have also filed separate lawsuits against Defendants' co-conspirators in different forums for jurisdictional reasons. Defendants here, and their co-conspirators elsewhere, are jointly and severally liable for Plaintiffs' injuries. Plaintiffs seek damages here only to the extent those damages have not already been recovered from a co-conspirator.

## II.   JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a State different from Defendants.

25.     This Court has personal jurisdiction over HomeServices and Douglas Elliman. They have: (1) transacted business in the United States, including in this District; (2) transacted with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

26.     Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d). Each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.   THE PARTIES

### A.   Plaintiffs

27.     Plaintiff James Lutz is a resident of Colorado. In 2021, Mr. Lutz purchased a home in Key Colony, Florida using a buyer-agent broker that is a franchise of Defendant HomeServices and that operates under Defendants' "Berkshire Hathaway HomeServices" brand name. The home Mr. Lutz purchased was listed on the Florida Keys multiple listing service ("FLKMLS").[5] Upon information and belief, the FLKMLS is owned and/or run by the Florida Keys Board of REALTORS®, a NAR member that must adhere to NAR's guidelines and policies.[6]

---

[5] https://www.redfin.com/FL/Key-Colony-Beach/12-7-St-33051/home/139603903

[6] https://realtyna.com/mls-coverage/mls/florida-keys-mls-flkmls/

28.     Plaintiff Scott Davis is a resident of North Carolina. In 2022, Mr. Davis purchased a home in Greensboro, North Carolina using a buyer-agent broker from Allen Tate Real Estate, LLC, a subsidiary of co-conspirator Hanna Holdings, Inc. The home Mr. Davis purchased was listed on the Triad Multiple Listing Service. Upon information and belief, the Triad MLS is owned and/or run by the Greensboro Regional REALTORS® Association, a NAR member that must adhere to NAR's guidelines and policies.

29.     Plaintiff Niall Adams is a resident of Maine. In May 2024, Mr. Adams purchased a home in Freeport, Maine using a buyer-agent associated with co-conspirator Keller Williams. The property Mr. Adams purchased was listed on the MLS Maine Listings, which upon information and belief is owned and operated by the Maine Association of REALTORS®, a member of NAR, and it imposed the NAR rules alleged herein to be anticompetitive.

30.     Plaintiff Mya Batton is a resident of Tennessee. In 2020, Ms. Batton purchased a home in Mount Juliet, Tennessee using a buyer-agent. The property was listed on the MLS RealTracs, which upon information and belief is a member of NAR, or owned and operated by members of NAR, and it imposed the NAR rules alleged herein to be anticompetitive.

31.     Plaintiff Theodore Bisbicos is a resident of Massachusetts. In 2021, Mr. Bisbicos purchased a home in Chelsea, Massachusetts using a buyer-agent. The home Mr. Bisbicos purchased was listed on the MLS Property Info Network ("MLSPIN"). Upon information and belief, the MLSPIN is run entirely by NAR members who must adhere to NAR's guidelines and policies.

32.     Plaintiff Aaron Bolton is a resident of Florida. In 2021, Mr. Bolton purchased a home in Parrish, Florida using a buyer-agent. The property was listed on the MLS Stellar MLS,

which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

33.     Plaintiff Jason Boomsma is a resident of Wisconsin. In March 2022, Mr. Boomsma purchased a home in Mount Horeb, Wisconsin using a buyer-agent affiliated with Defendant HomeServices of America, Inc. The property was listed on the MLS Wisconsin Real Estate Exchange, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

34.     Plaintiff Michael Brace ("Brace") is a resident of Kansas. In 2020, Brace purchased a home in Wichita, Kansas using a buyer-agent. The home Brace purchased was listed on the South Central Kansas multiple listing service ("SCK MLS"). Upon information and belief, the SCK MLS is owned and/or run by realtors of South Central Kansas, an NAR member that must adhere to NAR's guidelines and policies.

35.     Plaintiff Thomas Braun is a resident of North Carolina. In September 2022, Mr. Braun purchased a home in Hendersonville, North Carolina using a buyer-agent. The property was listed on the MLS GRiD, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

36.     Plaintiff Timothy Caruso is a resident of New Hampshire. In October 2022, Mr. Caruso purchased real estate in Raymond, New Hampshire using a buyer-agent. The property was listed on PrimeMLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

37.     Plaintiff Sabrina Clark is a resident of Iowa. In 2021, Ms. Clark purchased a home in West Des Moines, Iowa using a buyer-agent associated with co-conspirator Anywhere. The property was listed on MLS Des Moines Area Association of Realtors, which upon information

and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

38.     Plaintiff Colleen Duval is a resident of California. In August 2023 Ms. Duval purchased a home in Rancho Cucamonga, California using a buyer-agent. The property was listed on the California Regional MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

39.     Plaintiff James Edwards is a resident of California. In July 2022, Mr. Edwards purchased a home in Palm Springs, California using a buyer-agent. The property was listed on the CDAR MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

40.     Plaintiff Ryan Eisner is a resident of Illinois. In May 2021 he purchased a home in Chicago, Illinois using a buyer-agent. The property was listed on the listed on the MLS Midwest Real Estate Data, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

41.     Plaintiff Steven Ewald is a resent of Illinois. In October 2022, Mr. Ewald purchased a home in Evanston, Illinois using a buyer-agent. The property was listed on the MLS Midwest Real Estate Data, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

42.     Plaintiff Carson Fairbourn is a resident of Utah. In October 2020, Mr. Fairbourn purchased a home in Sandy, Utah using a buyer-agent. The property was listed on the Wasatch Front Regional MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

43.     Plaintiff John Garrett is a resident of West Virginia. In July 2023, Mr. Garrett purchased a home in Lewisburg, West Virginia using a buyer-agent. The property was listed on the MLS Greenbriar Valley MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

44.     Plaintiff Brennon Groves is a resident of Maryland. In October 2022, Mr. Groves purchased a home in Waldorf, Maryland using a buyer-agent. The property was listed on the MLS Bright MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

45.     Plaintiff Darin Hendry is a resident of Missouri. In February 2022, Mr. Hendry purchased a home in St. Peters, Missouri using a buyer-agent. The property was listed on the MLS Maris MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

46.     Plaintiff Anna James is a resident of North Carolina. In 2022, Ms. James purchased a home in Greensboro, North Carolina using a buyer-agent. Also in 2022, Ms. James purchased a home in High Point, North Carolina using a buyer-agent. Both properties were listed on the MLS Triad MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

47.     Plaintiff Do Yeon Irene Kim is a resident of Florida. In 2018, Ms. Kim purchased a home in Orlando, Florida using a buyer-agent. The property was listed on the MLS Stellar MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

48.     Plaintiff Jordan Kullmann is a resident of Minnesota. In September 2022, Mr. Kullmann purchased a home in Plymouth, Minnesota using a buyer-agent. The property was listed on the MLS Northstar MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

49.     Plaintiff James Mullis is a resident of Nevada. In 2020, Mr. Mullis purchased a home in Henderson, Nevada using a buyer-agent. The property was listed on the MLS GLVAR, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

50.     Plaintiff Daniel Parsons is a resident of New Mexico. In 2021, Mr. Parsons purchased a home in Rio Rancho, New Mexico using a buyer-agent. The property was listed on the MLS SWMLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

51.     Plaintiff Joshua Putt is a resident of Arizona. In September 2020, Mr. Putt purchased a home in Maricopa, Arizona using a buyer-agent. The property was listed on the MLS ARMLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

52.     Plaintiff John Sannar is a resident of Virginia. In June 2020, Mr. Sannar purchased a home in Alexandria, Virginia using a buyer-agent. The property was listed on the MLS Bright MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

53.     Plaintiff Robert Sayles is a resident of South Carolina. In May 2019, Mr. Sayles purchased a home in Mount Pleasant, South Carolina using a buyer-agent. The property was listed

on the MLS Broker Reciprocity, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

54.     Plaintiff Benjamin Shadle is a resident of Washington D.C. In March 2021, Mr. Shadle purchased a home in Washington D.C. using a buyer-agent. The property was listed on the MLS Bright MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

55.     Plaintiff Lisa Shankus is a resident of Michigan. From 2018 to 2021 Ms. Shankus purchased multiple homes in Michigan using a buyer-agent. The properties were listed on several MLSs, which upon information and belief were members of NAR, or owned and operated by NAR members, and they imposed the NAR rules alleged herein to be anticompetitive.

56.     Plaintiff Brent Strine is a resident of Oregon. In May 2019, Mr. Strine purchased a home in Oregon City, Oregon using a buyer-agent. The property was listed on the MLS Oregon Data Share, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

57.     Plaintiff Christine Van Woerkon is a resident of Connecticut. In 2023, Ms. Van Woerkon purchased a home in Sterling, Connecticut using a buyer-agent. The property was listed on the MLS Smart MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

58.     Plaintiff Sherrie Wohl is a resident of New York. In March 2023, Ms. Wohl purchased a home in Roslyn, New York using a buyer-agent. The property was listed on the MLS One Key Realty, which upon information and belief is a member of NAR, or owned and operated by NAR members, and imposed the NAR rules alleged herein to be anticompetitive.

###### B.    Defendants

59.    Defendant HomeServices of America, Inc. is one of the nation's largest real estate brokerages. It is a Delaware Corporation with its principal place of business in Minneapolis, Minnesota and an affiliate of Berkshire Hathaway. HomeServices owns Defendants HSF Affiliates, LLC ("HSF") and BHH Affiliates, LLC ("BHH"), as well as dozens of brokerages across the country, including in Florida. HomeServices' Florida brokerages include EWM Realty, Florida Realty, Florida Network Realty, Beach Properties of Florida, and Roberts Brothers.

60.    HomeServices also establishes real estate broker franchises throughout the United States, including in this District. Upon information and belief, HomeServices provides financing to its franchisees, provides them with marketing materials and support, conducts on-site and group visits with franchisees, provides training materials and mandatory curriculum, and much more to its franchises, including those in Florida.

61.    HSF and BHH are both Delaware limited liability companies headquartered in Irvine, California and wholly owned by HomeServices. HSF operates and manages real estate brokerages across the country, including in Florida, such as Real Living Real Estate, LLC, a full-service real estate brokerage franchise company. BHH is a residential real estate franchisor for Berkshire Hathaway HomeServices ("BHHS"), which is a service mark that franchisees obtain the right to use via a franchise agreement. Neither BHH nor Real Living Real Estate, LLC ("RLRE") have employees. Instead, all employees involved in their operations are employees of HSF.

62.    HomeServices sets financial goals and provides legal and risk oversight and input to its brokerages and subsidiaries. In 2023, HomeServices' annual sales were $136.1 billion.

63.    This Complaint refers to HomeServices, HSF and BHH as "HomeServices."

64.    HomeServices has approximately 53,000 agents in 1,612 offices in 50 different states. HomeServices of America, Inc. owns some brokerages, some of which are BHH Affiliates

franchisees. HomeServices of America, Inc. also owns individual brokerages that are not branded BHHS, such as Long & Foster, which was acquired in 2017.

65.      The following real estate agencies are subsidiaries of HomeServices: Fox & Roach; First Weber; Lovejoy Realty, Inc.; Long Realty (operating in Tucson, Arizona); Ebby Halliday Real Estate, Inc., EWM Realty (operating in Florida); Kentwood Real Estate (operating in Colorado); Preferred Carolinas Realty, BHH Arizona Properties; BHH California Properties; BHH Nevada Properties.

66.      Throughout the United States, HomeServices franchises and affiliates usually ████████████████████████████████████████████[7]

67.      Real estate agents who work at franchisees and brokerages owned by HomeServices ████████████████████████[8] Even within a single brokerage, ██████ ███████████████████████.[9] HomeServices franchisees can ██████████ ████████████.[10]

68.      Douglas Elliman Inc. ("Douglas Elliman") is a publicly traded real estate brokerage company incorporated in Delaware with its principal place of business in Florida. Douglas Elliman



[7] ██████████████████████████████
[8] ███████████████████████████████████████████
███████████████████████████
[9] ███████████████████████████████████████████
[10] ███████████████████████████████████████████

owns Douglas Elliman Realty LLC, which provides residential real estate brokerage services. Douglas Elliman Realty LLC is the sixth-largest residential brokerage company in the United States. In 2022, Douglas Elliman was engaged in over 26,000 transactions with a sales volume valued at over $42 billion. Douglas Elliman has over 20 offices with approximately 6,900 real estate agents. As used herein, the term "Douglas Elliman" will refer collectively to Douglas Elliman, Inc. and Douglas Elliman Realty LLC.

### C.    Coconspirators

69.    HomeServices' competitors include eXp World Holdings, Inc., Keller Williams Realty, Inc., Anywhere Real Estate, Inc. formerly known as Realogy Holdings Corp., RE/MAX LLC, and others.

70.    Defendants' coconspirators include the three largest real estate brokers in the country: Anywhere, RE/MAX, and Keller Williams. Their coconspirators further include Compass, Inc. ("Compass"), eXp, Redfin Corporation, Weichert Realtors, United Real Estate Group, and Howard Hanna Real Estate Services. Plaintiffs' counsel has brought suit against these coconspirators, as well as NAR, in two related litigations. Plaintiffs do not seek a double recovery and will account for any damages recovered from a co-conspirator in these separate litigations.

71.    Franchisees and brokers of HomeServices and Douglas Elliman also participated as coconspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each complied with and implemented the Challenged Restraints in the geographic areas where the NAR MLSs operate. In addition, other brokers in these areas have participated as coconspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These other brokers complied with and implemented the Challenged Restraints in these geographic areas.

## IV.     BACKGROUND ON NAR AND THE REAL ESTATE INDUSTRY

### A.     NAR and Affiliated MLSs

72.     NAR is the largest trade association in America, composed of REALTORS® (real estate agents registered with NAR), including residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry across the United States. Members belong to one or more of NAR's approximately 1,200 local associations or boards and/or 54 state and territory associations. NAR's local associations and affiliated MLSs govern the conduct of NAR's 1.4 million member REALTORS®. NAR's members, including member brokers, are competitors.

73.     Among other activities, NAR establishes and enforces rules, policies, and practices that are adopted by NAR's local associations and their affiliated MLSs and that, in turn, must be complied with by REALTORS® and other agents who desire access to a NAR-affiliated MLS. Examples include a Code of Ethics and a Handbook on Multiple Listing Policy (the "Handbook").[11] The Handbook "is intended to guide member associations of REALTORS® in the operation of multiple listing services consistent with the policies established by the National Association's Board of Directors."[12] NAR requires local REALTOR® associations to follow and enforce the Handbook.[13]

---

[11] *See* NAR Website—Governing Documents, *available at* https://www.nar.realtor/about-nar/governing-documents (last visited Apr. 17, 2025).

[12] *See* 2025 NAR Handbook at iii, *available at* https://www.nar.realtor/sites/default/files/2025-01/PDF-HMLP-2025-Handbook-on-Multiple-Listing-Policy-2025-01-23.pdf (last visited Apr. 17, 2025).

[13] *See* 2025 NAR Handbook at iii, 8, 35–39, *available at* https://www.nar.realtor/sites/default/files/2025-01/PDF-HMLP-2025-Handbook-on-Multiple-Listing-Policy-2025-01-23.pdf (last visited Apr. 17, 2025).

74.     NAR rules are enforced by local MLS associations, typically in conjunction with the association of REALTORS®.[14] Local MLSs with an NAR charter that do not follow NAR rules and policies could have their charter revoked, lose NAR insurance, and have their officers removed.[15]

75.     Membership in NAR provides real estate professionals with a number of benefits, including liability insurance, access to MLSs, training, and more.

76.     NAR rules are first recommended by relevant committees, such Multiple Listing Policy Committee, the Professional Standards Committee, or the MLS Technology and Emerging Issues Advisory Board. NAR's Board of Directors is then required to approve any NAR rule.

77.     When REALTORS® from various brokerage companies serve on NAR boards and committees, they owe a fiduciary duty to NAR.[16]

78.     The vast majority of home sellers and buyers are represented by brokers, including those registered with NAR. According to NAR, in 2020, 89% of sellers sold their home with assistance from a seller-broker, and 88% of buyers purchased their home with assistance from a buyer-agent.

79.     State licensing laws regulate who can represent sellers and buyers in the real estate market. Two categories of entities may be licensed under state law: (1) the real estate broker (also known as a "brokerage firm"); and (2) the individual real estate licensee or agent. Real estate brokers are legally responsible for the activities of their licensed agents.

---

[14]  *See* Gansho Testimony in 10/24/23 *Burnett* Tr. Vol. 6 at 1184:14-2.

[15]  *See Burnett* Pl. Trial Ex. 334 (12/21/18 email from Gansho); Gansho Testimony in 10/24/23 *Burnett* Tr. Vol. 6 at 1248:2-1253:3 (discussing *Burnett* Pl. Trial Ex. 334).

[16]  *See* Gansho Testimony in 10/24/23 *Burnett* Tr. Vol. 6 at 1272:18-1274:1.

80.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. For that reason, all contracts for real estate services must be with brokers, not agents, and all payments are made to brokers, not agents. Brokerage firms pay their individual agents. For ease of reference, this Complaint generally refers to brokers and agents interchangeably.

81.     Brokers typically share and find information about houses for sale on an MLS. An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their individual realtors so long as they comply with the rules of the MLS. MLSs function as joint ventures between real estate brokers to publish and share information about property listings in specified geographic areas.

82.     MLSs also act as the main sources of listings for online websites, such as Zillow, through which many prospective home buyers find homes. However, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.

83.     Most MLSs require someone to be a REALTOR® to access the database. The general public is typically not provided MLS access.

84.     Due to near industry-wide participation and control over important data, brokers offering MLSs possess and exercise power in the markets for the provision of real estate brokerage services to home buyers and sellers throughout the country. If a seller-broker does not list a client's property on an MLS, many buyer-agents will not show that property to prospective buyers.

85.     NAR controls a substantial number of the MLSs in the United States. The NAR MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR. NAR's map of affiliated MLSs reflects NAR's wide reach.

**Figure 1**[17]



**B.**      **NAR's History of Anticompetitive Restraints.**

86.      NAR's Code of Ethics in 1914 encouraged REALTORS® to maintain local

industry commission rates.[18]

87.      NAR's Code of Ethics in 1924 encouraged REALTORS® to set commission rates

according to those suggested by local REALTOR® associations.[19]

---

[17] MLS Map of the National Association of REALTORS®, NAR, https://www.nar.realtor/mls-map-of-the-national-association-of-realtors (last accessed Aug. 5, 2021).

[18] *See* NAR 1914 Code of Ethics at Article 9 ("If the commission which it is usual to charge in the locality in which the broker is operating, is a fair one to the owner and broker alike, each broker owes it to himself, to his other clients as well as to his fellow brokers, to maintain the rate."), *available at* https://www.nar.realtor/sites/default/files/documents/COE1914.pdf (last visited Apr. 17, 2025).

[19] *See* NAR 1924 Code of Ethics at Article 9 ("The schedules of fees established by the various real estate boards are believed to represent fair compensation for services rendered in their communities and should be observed by every Realtor."), *available at* https://www.nar.realtor/about-nar/history/1924-code-of-ethics (last visited Apr. 17, 2025).

88.     In 1950, the Supreme Court found a local REALTOR® board violated the Sherman Act by setting standard commissions based on a schedule of fees. *See United States v. Nat'l Assoc. Real Estate Boards*, 339 U.S. 485 (1950).

89.     By the 1950s, a 5% "commission rate was quite uniform across the U.S.," and began to increase to 6% in 1958 throughout the country.[20]

90.     Soon after the Supreme Court's decision in *Nat'l Assoc. Real Estate Boards*, local REALTOR® boards and MLSs began "recommending" or "suggesting" commission rates, including efforts by REALTORS® in California and Maryland to set commissions at 6% or above; NAR ultimately abolished use of recommended fees in 1971 after objections and lawsuits by the U.S. Department of Justice.[21]

91.     Since the 1980s, real estate agents have generally been charging 5–6% commission for one residential transaction.[22]

---

[20] *See* Federal Trade Commission, *The Residential Real Estate Brokerage Industry* (Dec. 1983) at 196, *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/The-Residential-Real-Estate-Brokerage-Report--Butters-Report.pdf (last visited Apr. 17, 2025).

[21] *See* Federal Trade Commission, *The Residential Real Estate Brokerage Industry* (Dec. 1983) at 197–99, *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/The-Residential-Real-Estate-Brokerage-Report--Butters-Report.pdf (last visited Apr. 17, 2025); U.S. Government Accountability Office, *Real Estate Brokerage: Factors That May Affect Price Competition*, GAO-05-947 (Aug. 2005) at 12–13, *available at* https://www.gao.gov/assets/gao-05-947.pdf (last visited Apr. 17, 2025).

[22] *See* Figgs Dep. Designation at *Burnett* Trial at 23:20-26:15 (introduced at 10/18/23 *Burnett* Tr. Vol. 2 at 207:6-14) (discussing *Burnett* Pl. Trial Ex. 660, KWRI_00338229); U.S. Government Accountability Office, *Real Estate Brokerage: Factors That May Affect Price Competition*, GAO-05-947 (Aug. 2005) at 9, *available at* https://www.gao.gov/assets/gao-05-947.pdf ("Although comprehensive data on brokerage fees are lacking, past analyses and anecdotal information from industry analysts and participants indicate that, historically, commission rates have remained relatively uniform across markets and over time. Various studies using data from the late 1970s through the mid-1980s found evidence that the majority of listings in many communities clustered around the same rate, exactly 6 percent or 7 percent.... Many of the industry analysts and participants we interviewed said that commissions still cluster

92. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮.[23]

93.     Under NAR model rules for MLSs in place before 1996, listing brokers would offer to share commissions with brokers assisting buyers as the listing broker's subagent, meaning that buyer's brokers owed a fiduciary duty only to the seller.[24]

94.     As one academic noted:

For most of the last century, the legal relationships between brokers and their clients were simple: Listing brokers represented sellers, and agents who worked with buyers did so as "subagents" of the listing broker. All of the agents involved in a transaction owed their allegiance to the seller, and buyers were unrepresented....

The concept of subagency helped the National Association of Realtors, and its state and local Realtor associations, establish the multiple listing service as the dominant method of marketing properties, limiting the legal liability of their members, and shielding Realtor associations and MLSs from antitrust claims.[25]

95.     Home buyers eventually started to learn that they lacked any representation in house transactions, they started complaining and expressing confusion, and 44 states passed mandatory disclosure laws requiring home buyers to be adequately informed about subagency; this caused NAR to analyze the subagency issue beginning in July 1991.[26]

---

around a common rate within most markets, and they generally cited rates of 5 percent to 6 percent as typical now.") (last visited Apr. 17, 2025).

[23] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[24] *See* S. Millett Testimony in 10/23/23 *Burnett* Tr. Vol. 5 at 940:13-941:11, 944:10-24, 980:20-24, 982:14-17.

[25] *See* Carter, Matt, "From Subagency to Non-Agency: A History," *Inman* (Feb. 17, 2012), *available at* https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history/ (last visited Apr. 18, 2025)).

[26] *See Burnett* Def. Trial Ex. D-3533A, NARSITZER0000005797 at 5799, 5817 (March 1992 Report of the Presidential Advisory Group on Agency); S. Millett Testimony in 10/23/23 *Burnett* Tr. Vol. 5 at 941:12-942:9, 980:25-983:13.

96.    "Subagency had worked so well, and for so long, that the brokerage industry's first response to the new threat was to defend the practice. The legal liability associated with subagency represented a threat to mandatory cooperation between brokers and the MLS itself.… For years, MLSs had successfully argued that they could require members to be Realtors, because only brokers who had pledged to follow the Realtor code of ethics could be entrusted with automatic offers compensation as subagents of the listing broker."[27]

97.    In July 1992, NAR abandoned the subagency rule and instead adopted the Challenged Restraints.[28]

98.    The Challenged Restraints created a culture of cooperation among competing real estate agents, including the payment of cooperative commissions, that would disappear if NAR died.[29]

99.    According to NAR, broker cooperation sets the United States real estate industry apart from the rest of the world.[30]

---

[27]  *See* Carter, Matt, "From Subagency to Non-Agency: A History," *Inman* (Feb. 17, 2012), *available at* https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history/ (last visited Apr. 18, 2025)).

[28]  *See Burnett* Def. Trial Ex. D-3537, NARSITZER0000006700 at 6701 (04/28/92 NAR Board Minutes, Recommendation #1); S. Millett Testimony in 10/23/23 *Burnett* Tr. Vol. 5 at 949:16-951:16, 1026:6-1027:17 (Realtor® for Millett Realty Company and president of NAR in 1999).

[29] *See Burnett* Pl. Trial Ex. 215, NARSITZER0000550775 (06/08/18 email); 11/22/21 Goldberg Dep. in *Burnett* at 166:15-167:20 (introduced at 10/17/23 *Burnett* Tr. Vol. 1 at 182:22-183:15) (discussing *Burnett* Pl. Trial Ex. 215).

[30]  *See* 11/22/21 Goldberg Dep. in *Burnett* at 209:21-210:13 (introduced at 10/17/23 *Burnett* Tr. Vol. 1 at 182:22-183:15) (discussing *Burnett* Pl. Trial Ex. 219).

100.    According to NAR publications in 2014 and 2016, the dual tradition of competition and cooperation in the real estate profession presents frequent opportunities for antitrust misconduct.[31]

101.    The U.S. Department of Justice and the Federal Trade Commission have noted: "Under the MLS system, listing brokers rely on cooperating brokers to procure a buyer in the majority of transactions."[32]

102.    The U.S. Department of Justice and the Federal Trade Commission have noted: "The cooperation between brokers characterizing many real estate transactions clearly provides incentives for adhering to the 'going rate' commission. A brokerage firm that solicits listings by offering lower commissions may find itself disadvantaged since agents from other firms may prefer to concentrate their efforts where higher commissions are available."[33]

103.    The United States Government Accountability Office concluded in 2005 that: "One potential cause of the industry's apparent lack of price variation is the use of multiple listing services (MLS), which facilitates cooperation among brokers in a way that can benefit consumers but may also discourage participating brokers from deviating from conventional

---

[31] *See Burnett* Pl. Trial Ex. 207 at pp. 5–6 (2014 NAR Antitrust Compliance Guide for REALTORS® noting the dual tradition of competition and cooperation "presents opportunities for antitrust suspicion and occasionally misconduct almost on a daily basis"); 11/22/21 Goldberg Dep. in *Burnett* at 53:16-22, 61:17-62:11 (introduced at 10/17/23 *Burnett* Tr. Vol. 1 at 182:22-183:15) (discussing *Burnett* Pl. Trial Ex. 207); *Burnett* Pl. Trial Ex. 205A at p. 7 of 8 (2016 NAR Real Estate Brokerage Essentials stating, "This dual tradition of competition and cooperation, which exists in few other professions, presents frequent opportunities for antitrust misconduct .…"); Gansho Dep. Designation at *Burnett* Trial at 55:3-55:25, 61:10-62:10, 66:25-69:9 (introduced at 10/18/23 *Burnett* Tr. Vol. 2 at 206:21-25) (discussing *Burnett* Pl. Trial Exs. 205A & 207).

[32] *See* U.S. Dep't of Justice and Federal Trade Commission, Competition in the Real Estate Brokerage Industry (Apr. 2007) at 67.

[33] *See id.*

commission rates. For instance, an MLS listing gives brokers information on the commission that will be paid to the broker who brings the buyer to that property. This practice potentially creates a disincentive for home sellers or their brokers to offer less than the prevailing rate, since buyers' brokers may show high-commission properties first."[34]

104.    The United States Government Accountability Office concluded in 2005 that: "When choosing among comparable homes for sale, brokers have a greater incentive—all else being equal—to first show prospective buyers homes that offer other brokers the prevailing commission rate than homes that offer a lower rate. Therefore, even without formal policies to maintain uniform rates, individual brokers' reliance on the cooperation of other brokers to bring buyers to listed properties may help maintain a standard commission rate within a local area, at least for buyers' brokers."[35]

## V.    THE CHALLENGED RESTRAINTS

105.    NAR's Handbook, Code of Ethics, and Standards of Practice, among other policies, impose rules, policies, and practices on all NAR members, including NAR MLSs. Certain of these rules, practices, and policies significantly restrain competition for the provision of buyer-agent services and harm home buyers across the United States.

106.    Compliance with NAR's rules is mandatory for NAR membership. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and

---

[34] *See* U.S. Government Accountability Office, *Real Estate Brokerage: Factors That May Affect Price Competition*, GAO-05-947 (Aug. 2005) at "What GAO Found," *available at* https://www.gao.gov/assets/gao-05-947.pdf (last visited Apr. 17, 2025).

[35] *See* U.S. Government Accountability Office, *Real Estate Brokerage: Factors That May Affect Price Competition*, GAO-05-947 (Aug. 2005) at 13, *available at* https://www.gao.gov/assets/gao-05-947.pdf (last visited Apr. 17, 2025).

opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

107.    Additionally, NAR's Handbook on Multiple Listing Policy provides that "Association and Association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."

108.    NAR's rules included until recently: (i) the Buyer-Agent Commission Rule; (ii) a prohibition on disclosing to buyers the total commissions paid to brokers upon the sale of a house ("Concealment Rule"); (iii) rules permitting and encouraging buyer-agents to represent to home buyers that their services are free ("Free-Service Rule"); (iv) rules allowing and making it easy for buyer-agents to filter MLS listings to only those with high commissions ("Filter Rules"); and (v) rules restricting sellers and seller-brokers' ability to modify the commissions offered to buyer-agents after an offer to purchase the listed home has been made ("Commission Modification Rules").

109.    These Challenged Restraints constitute an agreement among competitors. NAR members can participate in the MLS, and gain the benefits provided by NAR and the NAR MLS, as long as they agree to adhere to and enforce the anticompetitive restraints set forth in NAR's rules, practices, and policies. Thus, NAR's rules and their adoption and enforcement by NAR MLSs' that are in turn operated by a consortium of competing brokers, reflected concerted action between horizontal competitors, and constituted agreements among competing real estate brokers that reduced price competition among brokers, encouraged overuse of buyer-brokers, and led to higher prices and lower quality service for American home buyers.

A.      **The Buyer-Agent Commission Rule**

110.    Per NAR mandatory rules in place since the 1990s, under the unilateral offer of cooperation and compensation principle in the real estate industry for all houses listed on the MLS, there is a requirement that the seller's agent makes a unilateral offer of compensation to the buyer's agent to be paid from the sale proceeds expressed either as a percentage of the gross selling price or a definite dollar amount.

111.    In 1996, the Handbook set forth the Buyer-Agent Commission Rule as follows: "In filing a property with the Multiple Listing Service of a Board of Realtors® the Participant makes a blanket unilateral offer of cooperation to the other MLS Participants, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants."[36]

112.    The 1996 Handbook further stated that "multiple listing services shall not publish listings that do not include an offer of compensation ***expressed as a percentage of the gross selling price or as a definite dollar amount***, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[37]

113.    From November 2004 to at least 2023, NAR rules stated: "In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other

---

[36] *See Burnett* Def. Trial Ex. D-3557, NARSITZER0000020199 at 0230 (1996 NAR Handbook of Multiple Listing Policy, Policy Statement 7.23); *Burnett* Def. Trial Ex. D-3564, NARSITZER00000756192 at 6202 (showing Policy Statement 7.23 "made, seconded and carried").

[37] *See Burnett* Def. Trial Ex. D-3557, NARSITZER0000020199 at 0230 (1996 NAR Handbook of Multiple Listing Policy, Policy Statement 7.23) (emphasis added).

MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants."[38]

114.    From November 1996 to at least 2023, NAR rules stated: "Multiple listing services shall not publish listings that do not include an offer of compensation *expressed as a percentage of the gross selling price or as a definite dollar amount*, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[39]

115.    The NAR Code of Ethics required the selling agent to compensate the buyer's agent.[40] The NAR Code of Ethics stated in part: "In cooperative transactions, REALTORS® shall compensate cooperating REALTORS® (principal brokers) …."

116.    According to HomeServices of America Inc.'s former president and CEO (Gino Blefari):  (1) ██████████████████████████████████████████████████████

███████████████████████████████████████████████,[41] (2) ███

███████████████████████████████████████████████████████[2]

---

[38] *See Burnett* Pl. Trial Ex. 136 at p. 33 (2015 NAR Handbook on Multiple Listing Policy, Policy Statement 7.23); *Burnett* Pl. Trial Ex. 1709 at p. 39 (2022 NAR Handbook on Multiple Listing Policy, Policy Statement 7.23); *Burnett* Pl. Trial Ex. P-4587 at p. 39 (2023 NAR Handbook on Multiple Listing Policy, Policy Statement 7.23).

[39] *See Burnett* Pl. Trial Ex. 136 at p. 34 (2015 NAR Handbook on Multiple Listing Policy, Policy Statement 7.23); *Burnett* Pl. Trial Ex. 1709 at p. 40 (2022 NAR Handbook on Multiple Listing Policy, Policy Statement 7.23); *Burnett* Pl. Trial Ex. P-4587 at p. 40 (2023 NAR Handbook on Multiple Listing Policy, Policy Statement 7.23) (emphasis added).

[40] *See* 10/19/22 Warner 30(b)(6) Dep. in *Burnett* at 29:21-30:4 (introduced at 10/23/23 *Burnett* Tr. Vol. 5 at 892:6-11).

[41] *See* █████████████████████████████; Blefari Testimony in 10/25/23 *Burnett* Tr. Vol. 7 at 1484:10-19.

[42] *See* █████████████████████████████.

and (3) ████████████████████████████████████████████

██████████████████████████████.[43]

117.   ██████████████████████████████.[44]

### 1.   The Clear Cooperation Policy was Enacted to Bolster the Buyer-Agent Commission Rule.

118.   To force as many home listings as possible onto the MLS in the face of competitive threats from companies like Zillow and to thus trigger the Buyer-Agent Commission Rule, NAR—with help from HomeServices—passed the Clear Cooperation Policy in November 2019.

119.   NAR Rule 8.0 (a/k/a the "Clear Cooperation Policy" or "Off-MLS listing rule") says, "Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants."

120.   When the NAR's MLS Technology and Emerging Issues Advisory Board was putting together proposed language for NAR Rule 8.0, █████████████████████████

███████████████████████████████████.[45]

121.   Several Realtors® spoke out in opposition to the proposed NAR Rule 8.0, citing antitrust concerns:

a.   ████████████████████████████████████████████

████████████████████████████████."[46]

---

[43] *See* ████████████████████████████████ *accord* ████████████████████
████████████.

[44] *See* ██████████████████████████

[45] *See* ██████████████████████████

[46] *See* ██████████████████████████████████████
████████████████████████████████

b. ███████████████████████████████████████

████████████████████████████████████████

████████████

c. ████████████████████████████████████████

████████████████████████

d. ████████████████████████████████████████

████████

e. ██████████████████████████████████

███████████████████.

f. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████[47]

122. ████████████████████████████████████

███████████████████████████████████████.[49] As part of that support

<hr />

[47] *See also* ████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████

[48] *See* ████████████████████████████████████
███████████████████████████████████

[49] *See* ████████████████████████████████████
████████████████████████████

for NAR Rule 8.0, HomeServices supported the following advocacy:



123.    One reason HomeServices pushed for NAR Rule 8.0 to be adopted was because ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[51]

124.    The NAR Handbook also addresses NAR Rule 8.0, stating "Within one business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with the other participants."

125.    Because all HomeServices agents and brokers belong to an MLS, they are required to list their properties within one business day of marketing the property.

126.    Because all Douglas Elliman agents and brokers belong to an MLS, they are required to list their properties within one business day of marketing the property.

127.    Local MLSs sometimes have their own NAR Rule 8.0 mirroring the NAR's similar rule that real estate agents are obligated to follow.

**B.    The Commission Concealment Rule**

128.    The anticompetitive effects of NAR's Buyer-Agent Commission Rule are magnified by additional rules adopted and enforced by Defendants. NAR's Commission Concealment Rule prohibits disclosing to prospective buyers the total commissions offered to buyer-agents. So, while buyer-agents can see the commission they will earn if their client



[50] *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[51] *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

purchases a property, NAR MLSs conceal this fee from the home buyers who will actually pay the commission through the home purchase price.

129.    HomeServices, Douglas Elliman, and their co-conspirators agreed to, instituted, and abided by series of rules ensuring commission concealment from buyers. These rules are laid out in several places in NAR's Handbook, including Policy Statement 7.23, which states "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."

130.    Simultaneously, the Challenged Restraints agreed to by Defendants and their co-conspirators mandated price information sharing among brokers through its MLS rules. This type of one-way information exchange agreement eliminated the need for buyer-agents to compete on price by offering rebates or accepting lower commissions. It also encouraged and enabled brokers to set persistently high commission offers, leading to higher prices for buyer-agent services. Additionally, since buyers could not see commission offers, they could not detect or resist steering, which is the practice of not showing homes to buyers or directing buyers towards homes based on the offered commission. Steering results in higher prices and reduces the quality of buyer-agent services for home buyers.

131.    █████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████[52]



---

[52] *See* ████████████████████████████████████████████

████████████████████████████████████

132.    HomeServices, Douglas Elliman, and their co-conspirators implemented the Commission Concealment Rule in each MLS they operated, which are themselves controlled by the co-conspirators. Absent an agreement, it would have been in each MLS's economic self-interest, and also in each Defendant's individual self-interest, to compete for homebuyers by displaying to them the charges for buyer-broker services and by removing the ability for brokers to steer unwitting homebuyers away from properties that otherwise met their qualifications.

### C.    NAR's Free-Service Rule

133.    NAR's Free-Service Rule, which has been widely adopted by NAR MLSs, encouraged buyer-agents to mislead buyers into thinking that the buyer-agent's services are free when they are not.

134.    Until January 2021, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer-agents governed by NAR are technically paid through the seller-broker, those buyer-agents can always tell their buyer clients that their services are free. As a result, buyers think they are paying nothing for buyer-agent services.

135.    Because buyers do not believe they are paying anything for brokerage services, they are unlikely to (1) attempt to negotiate a lower buyer-agent commission and/or (2) search for or find attractive buyer-agent rebate offers or other discounts. In these ways, NAR's Free-Service Rule leads to higher prices for services provided by buyer-agents.

136.    HomeServices's and Douglas Elliman's agents routinely represented buyer-agent services as free or at no cost to the buyer.

137.    For example, ████████████████████████████████

████████████████████████████████████████████.[53]

138.    Berkshire Hathaway HomeServices Innovative Real Estate, based in Denver, Colorado, similarly posted on REALTOR.com that "It's our job to look after your best interests, and we will do so at no cost to you as a buyer."[54]

139.    Another HomeServices affiliate, Team Lytle in northwest Louisiana, also currently states on its website that "It's our job to look after your best interests, and we will do so at no cost to you as a buyer."[55]

140.    Sheila Newton Team, a BHH franchisee in South Carolina, states on its website that its agents will "help you navigate through inspections, appraisals, and closing in a stress-free way. We do all of this at no cost to you, the buyer, as we are compensated by the seller."[56]

141.    Heather Gossen Real Estate Group, a Berkshire Hathaway HomeServices Fox Cities Realty affiliate in Wisconsin, states the same language in the same context on its website: "We do all of this at no cost to you, the buyer, as we are compensated by the sellers."[57]

142.    Jim Saxon, a Berkshire Hathaway HomeServices president based in Pennsylvania, states in an interview posted on Berkshire Hathaway HomeServices Stouffer Realty in Ohio's

[53] *See* ███████████████████████

[54] REALTOR.com, Berkshire Hathaway HomeServices Innovative Real Estate, *available at* https://www.realtor.com/realestateagency/568060527e54f701001f0563 (last visited Aug. 1, 2025).

[55] About Us, Team Lytle, *available at* https://www.teamlytle.com/about/ (last visited Aug. 1, 2025).

[56] The Home Buying Process, Sheila Newton Team, *available at* https://www.sheilanewtonteam.com/resources/the-home-buying-process (last visited Aug. 1, 2025).

[57] The Home Buying Process, Heather Gossen Real Estate Group | Berkshire Hathaway HomeServices Fox Cities Realty, *available at* https://www.heathergossen.com/buying (last visited Aug. 1, 2025).

website that "To purchase a home there is no cost. The commission on a real estate transaction is paid by the seller, so as a purchaser, there is no cost to buy a home."[58]

143.    Kraig Schneider, a Berkshire Hathaway HomeServices Arizona Properties buyer's agent, states on his website that his services are "all at no cost to you as the builders, developers and sellers pay my fee."[59]

144.    Berkshire Hathaway HomeServices Georgia Properties provides a Buyer's Guidebook online that, in discussing buyer-agents, states "In most cases, it is a service at no cost to the buyer. Georgia law allows the agency representing the seller to share its commission with the seller's agency so that both parties are on an equal footing."[60] The Guidebook further provides that "Georgia law usually allows us to negotiate with the seller in sharing the commission they pay their agency with ours. This is so that it is not an added cost to your expenses and so that they are in the same conditions as the seller."[61]

145.    In its Buyer's Guide for New Jersey, Douglas Elliman tells buyers that "An agent will provide services at no cost to you. The seller pays the full sales commission, which is split between the seller's agent and buyer's agent."[62]

---

[58] Questions from First Time Homebuyers, Berkshire Hathaway HomeServices Stouffer Realty, *available at* https://www.staufferrealty.com/first-time-homebuyer/video-series/155/questions-from-first-time-homebuyers/ (last visited Aug. 1, 2025).

[59] About Kraig Schneider, Berkshire Hathaway HomeServices Arizona Properties, *available at* https://kraigschneider.bhhsaz.com/ (last visited Aug. 1, 2025).

[60] Berkshire Hathaway HomeServices Georgia Properties' Buyer's Guidebook at 9, *available at* https://www.hsgaproperties.com/agentcss/TheMontenegroGroup/buyers-guide-english.pdf (last visited Aug. 1, 2025).

[61] *Id.* at 14.

[62] Douglas Elliman Buyer's Guide New Jersey at 4, *available at* https://issuu.com/jessica_jozwiack/docs/de_nj_buyers_guide_final (last visited Aug. 1, 2025).

146.    Brandon Mason New York, an affiliate of Douglas Elliman Real Estate based in Manhattan, states on its website that "Sellers pay buyer's brokers, so your buyer's broker's services and expertise are yours at no cost to you."[63]

147.    Jill Shore, a Douglas Elliman Real Estate agent based in Colorado, tells buyers in her Complete Homebuying Guide for Snowmass that "Also, the best thing about working with an agent is that it comes at no cost to you, as the seller of the house typically splits the commission between their agent and the buyer's agent."[64]

148.    Upon information and belief, Defendants and their co-conspirators made similar statements that buyer-agent services were at "no cost" to buyers nationwide.

149.    Buyers therefore do not necessarily realize that the broker commission is added to the purchase price of the home such that buyers are sharing the cost of the commission with the seller. As set forth below, the cost of the buyer's agent comes from the buyer's purchase price and inflated commissions increase the cost of homes purchased by buyers.

150.    This fact is obscured further by NAR's Code of Ethics, which permitted and encouraged buyer-agents to tell their clients that their services are free. From January 1997 to January 2022, the NAR Code of Ethics said that "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client, provided that the potential for the REALTOR® to obtain a benefit by a third-party is clearly disclosed at the same time." In fact, home buyers pay a high price for these "free" services in the

---

[63] Buying, Brandon Mason New York, *available at* https://brandonmason.nyc/buyers (last visited Aug. 1, 2025).

[64] Jill Shore's Complete Homebuying Guide for Snowmass, Jill Shore Aspen Real Estate, *available at* https://jillshoreaspen.com/blog/jill-shores-complete-homebuying-guide-for-snowmass (last visited Aug. 1, 2025).

form of supracompetitive purchase prices and buyer-agent commission rates as well as reduced quality of buyer-agent services.

151.    Because buyer agents were widely misleading their buyer clients throughout most of the relevant period, the former NAR Standard of Practice 12-2 was repealed and the NAR Code of Ethics as of January 2022 says, "REALTORS® must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the REALTOR® will receive no financial compensation from any source for those services."[65]

D.    **NAR's Commission Filter Rules**

152.    NAR's Commission Filter Rules allowed buyer-agents to filter MLS listings that would be shown to buyers based on the level of buyer-agent commissions offered. Some MLSs further permitted buyer-agents not to show certain homes to potential home buyers if the buyer-agent would make less money because of lower commissions, even though those homes otherwise met the buyer's search criteria.

153.    For example, according to Policy Statement 7.58 of NAR's Handbook "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers."

154.    These Filter Rules, which were widely adopted by NAR MLSs, facilitated steering by helping buyer-agents selectively conceal from potential home buyers any property listings offering lower buyer-agent commissions. This reduced the quality of buyer-agent services and raised prices for buyer-agent services for home buyers.

---

[65] *Burnett* Pl. Trial Ex. D4034 at Standard of Practice 12-1 (2023 NAR Code of Ethics).

### E.       Commission Modification Rules

155.     Even if a home buyer were to obtain enough information to negotiate a lower buyer-agent commission, NAR's ethics rules expressly prohibited buyer-agents from attempting to reduce buyer-agent commissions offered on MLSs through the submission of purchase offers. While NAR claimed that brokers can negotiate their compensation at any time during the transaction, NAR's Standard of Practice 16-16 in place beginning January 2004 stated: "REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."[66] In other words, it was an unequivocal violation of NAR's ethics rules for a buyer-agent to even present an offer to a seller that is conditional on the seller reducing the buyer-agent commission.

156.     To the extent buyer-agents did seek to modify buyer-agent commissions, NAR illogically instructed buyer-agents to attempt those modifications before even showing the property to any potential buyers. Per NAR's interpretation of its Code of Ethics, a buyer's broker could only ethically try to reduce the offered compensation from the seller *before* the buyer broker shows the house to the client.[67]

---

[66] *See Burnett* Pl. Trial Ex. D4034 at Standard of Practice 16-16 (2023 NAR Code of Ethics).

[67] *See* NAR Interpretations of the Code of Ethics (34th ed.), #16-15 at 92, *available at* https://www.nar.realtor/sites/default/files/documents/coe-2022-case-interpretations-2022-03-28.pdf ("The Hearing Panel's decision noted that Realtor® B was indeed entitled to negotiate with Realtor® A concerning cooperating broker compensation but that such negotiation should be completed prior to the showing of the property by Realtor® B. The decision indicated that Realtor® B was entitled to show property listed by Realtor® A on the terms offered by the listing broker in the MLS.") (last visited Apr. 18, 2025).

157.    By requiring buyer-agents willing to reduce buyer-agent commissions to request those reductions prior to even showing the property to a potential buyer, NAR foreclosed virtually all negotiation over the buyer-agent commission. To comply, a buyer-agent would effectively need to contact a seller-broker on his own to negotiate a reduction to his own commission before his client had even seen the potential home.

158.    Since January 2014, NAR's rules also restrained negotiation of the buyer-agent commission by providing that after the seller had received purchase offers, the seller-broker was prohibited from attempting to unilaterally modify the buyer-agent commission that was offered on the MLS. NAR Standard of Practice 3-2 stated: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction."[68]

159.    Consistent with NAR's rule, the New Jersey MLS Rules and Regulations, for example, stated that a listing broker could only offer a buyer-agent compensation that differs from the compensation indicated on the listing if the seller-broker "informs the other broker in writing in advance of submitting an offer to purchase." As another example, MLSListings Inc., one of the largest MLSs in Northern California, stated the following on its website to help explain the Challenged Restraints:

> **Can I change my offer of compensation that I had offered to the cooperating agent in the MLS after the agent produces an offer signed by the buyer?**
>
> No. In no event shall the listing broker revoke or modify the offer of compensation later than the time the cooperating broker produces

---

[68] *See Burnett* Pl. Trial Ex. D4034 at Standard of Practice 3-2 (2023 NAR Code of Ethics).

> a prospective buyer who has signed an offer to purchase the property
> for which the compensation has been offered through the MLS (9.8).

160.     NAR imposed yet another restraint on negotiation by making it unethical for a buyer-agent to urge the buyer to negotiate directly with the seller to reduce commissions. Since the vast majority of home buyers have limited or no familiarity with this market and believe that the buyer-agent's services to them are "free," this restriction further restrained negotiations regarding buyer-agent commissions

## VI.   HOMESERVICES AND DOUGLAS ELLIMAN PARTICIPATED IN, FACILITATED, AND IMPLEMENTED THE CONSPIRACY

161.     HomeServices and Douglas Elliman orchestrated and participated in the conspiracy alleged herein by: (1) requiring their franchisees and/or agents (and the agents employed by those franchisees) to comply with the Challenged Restraints; (2) supervising, through their executives, NAR's operations including NAR's adoption, maintenance, and enforcement of the Challenged Restraints by serving on the Board of Directors and various committees; and (3) imposing the rules on MLSs through their control of local realtor associations by, for example, participating in the governance and management of those associations and encouraging the adoption of the Challenged Restraints.

### A.  HomeServices and Douglas Elliman Were Involved in Issuing and Maintaining the Challenged Restraints

162.     The top 50–75 brokerages, which include HomeServices and Douglas Elliman, are members of NAR's Real Estate Services Advisory Group and have a seat on the NAR's board of directors. NAR's board of directors consisted of competitors who agreed to implement, maintain, and abide by the Challenged Restraints.

163.    HomeServices  and  its  associated  companies  ███████████████

████████████████████████████████████████████████████[69]

164.    HomeServices' executive leadership and the CEOs of its operating companies ████

████████████████████████████████████████████████████

████████████████████████████████.[70]

165.    Several employees of HomeServices and Berkshire Hathaway have held leadership

positions with NAR.[71] HomeServices of America, Inc.'s president and chief operating officer from

2008–2017 (Robert Moline) ██████████████████████████████████████

████████████████████████████████████████████████████

████████████[72] John Smaby, longtime manager of Edina Realty, was elected president of NAR

in 2018 ████████████████████.[73]

---

[69] *See* ████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

[70] *See* ██████████████████████████████████████
██████████████████

[71] *See* ████████████████████████████████████████
████████████████████████████████████████
██████████████ Peltier Testimony in *10/24/23 Burnett* Tr. Vol. 6 at 1343:16-20, 1345:6-
11.

[72] *See* ████████████████████████████████████
███████████████

[73] *See* ████████████████████████████████████
████████████

166.   HomeServices has also ███████████████████████████████.[74]

167.   In 2017, ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████[75]

168.   As part of the MLS 2020 Agenda, Art Carter (CEO of California Regional

Multiple Listing Service, Inc.) stated, "████████████████████████████

████████████████████████████████████████████████████████████

███████████████[76]

169.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████

170.   A Douglas Elliman representative served as the Vice-Chair of NAR's Real Estate

Services Advisory Group.[78]

---

[74] *See* █████████████████████████████████████████████
███████

[75] *See* █████████████████████████████████████████████
██████████████████████████

[76] *See* █████████████████████████████████████████████
██████████████████████████

[77] *See* █████████████████████████████████████████████
██████████████████

[78] National Association of REALTORS, NAR's 2019 Real Estate Services Advisory Group,
*available at* https://assets.inman.com/wp-content/uploads/2024/03/NAR-Real-Estate-Services-
RES-Group.pdf (last visited Aug. 1, 2025) (listing Herman as Vice Chair of group); *see also*
November 14, 2017 Letter from Real Estate Services Advisory Group of NAR to Speaker Paul
Ryan, Democratic Leader Nancy Pelosi, Chairman Kevin Bradley, and Ranking Member
Richard E. Neal, *available at*
https://www.silvar.org/userfiles/file/2017.11.14_RES_Letter_to_House_Leadership_Re_Tax_Cu

171.    Douglas Elliman representatives have served on the Multiple Listings Committee, which agreed to implement and maintain many of the Challenged Restraints. Upon information and belief, Douglas Elliman representatives served on multiple relevant committees through which the Challenged Restraints were issued.

172.    In these roles, HomeServices and Douglas Elliman agreed with each other, NAR, and other competitor brokerages to impose, maintain, and abide by the Challenged Restraints.

**B. HomeServices and Douglas Elliman Required Their Agents to Follow The Challenged Restraints.**

173.    As alleged above, NAR requires its members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. NAR and its affiliated associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices codified in NAR's Code of Ethics.

174.    HomeServices' franchisees are obligated to follow the rules and policies of HomeServices of America, Inc. and, each quarter, must certify that they have satisfied the HomeServices code of conduct, which includes NAR's code of ethics.

175.    HomeServices' rules and policies require their franchises and agents to (1) comply with NAR's Code of Ethics; (2) join and comply with the rules of the local realtor association; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

176.    Indeed, HomeServices required its franchisees and subsidiaries to join NAR or an MLS and to follow and enforce the Challenged Restraints.

---

ts_and_Jobs_Act.pdf (last visited Aug. 1, 2025) (listing Herman as signatory for Real Estate Services Advisory Group).

177.    Additionally, the Real Living Franchise Disclosure Document makes clear that franchisees must "at all times comply with the Code of Ethics of the National Association of Realtors and other appropriate organizations." Franchisees are also required to provide "electronic feeds of all real estate listings and other information available from the multiple listing services" and must do so in compliance with "standards adopted by the National Association of Realtors® or such other standards that we may periodically specify."[79] BHH Affiliates has specifically required its Florida-based franchisees to comply with the NAR Code of Ethics.

178.    Douglas Elliman's rules and policies require their agents to (1) comply with NAR's Code of Ethics; (2) join and comply with the rules of the local realtor association; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

179.    Douglas Elliman employees



[80]

---

[79] Franchise Disclosure Document, Berkshire Hathaway (issued May 1, 2023, as amended November 28, 2023), available at
https://www.wdfi.org/apps/FranchiseSearch/MainSearch.aspx?W7chLupbe6aeUGgSRi4ZpKTdr RIoo2LzTk5OM5n2qDe8dVumyvYwjkCb2HTcokECACFCmLsi4CSTARXZqeugqoN1qikUke NVbEiO8heWYS7LjC1Ccc5eDA%3d%3d.

[80] *See*



180. Douglas Elliman also admits that "Through our brokerages, we participate in MLSs and are a member of the National Association of Realtors ("NAR") and state real estate associations and, accordingly, are subject to each group's rules, policies, data licenses, and terms of service."

181. Sales agreements used by Douglas Elliman reflected that ████████████████ ██████████████████████████████████.[81]

182. Such sales agreements also made clear ██████████████████████ ████████████████████████████.[82]



183.     Douglas Elliman also propagated its own policy and procedures handbooks, ██████

█████████████████████████████.[83]

184.     Through the actions of HomeServices, Douglas Elliman, and their co-conspirators, NAR required its members, including state and local realtor associations, as well as non-member brokers and agents operating in areas with NAR MLSs, to comply with the above anti-competitive rules, and with other rules contained in NAR's rules, practices and policies, including the NAR Handbook and the NAR Code of Ethics.

185.     Through the actions of HomeServices, Douglas Elliman, and their co-conspirators, NAR requires NAR members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics and the intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

186.     NAR threatens its individual and association members with expulsion if they fail to comply with the Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which

---

[83] *See* 

shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

187.    A local realtor association owns each of the NAR MLSs, and those realtor associations are required by NAR to ensure that their MLS and the MLS's participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy. Because access to the NAR MLSs and other MLSs is commercially necessary, brokers and agents must comply with the mandatory provisions in NAR's Handbook. Without access to a local MLS, including the NAR MLSs, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

188.    The role of a local realtor association is particularly important for home buyers as the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings. Listing brokers will use the MLS to market sellers' properties to other broker and agent participants in the MLS and, through those brokers and agents, to potential home buyers.

189.    Further, one of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatens to withhold these insurance benefits from realtor associations and MLSs that do not comply with NAR's mandatory provisions. NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

190.   NAR reviewed the governing documents of its local realtor associations to ensure compliance with its rules. NAR also requires its local realtor associations to certify compliance with its mandatory rules.

191.   Representatives from both HomeServices and Douglas Elliman have served in leadership roles at MLSs and local realtor associations where they agreed with competitors to impose and maintain the Challenged Restraints on those MLSs.

### C. HomeServices and Douglas Elliman Enforced the NAR Rules by Training Their Agents on Commissions.

192.   HomeServices' policy was ███████████████████████████[84]

193.   Douglas Elliman's handbooks also ████████████████████.[85]

194.   HomeServices has ████████████████████████████████

████████████████████████████████████████

████████████████████████████[86] Similarly, BHH Affiliates █████████

████████████████████████████████████████

---

[84] *See* 

[85] *See* ████████████████████████████████████████.

[86] *See* ████████████████████████████████████████

50

██████████████████████████████████████████.[87] RLRE agents also ███████████████████████

███████████████████████████.[88]

195.    HomeServices ████████████████████████████████████████████████.[89]

196.    HomeServices of America, Inc.'s former president and CEO (Gino Blefari) ████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████.[90]

197.    HomeServices of America, Inc.'s former president and CEO (Gino Blefari) trained

agents at HomeServices franchisees and affiliates that while commission is negotiable, it can only

go up from 6%, the purpose of which was for the agents to learn.[91] Mr. Blefari also ██████████

███████████████████████████████████████████████████████████████.[92]

---

[87] *See* ████████████████████████████████████████████████████████████
███████████████████████████████████

[88] *See* ███████████████████████████████████████████████████
████████████████████████████████████

[89] *See* ██████████████████████████████████████████████████

[90] *See* █████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

[91] *See* Blefari Testimony in 10/25/23 *Burnett* Tr. Vol. 7 at 1456:23-1459:11; *Burnett* Pl. Trial Ex. 686, HSOA-MOe-0000094103 at 4113–14, 4134 (08/15/18 email from Watson to Blefari and others attaching Berkshire Hathaway HomeServices Home Marketing System Script with Blefari comments: "I would always confidently answer, 'Yes, commissions are negotiable, but I can only go up from six'"); *see also* ███████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

[92] *See* ████████████████████████████████████████

198. An Intero PowerPoint training document (of which Mr. Blefari is a custodian) contains a cartoon with a 6% commission written on a person's chest and a caption stating, "What gives you the impression I won't negotiate my commission?"—a training method that a HomeServices affiliate CEO disavows.[93] ███████████████████████████████

███████████████[94]

199. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████[95]

200. HomeServices affiliates ███████████████████████

███████████████████████████████████[96] Kentwood Real Estate told its

agents, ███████████████████████████████████████

---

[93] *See Burnett* Pl. Trial Ex. P-1582-A, HSOA-Lutz-01048528 & 8530 at 8541, HSOA-MOe-0000552412 at 2425 (10/21/20 email from Pierce to Branch Managers with scripts "Earning a FULL Commission" attachment); *see also* ███████████████████████████████████
███████████████; *cf. United States v. Nat'l Assoc. Real Estate Boards*, 339 U.S. 485, 489 (1950) ("Subtle influences may be just as effective as the threat or use of formal sanctions to hold people in line.").

[94] *See* ███████████████████████████████████████████
███████████████████████████████████████████

[95] *See* ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

[96] *See* ███████████████████████████████ *see also Burnett* Pl. Trial Ex. P-1582-A, HSOA-Lutz-01048528 at 8540, HSOA-MOe-0000552412 at 2424 (10/21/20 email from Pierce to Branch Managers with scripts attachment stating, "TIP: Fill out the listing paperwork in advance with a 6% commission – offer 2.5% to the co-op broker").

[97] BHH Arizona Properties, BHH California Properties, and BHH Nevada Properties [98] Preferred Carolinas .[99]

201. HomeServices affiliates .[100]

202. HomeServices [101] HomeServices also .[102]

## VII. DEFENDANTS POSSESS MARKET POWER IN THE MARKET FOR THE PROVISION OF BUYER-AGENT SERVICES

203. The relevant service market for the claims asserted herein is the market for buyer-agent services. The relevant geographic markets for the claims asserted herein are the geographic



[97] *See*

[98] *See*

[99] *See*

[100] *See*

[101] *See*

[102] *See*

areas in which NAR MLSs operate. This market comprises the bundle of services provided to home buyers by residential real estate brokers with access to the NAR MLSs. Defendants' and their coconspirators' control of the NAR MLSs gives Defendants the ability to impose the Challenged Restraints on class members and other market participants. Access to NAR MLSs is critical for brokers to compete and to assist home buyers where those MLSs operate.

204.    Upon information and belief, NAR and the Defendants, through their coconspirator franchisees and other conspiring brokers where the NAR MLSs operate, collectively provide the majority of the residential real estate broker services in these areas.

205.    HomeServices has been #1 in transaction size in the country since 2018, overtaking Anywhere (f/k/a Realogy).

206.    Douglas Elliman is typically among the top 5 brokers in terms of sales volume, and often has the #1 per-agent sales volume and highest average per-transaction total.

207.    Defendants and their coconspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

208.    Any buyer-agents in the areas in which the NAR MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' control of the NAR MLSs through themselves and their coconspirators means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A seller-broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a buyer-agent who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to

a listing service. Having access to an MLS is a virtual necessity for a real estate agent's job, for both seller's agents and buyer's agents.[103]

209.    For an alternative listing service to compete effectively with one of the NAR MLSs, the alternative would require listings as comprehensive as the NAR MLS. Brokers and their individual realtors who profited from inflated buyer-agent commissions had minimal incentives to participate in an alternative listing service that would generate lower buyer-agent commissions and lower total commissions. Further, many buyers would be very reluctant to retain a buyer-agent operating on an alternative listing service that required them to pay the buyer-agent commission when other buyer-agents operating on the NAR MLSs represented that they are entirely compensated by home sellers. Accordingly, seller-brokers on an alternative listing service would struggle to attract buyer-agents and their buyer clients. And buyer-agents would be reluctant to use a listing service with limited properties. Accordingly, a listing service attempting to compete with any of the NAR MLSs would likely fail to attract enough property listings to operate profitably and act as a competitive constraint on the incumbent MLSs. The absence of listing services that effectively compete with the NAR MLSs (or other MLSs) reflects substantial barriers to entry. NAR also advises MLSs that non-compete agreements are a "critical component" of any agreement between MLSs and third-party websites, such as Zillow, that may wish to access the MLSs data. NAR's checklist of "critical components" states that any non-compete should include provisions that the third-party website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and

---

[103]   *See* G. Keller Dep. Designation at *Burnett* Trial at 144:23-145:16 (introduced at 10/17/23 *Burnett* Tr. Vol. 1 at 181:5-9) (real estate agents would not be able to make a living without access to an MLS); G. Keller Testimony in 10/27/23 *Burnett* Tr. Vol. 9 at 2086:7-14 (real estate agents "have to join MLS or they have to quit work").

compensation." Further, NAR advises that the non-compete agreement should require the third-party website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." Thus, NAR, in furtherance of the conspiracy, has advised MLSs to take affirmative steps to prevent third-party websites from becoming competitors.

## VIII.   THE CHALLENGED RESTRAINTS HARMED HOMEBUYERS

210.   Defendants' conspiracy had the following anticompetitive effects, among others, in each area in which a NAR MLS operates, and nationwide:

- Home buyers paid, through the purchase price of their homes, inflated buyer-agent commissions and inflated total commissions;

- Inflated total commissions were incorporated into the home purchase price, thereby causing buyers to pay higher prices for homes;

- The retention of a buyer-agent was severed from the setting of the broker's commission; the home buyer retained the buyer-agent, while the home seller set the buyer-agent's compensation;

- Price competition among brokers to be retained by home buyers was restrained;

- Competition among home buyers was restrained by their inability to compete for the purchase of a home by lowering the buyer-agent commission; and

- The quality of buyer-agent services was reduced, as buyer-agents were incentivized to steer their clients to higher commission homes;

- The quality of buyer-agent services was also reduced through barriers that prevented buyer-agents from presenting and receiving purchase proposals that reduced the buyer-agent commission, thus making the proposals more attractive to and more likely to be accepted by sellers; and

- Defendants have increased their profits substantially by receiving inflated buyer-agent commissions and inflated total commissions.

### A. Broker Compensation

211. Under the Challenged Restraints, the standard practice in the residential real estate industry was to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price. Commissions were paid when the home sells.

212. The seller-broker's compensation is specified in a listing agreement, a contract between the seller and the seller-broker that details the terms of the seller-broker services, such as requiring that property be listed on an MLS. Under the Challenged Restraints, the listing agreement would specify the total commission that a home seller would pay to the seller-broker, often with a portion of that amount earmarked to be paid to the buyer-agent in the event the buyer has a broker.

213. The buyer-agent was typically compensated with a portion of the total commission paid to the seller-broker, which the buyer-agent received if her client purchased the seller's home.

214. The typical split of commission between the seller's agent and the buyer's agent was 50/50. This holds ███████████████████████ [104]

215. The following example illustrates how this process typically worked under the Challenged Restraints:

- A homeowner entered into a contract with a seller-broker, in which the seller agreed to pay the seller-broker six percent in total commissions in exchange for marketing and facilitating the sale of the home.

- The seller-broker then made a blanket, unilateral offer of a three percent commission to every buyer-agent when it listed the home on the MLS.

---

[104] *See* ████████████████████████████

- A buyer-agent shows the property to a buyer client, who buys the home for $500,000.

- The buyer paid the $500,000 purchase price into an escrow account. The escrow company then simultaneously transmitted the seller-broker's commission (three percent of the sales price or $15,000) to the seller-broker, the buyer-agent commission (three percent of the sales price or $15,000) to the buyer-agent, and the net amount due to the seller.

216.    Buyer-agent fees were paid out of the funds from the purchase price of the house—a price the home buyer pays. Even when there was a split commission between the seller and buyer agents, the money paid to the buyer's broker ultimately came from the buyer and his/her mortgage company.



217.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████[105] From April 29, 2015 to May 31, 2021, ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████.[106]

218.    Upon information and belief the same was true for Douglas Elliman.

### B.  There Was No Pro-Competitive Justification for the Challenged Restraints

---

[105] *See* ████████████████████████████████████

[106] *See* ████████████████████████████

219.    There was no pro-competitive benefit to Defendants' conspiracy. Defendants successfully stabilized buyer-agent commissions and significantly increased the dollar cost charged despite the diminishing role of buyer-agents. According to data from NAR, many home buyers no longer locate prospective homes with the assistance of a broker, but rather independently through online services. Buyer-agents increasingly have been retained after their client has already found the home the client wishes to buy. "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees." Despite their diminishing role, buyer-agents continued to receive the same artificially elevated commission, due to Defendants' conspiracy.

220.    Defendants' success in maintaining (and, in inflation-adjusted dollar terms, substantially increasing) the charge imposed by buyer-agents despite the advent of new technologies stands in stark contrast to other industries. "[I]n almost every other consumer industry—booksellers, retailers, home appliances, insurance, banking, stock brokers—the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. . . . Economists call this process of squeezing out transaction costs 'disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."[107] Despite technological advances that lessened the role of brokers and widespread fluctuations in housing prices, brokerage fees failed to reflect these changes.

---

[107] *The Realtor Racket*, WALL ST. J. (Aug. 12, 2005), https://www.wsj.com/articles/ SB112381069428011613.

221.    Moreover, there was a disconnect between buyer-agent costs and buyer-agent commissions. Competition normally pushes firms to adopt fee structures that approximate their costs, but this trend was absent for real estate brokerage fees. For example, buyer-agent costs were similar regardless of the price of the home. As the Wall Street Journal has explained, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises."[108] Instead, broker commissions remained divorced from the quantity, quality, and value of the services.

222.    Even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.

### C.   The Challenged Restraints Inflated Buyer-Broker Commissions and Home Prices Paid by Homebuyers

223.    There is substantial economic evidence that Defendants' conspiracy resulted in buyer-agent commissions and total commissions that were inflated well above a competitive level nationwide.

224.    Defendants' conspiracy maintained broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the internet and the diminishing role of buyer-agents. Between 2000 and 2017, the average commission nationally has been stable at a supracompetitive rate of between 5 and 5.4 percent regardless of changing market conditions.

225.    Moreover, because housing prices have increased substantially in recent years (at a rate significantly exceeding inflation), and commissions are charged on a percentage of a home's sale price, the actual dollar commissions have become even higher. "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900,

---

[108] *Id.*

according to U.S. Census Bureau Statistics." As the Consumer Federation of America has observed, "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[109]

226.    The standard total broker commissions (*i.e.*, the aggregate commission paid to the seller-broker and buyer-agent) in areas where the NAR MLSs operate is between five and six percent, substantially higher than in countries with competitive markets for residential real estate brokerage services. In a 2002 study titled "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," economists Natalya Delcoure and Norm Miller concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2% . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%."[110] They also found variation within countries; in the United Kingdom, for example, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5-0.75%; in low priced areas [for homes] as high as 3.5%."[111] Ultimately, the economists concluded that, "[b]ased on global data … [total] US residential brokerage fees should equal something closer to 3.0%."[112]

---

[109] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.

[110] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INTL. REAL ESTATE REV. 12, 14 (2002).

[111] *Id.* at 17.

[112] *Id.* at 29.

227.    The adverse economic impact of the conspiracy's restraints on price competition were severe. The Consumer Federation of America indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[113]

228.    Brian Larson, an attorney who has represented many MLSs, has observed that "[w]ith the demise of subagency, there is little reason to keep interbroker compensation."[114] According to Larson, "[g]etting rid of interbroker compensation" [*i.e.*, payments from seller-brokers to buyer-agents] would improve the market in several areas, including:

- "Buyer broker fees can be commensurate with the skill and experience of the broker and with the buyer's needs."

- "The market benefits from price competition for buyer-broker services."

- "The dangers of price fixing, and the claims by industry watchdogs that it exists now, will largely be addressed. Brokers will really be unable to tell what their competitors are charging for services, and there will be no incentive for commissions to be 'standard.'"[115]

229.    Because of the scope and magnitude of the overcharges at issue here, the economic cost to the plaintiff Class and other consumers was enormous. Experts have suggested that the

---

[113] Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED. OF AM., at 4 (June 2006), https://consumerfed.org/wp-content/uploads/2006/06/6-19-06-Real-Estate-Cartel_Report.pdf.

[114] Brian Larson, *The End of MLS as We Know It (Redux) – Part I*, Larson Skinner (Dec. 15, 2010), https://larsonskinner.com/2010/12/15/the-end-of-mls-as-we-know-it-redux-part-i/.

[115] Brian Larson, *The End of MLS as We Know It (Redux) – Part II*, LARSON SKINNER (Dec. 20, 2010), https://larsonskinner.com/2010/12/20/the-end-of-mls-as-we-know-it-redux-part-ii/.

amount of "annual broker fees consumers might save if there was effective price competition is as much as $30 billion or more annually."[116]

230.    Economists Chang-Tai Hsieh and Enrico Moretti have suggested that more than half of current commissions might be eliminated by competition.[117] And as noted above, Natalya Delcoure and Norm Miller found that U.S. broker fees should equal something closer to three percent.[118]

231.    Without the Challenged Restraints, home prices would have been lower.[119]

232.    Despite the impact of buyer-broker commissions on home prices, HomeServices and Douglas Elliman agreed to rules permitting agents to misrepresent services as free, and their own agents repeatedly made those misrepresentations.

233.    As a result of the Buyer-Agent Commission Rule and its predecessor, seller-brokers had to make "blanket unilateral unconditional offers of compensation to their adversarial buyer-agents." These blanket offers relieved buyer-agents of the need to compete on things like price and quality of services. Thus, the Buyer-Agent Commission Rule reduced competition in the market for buyer-agent services and harmed home buyers in a number of ways.

234.    First, through the Buyer-Agent Commission Rule and its predecessor, Defendants enforced overuse of buyer-agents, which acted to sustain high commission rates for broker services. This commission rate was then baked into the price of the house, artificially raising home prices.

---

[116] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure (Abridged)*, 5 CORNELL REAL ESTATE REV. 26, 26 n.1 (2007).

[117] *See* Chang-Tai Hsieh & Enrico Moretti, *Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry*, 111 J. POL. ECON. 1076, 1116 (2003).

[118] Delcoure & Miller, *supra* n. 8, at 29.

[119]   *See* Frazier Testimony in 10/25/23 *Burnett* Tr. Vol. 7 at 1619:2-1620:3.

235.    The Consumer Federation of America has explained, "[t]ypically, on either a 5% or 6% commission, 3% will be offered to brokers with buyer clients, and that commission split is disclosed to brokers on real estate firm and multiple listing service databases." The listing of the 3% split "then acts as a powerful force to discourage lower splits of 2% or even 1% because listing brokers, and their sellers, fear that properties carrying these lower splits will not be shown. As a result, 'a listing broker lists a split below' the standard industry level 'at their, and their clients', peril because of the risk that traditional brokers working with buyers will avoid this property. . . . This informal discrimination against price competitors is the most important factor that allows dominant brokers to maintain high and uniform prices." As coconspirator Keller Williams has acknowledged in its instructions to seller-brokers regarding what to tell home sellers: "[y]ou're putting yourself at a disadvantage competitively when you reduce your commission."

236.    Additionally, because NAR and its members agreed amongst themselves to require blanket, unilateral, unconditional commissions, brokers did not need not compete with respect to the quality of services in order to obtain higher commissions. For example, novice brokers who had just received their licenses could charge the same prices as highly skilled, long-practicing brokers. Similarly, to the extent a broker commission was calculated as a "percentage of the gross selling price," a buyer-agent who facilitated the purchase of an $800,000 home received potentially two times as much as a buyer-agent who facilitated the purchase of a $400,000 home, regardless of whether the higher compensation was commensurate with the amount and type of services provided.

237.    The Challenged Restraints were an unlawful agreement among HomeServices, Douglas Elliman, NAR, and their co-conspirators to encourage the overuse and overcompensation of buyer-brokers. Absent this agreement among competitors, Defendants and their co-conspirators

64

would have been economically self-motivated to compete based on price and services to obtain business from the actual consumer of their service--homebuyers.

238. Indeed, the Consumer Federation has called brokers "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive." But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."

239. In March 2012, a broker/owner from REALPRO Associates who was a member of the NAR Professional Standards Committee notified NAR that the unilateral offer of compensation was the ultimate form of a trade restraint and violated the Sherman Act, stating: "The Sherman Antitrust Law is very clear about price fixing. We all understand that we cannot set fees, other than our own, and that there can be no standardization, express or implied, regarding fees of any nature. My contention is that the traditional method of compensation of a Seller and a Broker 'setting' compensation to be paid to a cooperating agent's company/firm is the ultimate form of restraint of trade, and indeed, represents price fixing in a free market."[120]

240. Second, while doing so was contrary to the fiduciary duties they owe to buyers, buyer-agents often "steered" home buyers to residential properties that offer higher commissions. Steering of home buyers to high commission homes reinforced high commission rates. It also reduced the quality of buyer-agent services by incentivizing buyer-agents to limit the homes they show prospective buyers to those that offer high commissions. Home buyers were therefore both more likely to pay a higher price for their home (since the buyer-agent commissions were baked

---

[120] *See Burnett* Pl. Trial Ex. 600, NARSITZER0000057912; *Burnett* Pl. Trial Ex. 601, NARSITZER0000057906 at 7907; 01/26/21 Niersbach Dep. in *Burnett* at 27:4-28:7, 29:22-35:18, 39:22-40:6 (introduced at 10/23/23 *Burnett* Tr. Vol. 5 at 903:14-17) (discussing *Burnett* Pl. Trial Exs. 600 & 601).

into the sale price), and less likely to be matched with the optimal home—the exact task the buyer-agent is paid to do.

241.    Fear of having buyers steered away from a property was also a strong deterrent to sellers who would otherwise offer lower buyer-agent commissions, which further contributed to higher prices for buyer-agent services. For example, ReeceNichols and Fox & Roach ███ ████████████████████████████████████████████████████████[121]

Similarly, EWM Realty ████████████████████████████████████████ ██████.[122] And BHH Nevada Properties ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████.[123]

242.    The prevalence of such steering has been widely reported in government reports, economic research, and the trade press.

243.    HomeServices, Douglas Elliman, and their co-conspirators enabled steering by agreeing amongst themselves to impose and abide by rules mandating that blanket commission

---



[121]  *See* Frazier Testimony in 10/25/23 *Burnett* Tr. Vol. 7 at 1624:17-25; ████████████████ ████████████████████████████████████████████████████

[122]  *See* ████████████████████████████████████████

[123]  *See* ████████████████████████████████████████████████

offers be made available to every buyer-agent using the MLS. NAR's requirement that offers of compensation be expressed in specific dollar or percentage terms enabled buyer-agents to easily compare the financial compensation offered to them by home sellers and steer their clients to higher commission homes.

244.    Thus, the Challenged Restraints were designed to create tremendous pressure on sellers to offer the high, standard commission and to act as a powerful deterrent to anyone who may attempt to offer a discounted commission. As one commentator explained: "[e]ssentially, the MLS listing acts as a tool which competing brokers can use to help enforce a near uniform commission rate and drive out discounters."

245.    The Defendants' franchisees, agents, and other coconspirators have also utilized software technology to help facilitate steering based on MLS commission data and to impede buyers from learning about properties that offer discount buyer-agent commissions. For example, NAR's affiliate, the Greater Las Vegas Association of REALTORS ("GLVAR") uses for its MLS a software program called Matrix, which was designed and sold by CoreLogic. CoreLogic provides software and data services to most, if not all, of the NAR MLSs. Matrix allows brokers to provide tailored electronic listings to their buyer clients. Matrix automatically generates and regularly sends emails to buyer clients that describe properties for sale that match their search criteria. When brokers set up the Matrix program for their buyer clients, one of the fields in the software allows the brokers to filter listings according to the value of the buyer-agent commission being offered. In other words, brokers can program the software to only send property listings to buyers that promise buyer-agent commissions above a specified value.

246.    GLVAR elected to adopt a version of the Matrix software that permitted brokers to exclude properties offering discount buyer-agent commissions from Matrix-generated emails to

buyer clients. A number of franchisees and broker agents, including coconspirator Compass, in at least the area covered by Greater Las Vegas have trained their realtors to insert 2.5 percent or higher as the minimum permissible buyer-agent commission when using the Matrix system to send property listings to buyer clients. As a consequence, unbeknownst to them, buyer clients of those realtors often do not receive Matrix-generated emails that include properties offering a buyer-agent commission of less than 2.5 percent, even if that property perfectly matches the buyers' search criteria. Compass is not the only one.

247.    As part of the DOJ's investigation into NAR and anticompetitive practices in the real estate industry, the DOJ served a Civil Investigative Demand ("CID") on CoreLogic directing it to produce "all documents relating to any MLS member's search of, or ability to search, MLS listings on any of the Company's multiple listing platforms, based on (i) the amount of compensation offered by listing brokers to buyer-agents; or (ii) the type of compensation, such as a flat fee, offered by listing brokers to buyer-agents."

248.    By encouraging and facilitating steering, and adhering to the "standard real estate commission," the Challenged Restraints deterred downward departures from the standard commission, encouraged overuse of buyer-brokers, and enables brokers to avoid doing business with, or otherwise retaliate against, buyer-agents who try to compete by offering significant discounts. Absent an agreement among the competing brokerages to implement, maintain, and enforce these rules, it would have been in HomeServices' and Douglas Elliman's self-interest to compete based on price and services.

249.    There are no pro-competitive justification for the Challenged Restraints. Until the early 1990s, all brokers were seller-brokers or subagents of seller-brokers. Under this "almost universal sub agency system . . . brokers, even those working solely with buyers, were legally

obligated to represent the interests of sellers." Because "nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing [*i.e.*, seller's] broker," the seller's broker was paid by the seller and would then compensate the subagent working with the buyer.

250.    With the emergence of brokers who were no longer sub-agents of the seller's broker but were instead working for the buyer, there was no justification for requiring buyer-agents' commissions to be paid as a portion of the total commission. One industry participant acknowledged, "[w]ith the demise of subagency, there is little reason to keep interbroker compensation. . . . It does not make sense for listing brokers to pay buyers' brokers for the services the latter provides to buyers." As another commentator has written: the practice of "sellers' brokers specifying the fees that buyers' brokers charge to the latter's own clients, should be recognized" as "at least an attempt to fix market prices. . . . There is no longer any reason to permit listing brokers [*i.e.*, seller-brokers] to set the default prices that these competing buyers' brokers charge to serve their own customers. . . . The elimination of interbroker compensation would diminish the ability of traditional brokers to frustrate vigorous price competition, and thus likely lead to a dramatic fall in broker revenues."

251.    Moreover, other segments of the real estate market both foreign and domestic demonstrate that the Challenged Restraints were unnecessary. There is no unilateral offer of cooperation and compensation in commercial real estate.

252.    Regarding residential real estate, BHHS found in 2015 ███████████

███████████████████████████████████████████████████████████

 [124] HSF Affiliates determined that ███████████████████████████████████████ [125] HomeServices' former president and COO ████████████████████████████████ .[126]

253.    It is noteworthy that Australia is similar to the United States in many ways. Both are former British colonies that have a common law legal system and speak English. Both have similar home ownership rates and household disposable income rates. Despite these similarities (and potentially others), Australians have managed to operate a residential real estate system that is more competitive than the United States.

254.    A report commissioned by NAR and circulated to HomeServices (the "D.A.N.G.E.R. Report") ████████████████████████████████ ████████████████████████████████ ██████ .[127]

---



[124] *See* ████████████████████████

[125] *See* ████████████████████████

[126] *See* ████████████

[127] *See* ████████████████████████

255.    The D.A.N.G.E.R. Report further said that [129] an earlier draft stated that "Home Buyer don't always want to use an agent, but think they have to. Wait till they discover they don't have to."[130]

256.    The internet has made buyer's agents less relevant. For the past 20 years, information on houses for sale is routinely posted on the internet, often with multiple photographs or virtual tours; "thus, the Internet has allowed buyers to perform much of the search and evaluation process independently, before contacting a broker."[131] HomeServices told the FTC in 2018 that

"[132] 72% of home buyers now find a house without using a real estate agent.[133]

257.    The real estate industry was thus well aware that home buyers operated under a fundamental misunderstanding about buyer's agents and devised ways to keep up that ruse simply to line the industry's pockets at the buyers' expense.

---

[128] *See*

[129] *See*

[130] *See Burnett* Pl. Trial Ex. 235A, NARSITZER0000051326 (draft D.A.N.G.E.R. Report).

[131] *See* U.S. Government Accountability Office, *Real Estate Brokerage: Factors That May Affect Price Competition*, GAO-05-947 (Aug. 2005) at 18, *available at* https://www.gao.gov/assets/gao-05-947.pdf (last visited Apr. 17, 2025).

[132] *See*

[133] *See Burnett* Pl. Trial Ex. 2093.

258.    The reason for the Challenged Restraints were clear: to maintain overuse of buyer-agents at the expense of home buyers. In the absence of the Challenged Restraints, buyers rather than sellers would have negotiated buyer-agent commissions, brokers would have competed with each other by offering lower commission rates and/or higher quality services, and buyers would have saved money, including through paying lower home prices.

## IX.    CONTINUOUS ACCRUAL

259.    During the years preceding the filing of this complaint, Defendants and NAR repeatedly engaged in anticompetitive conduct, including implementing and enforcing the Challenged Restraints. The Defendants did so until August 2024.

260.    As a result of their conspiracy, Defendants repeatedly charged and received inflated buyer-agent commissions and total commissions that were paid by Plaintiffs and the Class in connection with the purchase of residential real estate listed on one of the NAR MLSs. Each payment of these inflated commissions by Plaintiffs and Class Members during the class period injured them and gave rise to a new cause of action.

## X.    STATUTE OF LIMITATIONS

261.    The running of the statute of limitations begins when the Plaintiffs discover the existence of a cause of action.

262.    Plaintiffs and the Class had no knowledge of Defendants' unlawful conspiracy and could not have discovered it by the exercise of due diligence until, at the earliest, November 19, 2020, the date the DOJ announced the settlement of its antitrust claims against NAR.

263.    Moreover, it was reasonable for Plaintiffs and Class Members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior. Plaintiffs and Class Members are unsuspecting home buyers who do not have in-depth knowledge or information about the real estate industry and are not well-versed with NAR's framework. Additionally, as alleged

herein, NAR's policies, rules and practices specifically prohibit the disclosure of total broker commissions to home buyers and encourage buyer-agents to represent to their clients that they are receiving the brokers' services for free. As a result, the average home buyer does not appreciate that buyer-agent services cost them anything, let alone that Defendants actively conspire together to maintain supracompetitive broker commissions.

264.    For these reasons, the statutes of limitation applicable to Plaintiffs' and Class Members' claims have been tolled with respect to the claims asserted herein.

265.    Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitation on Plaintiffs' and the Class Members' claims until at least November 19, 2020.

266.    Defendants actively concealed their conspiracy by, for example, prohibiting the disclosure of total commissions to home buyers and encouraging brokers to represent to home buyers that their services are free of charge.

267.    Moreover, Defendants' anticompetitive conduct was inherently self-concealing because NAR tightly controls its regulated MLSs, agents, and brokers, and a reasonable buyer under the circumstances would not have had reason to suspect that they were being subjected to anticompetitive conduct. The conduct prohibiting NAR MLSs from disclosing to prospective buyers the amount of commission that the buyer-agent will earn if the buyer purchases a home listed on the MLS is inherently self-concealing, as is the conduct allowing buyer-agents to misrepresent to buyers that a buyer-agent's services are free. Likewise, conduct by the Defendants to filter MLS listings based on the level of buyer-agent commissions and to exclude homes with lower commissions is inherently self-concealing.

268.     Finally, certain of the Plaintiffs first filed suit against HomeServices in federal court in the Northern District of Illinois on January 25, 2021. The case was dismissed against HomeServices for lack of personal jurisdiction on February 20, 2024. Under state-law equitable tolling and re-filing rules, the statute of limitations for putative class members was tolled from January 25, 2021 to February 20, 2024.

## XI.   CLASS ACTION ALLEGATIONS

269.     Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) seeking damages pursuant to antitrust, unfair competition and consumer protection on behalf of the following class (the "Class"):

> **Damages Class**: All persons who, since December 1, 1996 through August 17, 2024, purchased in the Indirect Purchaser States[134] residential real estate that was listed on a NAR MLS.

270.     Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which any Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

271.     **Ascertainability**: Membership of the Class is defined based on objective criteria, and individual members will be identifiable from Defendants' and public records.

---

[134] The "Indirect Purchaser States" are the states identified in the claims for relief below.

272.    **Numerosity**: The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consist of at least thousands of individuals, and the members can be identified through Defendants' and public records.

273.    **Predominant Common Questions:** The Class claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a.      Whether Defendants conspired as alleged herein;

b.      Whether the conspiracy was implemented in the areas in which the NAR MLSs operate;

c.      Whether the conspiracy harmed competition as alleged herein;

d.      Whether home buyers were harmed as a result of Defendants' anticompetitive conduct as alleged herein;

e.      Whether buyer-agent commissions were inflated as a result of the conspiracy;

f.      Whether the quality of buyer-agent services was diminished as a result of the conspiracy;

g.      Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits; and

h.      The appropriate class-wide measures of damages.

274.     **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the proposed Class. Defendants' conduct that gave rise to Plaintiffs' claims is the same for all members of the Class.

275.    **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including antitrust violations. Plaintiffs have no interest that is antagonistic to those of the Class. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

276.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

277.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## XII.  CLAIMS FOR RELIEF

278.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

279.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to buyer-broker services in unreasonable restraint of trade

in commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

280.    HomeServices requires its affiliates and franchisees to join NAR and local realtors' associations, and to follow MLS rules and NAR rules, including the Challenged Restraints.

281.    HomeServices requires its franchisees and subsidiaries to enforce NAR rules and policies, including the Challenged Restraints.

282.    HSF and BHH, as companies wholly owned by HomeServices, followed these requirements.

283.    All BHH employees are HomeServices employees. BHH employees, thus, were subject to the same requirements and restrictions as other HomeServices employees.

284.    Douglas Elliman employees agreed to be bound by the Challenged Restraints through membership in local boards of realtors and through rules imposed by MLSs.

285.    Douglas Elliman enforced employee compliance through its own policy & procedure handbooks requiring its employees to join local real estate commission or boards and be bound by their rules.

286.    Douglas Elliman adhered to the NAR's Code of Ethics and Standards of Practice, and it ordered its agents to adhere to the Code of Ethics, including the Challenged Restraints.

287.    HomeServices executives held leadership positions in NAR, including a seat on the NAR board of directors and on the Real Estate Services Advisory Group, held positions on relevant NAR subcommittees responsible for issuing and maintaining the NAR Rules, encouraged its officers and employees to hold NAR leadership positions, and had its executive leadership and CEOs of its operating companies drive important discussions in furtherance of the conspiracy.

288.    All HomeServices franchises and company owned offices, save one in Manhattan, participate in at least one MLS. All HomeServices agents and brokers belong to an MLS.

289.    Douglas Elliman employees have held leadership positions in local trade associations and MLSs that have imposed the NAR rules, including the Challenged Restraints. Douglas Elliman has a seat on NAR's Board of Directors and its employees have served on NAR committees responsible for issuing and maintaining the Challenged Restraints and as Vice-Chair of the Real Estate Services Advisory Group.

290.    Both Douglas Elliman and HomeServices have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

291.    Defendants' acts and combinations in furtherance of the conspiracy, including agreeing to, implementing, abiding by, and enforcing the Challenged Restraints and misrepresenting their buyer-broker services as free have caused unreasonable restraints in the market for buyer-broker services and have harmed America's homebuyers

292.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated have been harmed by paying artificially-inflated broker commissions and home prices and receiving fewer and lower quality services from their buyer-brokers.

293.    By engaging in the foregoing conduct, Defendants violated the state antitrust and consumer protection laws pleaded below.

**CLAIM I: Violation of Arizona's Uniform State Antitrust Act**
**Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.***

294.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

295.    By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. §§ 44-1401, *et seq.*

296.    The Arizona Uniform State Antitrust Act prohibits any contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within the state of Arizona.

297.    Arizona's antitrust statute is interpreted in harmony with federal law.

298.    Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Arizona, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

299.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Arizona, including increased prices and costs and reduced and poorer quality services.

300.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Arizona's antitrust laws.

301.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

302.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Arizona.

303.    Plaintiffs mailed notice of this action to the Arizona Attorney General under Ariz. Rev. Stat. § 44-1415.

304.    The statute of limitations was tolled from January 25, 2021 to February 20, 2024, because the instant action was filed within six months of HomeServices and Douglas Elliman being dismissed from *Batton, et al v. Nat'l Assn. of Realtors, et al.*, 21-cv-430 (N.D. Ill.), for lack of personal jurisdiction. Ariz. Stat. § 12-504.

## CLAIM II: Violation of California's Cartwright Act
### Cal. Bus. Code §§ 16700, *et seq.*

305.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

306.    By reason of the conduct alleged herein, Defendants have violated California's Cartwright Act, Cal. Bus. Code §§ 16700, *et seq.*

307.    The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace.

308.    California's antitrust statute is interpreted in harmony with federal law.

309.    Beginning at least in the 1990s, Defendants enacted a combination of capital, skill, or acts for the purpose of creating and carrying out restrictions in trade or commerce or to prevent market competition in violation of Cal. Bus. & Prof. Code §§ 16700 et seq. Specifically, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in California, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers'

commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

310.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in California, including increased prices and costs and reduced and poorer quality services.

311.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of California's antitrust laws.

312.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

313.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in California.

### CLAIM III: Violation of the Connecticut Antitrust Act
### Conn. Gen. Stat. §§ 35-24, *et seq.*

314.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

315.    By reason of the conduct alleged herein, Defendants have violated the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq*.

316.    The Connecticut Antitrust Act "expresses a public policy of promoting competition in the marketplace and prohibiting unreasonable restraints of trade, monopolies and attempts to monopolize a defined marketplace."

317.    Connecticut's antitrust statute is interpreted in harmony with federal law.

81

318.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Connecticut, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

319.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Connecticut, including increased prices and costs and reduced and poorer quality services.

320.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Connecticut's antitrust laws.

321.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

322.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Connecticut.

**CLAIM IV: Violation of the District of Columbia Antitrust Act**
**D.C. Code Ann. §§ 28-4501, _et seq_.**

323.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

324.     By reason of the conduct alleged herein, Defendants have violated the District of Columbia Antitrust Act, D.C. Code Ann. §§ 28-4501, *et seq*.

325.     The purpose of D.C.'s antitrust law is "to promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

326.     D.C.'s antitrust statute is interpreted in harmony with federal law.

327.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in D.C., including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

328.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in D.C., including increased prices and costs and reduced and poorer quality services.

329.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of D.C's antitrust laws.

330.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

331.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in D.C.

## CLAIM V: Violation of Hawaii's Antitrust Statute
## Haw. Rev. Stat. § 480-3, *et seq.*

332.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

333.    By reason of the conduct alleged herein, Defendants have violated Hawaii's Antitrust Statute, Haw. Rev. Stat. § 480-3, *et seq.*

334.    Beginning at least in 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Haw. Rev. Stat. §§ 480-1, *et seq.* HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Hawaii, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

335.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Hawaii, including increased prices and costs and reduced and poorer quality services.

84

336.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Hawaii's antitrust laws.

337.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

338.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Hawaii.

339.    Plaintiffs mailed notice of this action to the Hawaii Attorney General pursuant Haw. Rev. Stat. § 480-13.3.

## CLAIM VI: Violation of the Illinois Antitrust Act
## 740 Ill. Comp. Stat. Ann. 10/7, *et seq.*

340.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

341.    By reason of the conduct alleged herein, Defendants have violated the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/7, *et seq.*

342.    The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade."

343.    Illinois's antitrust statute is interpreted in harmony with federal law.

344.    Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Illinois, including by agreeing with their competitors to implement, enforce, and abide by the

Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

345.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Illinois, including increased prices and costs and reduced and poorer quality services.

346.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Illinois's antitrust laws.

347.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

348.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Illinois.

### CLAIM VII: Violation of Iowa Competition Law
### Iowa Code §§ 553.1, *et seq*.

349.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

350.    By reason of the conduct alleged herein, Defendants have violated the Iowa Competition Law, Iowa Code §§ 553.1, *et seq.*

351.    The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices."

352.    Iowa's antitrust statute is interpreted in harmony with federal law.

353.    Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Iowa, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

354.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Iowa, including increased prices and costs and reduced and poorer quality services.

355.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Iowa's antitrust laws.

356.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

357.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Iowa.

358.    The statute of limitations was tolled from January 25, 2021 to February 20, 2024, because the instant action was filed after HomeServices and Douglas Elliman were dismissed from *Batton, et al v. Nat'l Assn. of Realtors, et al.*, 21-cv-430 (N.D. Ill.), for lack of personal jurisdiction.

87

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *144, 147-148 (S.D.N.Y. Oct. 20, 2015); Iowa Code § 614.10.

## CLAIM VIII: Violation of the Kansas Restraint of Trade Act
## Kan. Stat. Ann. §§ 50-101, et seq.

359.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

360.    By reason of the conduct alleged herein, Defendants have violated the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*

361.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "create or carry out restrictions in trade or commerce", "increase or reduce the price of merchandise, produce or commodities", "prevent competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities", "agree in any manner to keep the price of such article, commodity or transportation at a fixed or graded figure", or "agree to pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of any such article or commodity, that such person's price in any manner is affected."

362.    Kansas's antitrust statute is interpreted in harmony with federal law.

363.    Beginning at least in the 1990s, Defendants enacted a combination of capital, skill, or acts for the purpose of creating and carrying out restrictions in trade or commerce or to prevent market competition in violation of Kan. Stat. Ann. §§ 50-101, *et seq.* Specifically, beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Kansas, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free.

88

Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

364.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Kansas, including increased prices and costs and reduced and poorer quality services.

365.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Kansas's antitrust laws.

366.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

367.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Kansas.

368.    The statute of limitations was tolled from January 25, 2021 to February 20, 2024, because the instant action was filed within 6 months of HomeServices and Douglas Elliman being dismissed from *Batton, et al v. Nat'l Assn. of Realtors, et al.*, 21-cv-430 (N.D. Ill.), for lack of personal jurisdiction. Kan. Stat. Ann. § 60-518.

## CLAIM IX: Violation of Maine's Antitrust Statute
## Me. Rev. Stat. Ann. tit. 10, § 1104(1), *et seq*.

369.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

370.    By reason of the conduct alleged herein, Defendants have violated Maine's Antitrust Statute, Me. Rev. Stat. Ann. tit. 10, § 1104(1), *et seq*.

371.   Part 3 of Title 10 of the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, declaring "[e]very contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce in this State is declared to be illegal."

372.   Maine's antitrust statute is interpreted in harmony with federal law.

373.   Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Maine, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

374.   Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Maine, including increased prices and costs and reduced and poorer quality services.

375.   By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Maine's antitrust laws.

376.   Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

90

377.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Maine.

## CLAIM X: Violation of Maryland's Antitrust Statute
### Md. Com'l Law Code Ann. § 11-204, *et seq.*

378.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

379.    By reason of the conduct alleged herein, Defendants have violated Maryland's Antitrust Statute, Md. Com'l Law Code Ann. § 11-204, *et seq.*

380.    Maryland's antitrust laws prohibit *inter alia*, combinations that unreasonably restrain trade or commerce.

381.    Maryland's antitrust statute is interpreted in harmony with federal law.

382.    Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Maryland, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

383.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Maryland, including increased prices and costs and reduced and poorer quality services.

91

384.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Maryland's antitrust laws.

385.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

386.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Maryland.

### CLAIM XI: Violation of the Michigan Antitrust Reform Act
### Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

387.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

388.    By reason of the conduct alleged herein, Defendants have violated the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

389.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act."

390.    Michigan's antitrust statute is interpreted in harmony with federal law.

391.    Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Michigan, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their

buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

392.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Michigan, including increased prices and costs and reduced and poorer quality services.

393.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Michigan's antitrust laws.

394.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

395.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Michigan.

**CLAIM XII: Violation of the Minnesota Antitrust Law**
**Minn. Stat. Ann. § 325D.57, *et seq.***

396.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

397.    By reason of the conduct alleged herein, Defendants have violated the Minnesota Antitrust Law, Minn. Stat. Ann. § 325D.57, *et seq.*

398.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in Minnesota or any contract, combination, or conspiracy, wherever created, formed or entered into whenever any of these affect Minnesota trade or commerce.

93

399.     Minnesota's antitrust statute is interpreted in harmony with federal law.

400.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Minnesota, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

401.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Minnesota, including increased prices and costs and reduced and poorer quality services.

402.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Minnesota's antitrust laws.

403.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

404.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Minnesota.

## CLAIM XIII: Violation of Nebraska's Antitrust Law
### Neb. Code Ann. §§ 59-801, *et seq.*

405.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

406.     By reason of the conduct alleged herein, Defendants have violated Nebraska's Antitrust Law, Neb. Code Ann. §§ 59-801, *et seq.*

407.     Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade.

408.     Nebraska's antitrust statute is interpreted in harmony with federal law.

409.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Nebraska, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

410.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Nebraska, including increased prices and costs and reduced and poorer quality services.

411.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Nebraska's antitrust laws.

412. Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

413. As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Nebraska.

## CLAIM XIV: Violation of the Nevada Unfair Trade Practices Act
## Nev. Rev. Stat. Ann. §§ 598A, *et seq.*

414. Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

415. By reason of the conduct alleged herein, Defendants have violated the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A, *et seq.*

416. The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities . . . is necessary to the economic well-being of the citizens of the State of Nevada."

417. The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open, and competitive market, and to penalize all persons engaged in anticompetitive practices. Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade.

418. Nevada's antitrust statute is interpreted in harmony with federal law.

419. Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Nevada, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their

buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

420.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Nevada, including increased prices and costs and reduced and poorer quality services.

421.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Nevada's antitrust laws.

422.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

423.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class, acting as reasonable consumers, purchased homes in Nevada and were harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Nevada.

424.    Plaintiffs mailed notice to the Nevada Attorney General pursuant to Nev. Rev. Stat. § 598A.210(3).

### CLAIM XV: Violation of New Hampshire's Antitrust Statute
### N.H. Rev. Stat. § 356:1, *et seq.*

425.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

426.    By reason of the conduct alleged herein, Defendants have violated New Hampshire's Antitrust Statute, N.H. Rev. Stat. § 356:1, *et seq.*

427.     Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade.

428.     New Hampshire's antitrust statute is interpreted in harmony with federal law.

429.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in New Hampshire, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

430.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in New Hampshire, including increased prices and costs and reduced and poorer quality services.

431.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of New Hampshire's antitrust laws.

432.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

433.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in New Hampshire.

**CLAIM XVI: Violation of the New Mexico Antitrust Act**
**N.M. Stat. Ann. § 57-1-1, *et seq.***

434.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

435.     By reason of the conduct alleged herein, Defendants have violated the New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1, *et seq.*

436.     The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices.

437.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in New Mexico, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

438.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in New Mexico, including increased prices and costs and reduced and poorer quality services.

439.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of New Mexico's antitrust laws.

440.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

441.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in New Mexico.

## CLAIM XVII: Violation of the New York General Business Law
## N.Y. Gen. Bus. L. §§ 340, *et seq.*

442.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

443.     By reason of the conduct alleged herein, Defendants have violated the New York General Business Law, N.Y. Gen. Bus. L. §§ 340, *et seq.*

444.     Article 22 of the New York General Business Law generally prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade, or commerce in New York.

445.     New York's antitrust statute is interpreted in harmony with federal law.

446.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in New York, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

447.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in New York, including increased prices and costs and reduced and poorer quality services.

448.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of New York's antitrust laws.

449.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

450.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in New York.

451.    Members of the Class who purchased homes in New York are also entitled to all other forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees

452.    Plaintiffs mailed notice of this action to the New York Attorney General pursuant to N.Y. Gen. Bus. § 340(5).

### CLAIM XVIII: Violation of the North Carolina General Statutes
### N.C. Gen. Stat. §§ 75-1, *et seq.*

453.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

454.    By reason of the conduct alleged herein, Defendants have violated the North Carolina General Statutes, N.C. Gen. Stat. §§ 75-1, *et seq*.

455.    North Carolina's antitrust statute is interpreted in harmony with federal law.

101

456.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in North Carolina, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

457.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in North Carolina, including increased prices and costs and reduced and poorer quality services.

458.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of North Carolina's antitrust laws.

459.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

460.     Defendants' unlawful conduct offends North Carolina public policy to promote fair competition in all its marketplaces and is otherwise immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

461.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in North Carolina.

### CLAIM XIX: Violation of the North Dakota Uniform State Antitrust Act
### N.D. Cent. Code § 51-08.1-01, *et seq.*

462.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

463.     By reason of the conduct alleged herein, Defendants have violated the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*

464.     The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade.

465.     North Carolina's antitrust statute is interpreted in harmony with federal law.

466.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in North Carolina, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

467.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in North Carolina, including increased prices and costs and reduced and poorer quality services.

468.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of North Carolina's antitrust laws.

469.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

470.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in North Carolina.

### CLAIM XX: Violation of the Oregon Antitrust Law
### Or. Rev. Stat. §§ 646.705, *et seq.*

471.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

472.     By reason of the conduct alleged herein, Defendants have violated the Oregon Antitrust Law, Or. Rev. Stat. §§ 646.705, *et seq*.

473.     Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 and 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state."

474.     Oregon's antitrust statute is interpreted in harmony with federal law.

475.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Oregon, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

476.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Oregon, including increased prices and costs and reduced and poorer quality services.

477.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Oregon's antitrust laws.

478.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

479.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Oregon.

480.     Plaintiffs mailed notice of this action to the Oregon Attorney General pursuant to Or. Rev. Stat. § 646.780(5)(b).

481.      The statute of limitations was tolled from January 25, 2021 to February 20, 2024, because the instant action was filed after HomeServices and Douglas Elliman were dismissed from *Batton, et al v. Nat'l Assn. of Realtors, et al.*, 21-cv-430 (N.D. Ill.), for lack of personal jurisdiction. *Berquist v. Int'l Realty, Ltd.*, 537 P.2d 553, 561 (Ore. 1975).

## CLAIM XXI: Violation of the Tennessee Trade Practices Act
## Tenn. Code Ann. §§ 47-25-101, *et seq.*

482.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

483.     By reason of the conduct alleged herein, Defendants have violated the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*

484.     The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void.

485.     Tennessee's antitrust statute is interpreted in harmony with federal law.

486.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Tennessee, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

487.     Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Tennessee, including increased prices and costs and reduced and poorer quality services.

488.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Tennessee antitrust laws.

489.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

490.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Tennessee.

491.     The statute of limitations was tolled from January 25, 2021 to February 20, 2024, because the instant action was filed within twelve months of HomeServices and Douglas Elliman being dismissed from *Batton, et al v. Nat'l Assn. of Realtors, et al.*, 21-cv-430 (N.D. Ill.), for lack of personal jurisdiction. Tenn. Code Ann. 28-1-105(a) and 28-1-115.

## CLAIM XXII: Rhode Island
### R.I. Gen. Laws §§ 6-36-4, *et seq.*

492.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

493.     By reason of the conduct alleged herein, Defendants have violated Rhode Island's Antitrust Law, R.I. Gen. Laws §§ 6-36-4, *et seq.*

494.     Rhode Island's antitrust law deems "[e]very contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce is unlawful."

495.     Utah's antitrust statute is interpreted in harmony with federal law.

496.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Rhode Island, including by agreeing with their competitors to implement, enforce, and abide by the

107

Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

497.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Rhode Island, including increased prices and costs and reduced and poorer quality services.

498.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Rhode Island's antitrust laws.

499.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

500.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Rhode Island.

501.    Plaintiffs mailed notice of this action to the Rhode Island Attorney General pursuant to R.I. Gen. Laws Ann. § 6-36-21.

### CLAIM XXIII: Violation of the Utah Antitrust Act
### Utah Code 76-10-3101, et seq.

502.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

503.   By reason of the conduct alleged herein, Defendants have violated the Utah Antitrust Act, Utah Code 76-10-3101, *et seq.*

504.   The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce."

505.   Utah's antitrust statute is interpreted in harmony with federal law.

506.   Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Utah, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

507.   Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Utah, including increased prices and costs and reduced and poorer quality services.

508.   By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Utah's antitrust laws.

509.   Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

510.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Utah.

511.    Plaintiffs mailed notice of this action to the Utah Attorney General pursuant to Utah Code § 76-10-3109(9).

### CLAIM XXIV: Violation of the Vermont Antitrust and Consumer Fraud Act Vt. Stat. Ann. tit. 9, § 2453, et seq.

512.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

513.    By reason of the conduct alleged herein, Defendants have violated the Vermont Antitrust and Consumer Fraud Act, Vt. Stat. Ann. tit. 9, § 2453, *et seq.*

514.    Vermont's antitrust statute is interpreted in harmony with federal law.

515.    Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Vermont, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

516.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Vermont, including increased prices and costs and reduced and poorer quality services.

517.     By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Vermont's antitrust laws.

518.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

519.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Vermont.

### CLAIM XXV: Violation of the West Virginia Antitrust Act
### W. Va. Code § 47-18-1, *et seq.*

520.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

521.     By reason of the conduct alleged herein, Defendants have violated the West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq*.

522.     West Virginia's antitrust statute is interpreted in harmony with federal law.

523.     Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in West Virginia, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

524.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in West Virginia, including increased prices and costs and reduced and poorer quality services.

525.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of West Virginia's antitrust laws.

526.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

527.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in West Virginia.

## CLAIM XXVI: Violation of the Wisconsin Antitrust Act
## Wis. Stat. §§ 133.03, *et seq*.

528.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

529.    By reason of the conduct alleged herein, Defendants have violated the Wisconsin Antitrust Act, Wis. Stat. §§ 133.03, *et seq*.

530.    Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition."

531.    Beginning at least in the 1990s, HomeServices and Douglas Elliman engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in

Wisconsin, including by agreeing with their competitors to implement, enforce, and abide by the Challenged Restraints, by making unilateral offers of compensation and severely limiting or eliminating buyers' ability to negotiate their brokers' commissions, and by misrepresenting their buyer-broker services as free. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

532.    Defendants' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Wisconsin, including increased prices and costs and reduced and poorer quality services.

533.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Wisconsin's antitrust laws.

534.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

535.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in Wisconsin.

536.    Plaintiffs and the Class seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

537.    Defendants are jointly and severally liable for all damages suffered by Plaintiffs and the Class.

## **CLAIM XXVII: Violation of the Arizona Consumer Fraud Act**
## **Ariz. Rev. Stat. §§ 44-1521, *et seq*.**

538.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

539.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Ariz. Code §§ 44-1521, et seq. HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Arizona. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

540.    The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Ariz. Code §§ 44-1522(A).

541.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce and consumers.

542.    Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Arizona; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Class received lower quality and fewer services in Arizona; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Arizona.

543.     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce and consumers.

544.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property.

545.     The statute of limitations was tolled from January 25, 2021 to February 20, 2024, because the instant action was filed within six months of HomeServices and Douglas Elliman being dismissed from *Batton, et al v. Nat'l Assn. of Realtors, et al.*, 21-cv-430 (N.D. Ill.), for lack of personal jurisdiction. Ariz. Stat. § 12-504.

### CLAIM XXVIII: Violation of California's Unfair Competition Law (The "UCL") Cal. Bus. and Prof. Code §§ 17200, *et seq.*

546.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

547.     Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California's Unfair Competition Law (The "UCL"), Cal. Bus. and Prof. Code §§ 17200, *et seq.* HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminate buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in California. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

548.     During the Class Period, Defendants committed acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above.

549.     Defendants' conduct as alleged herein violated Section 17200. As alleged herein, Defendants engaged in a common, continuous, and continuing course of conduct of unfair competition by means of unfair and unlawful business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not limited to, the violations of California Business and Professions Code as set forth above.

550.     Defendants' acts or practices are unfair to homebuyers in the State of California within the meaning of Section 17200, California Business and Professions Code.

551.     The unlawful and unfair business practices of Defendants, each of them, have caused Plaintiffs and Class members pay supracompetitive and artificially-inflated prices for their homes and to receive lower quality and reduced services. Plaintiffs and Class members suffered injury in fact and lost money or property as a result of such unfair competition.

## CLAIM XXIX: Violation of the Colorado Consumer Protection Act
## Colo. Rev. Stat §§ 6-1-105, *et seq.*

552.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

553.     Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat §§ 6-1-105, *et seq.* HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby

116

affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Colorado. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

554.    The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Colo. Rev. Stat §§ 6-1-105, *et seq*.

555.    During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

556.    Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Colorado; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Class received lower quality and fewer services in Colorado; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Colorado.

557.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

<div align="center">

**<u>CLAIM XXX</u>**
**Violation of the Connecticut Unfair Trade Practices Act**
**Conn. Gen. Stat. §§ 42-110A,** *et seq.*
**(On Behalf of Plaintiffs and the Damages Class)**

</div>

558.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

559.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110A, *et seq.* HomeServices and Douglas Elliman agreed

<div align="center">117</div>

with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Connecticut. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

560.    The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Conn. Gen. Stat. §§ 42-110A, *et seq.*

561.    During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce and consumers.

562.    Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Connecticut; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Class received lower quality and fewer services in Connecticut; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Connecticut.

563.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

### CLAIM XXXI
### Violation of the District of Columbia Consumer Protection Procedures Act
### D.C. Code §§ 28-3901, *et seq.*
### (On Behalf of Plaintiffs and the Damages Class)

564.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

565.     Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq.* HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in D.C. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

566.     The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of D.C. Code §§ 28-3901, *et seq*.

567.     During the Class Period, Defendants' illegal conduct substantially affected D.C. commerce and consumers.

568.     Defendants' unlawful conduct had the following effects: (1) price competition for buyer-broker services was restrained, suppressed, and eliminated throughout D.C.; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout D.C.; (3) Plaintiffs and members of the Class received lower quality and fewer services in D.C.; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in D.C.

569.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

119

**CLAIM XXXII: Violation of Florida's Deceptive and**
**Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201(2), *et seq.***

570.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

571.     Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201(2), *et seq.* HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminate buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Florida. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

572.     The aforementioned conduct on the part of the Defendants constituted unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*

573.     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

574.     Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Florida; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class received lower quality and fewer

services in Florida; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Florida.

575.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

576.    The statute of limitations was tolled from January 25, 2021 to February 20, 2024, because the instant action was filed within six months of HomeServices and Douglas Elliman being dismissed from *Batton, et al v. Nat'l Assn. of Realtors, et al.*, 21-cv-430 (N.D. Ill.), for lack of personal jurisdiction. Ariz. Stat. § 12-504.

### CLAIM XXXIII: Violation of Iowa's Private Right of Action for Consumer Frauds Act
### Iowa Code §§ 714H.1, *et seq.*

577.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

578.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the violated Iowa's Private Right of Action for Consumer Frauds Act, Iowa Code §§ 714H.1, *et seq.* HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Iowa. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

579.     The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Iowa Code §§ 714H.1, *et seq.*

580.     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce and consumers.

581.     Defendants' unlawful conduct had the following effects: (1) price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Iowa; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Class received lower quality and fewer services in Iowa; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Iowa.

582.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

## CLAIM XXXIV
## Violation of the Kansas Consumer Protection Act
## Kan. Stat. §§ 50-623, *et seq.*

583.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

584.     Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Kansas Consumer Protection Act, Kan. Stat. §§ 50-623, *et seq.* . HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminate buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels

122

commission levels and home prices in Kansas. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

585. The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Kan. Stat. §§ 50-623, *et seq.*

586. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce and consumers.

587. Defendants' unlawful conduct had the following effects: (1) price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Kansas; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Class received lower quality and fewer services in Kansas; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes.

588. As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

589. The statute of limitations was tolled from January 25, 2021 to February 20, 2024, because the instant action was filed within 6 months of HomeServices and Douglas Elliman being dismissed from *Batton, et al v. Nat'l Assn. of Realtors, et al.*, 21-cv-430 (N.D. Ill.), for lack of personal jurisdiction. Kan. Stat. Ann. § 60-518.

### CLAIM XXXV: Violation of the Massachusetts Consumer Protection Act
### Mass. Gen. Laws ch. 93A, § 9, *et seq.*

590. Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

591.     Defendants were engaged in trade or commerce as defined by Mass. Gen. Laws ch. 93A.

592.     Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 9, *et seq.* HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminate buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Massachusetts. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

593.     Defendants' conduct constituted unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' violations of Chapter 93A were knowing or willful.

594.     During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

595.     Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Massachusetts; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Class received lower quality and fewer services in Massachusetts; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes.

596.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

597.    Defendants have or will be served with a demand letter in accordance with Mass. Gen. Laws ch. 93A, § 9.

**CLAIM VI: Violation of the Missouri Merchandising Practices Act**
**Mo. Stat. §§ 407.010, *et seq*.**

598.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

599.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Merchandising Practices Act, Mo. Stat. §§ 407.010, *et seq*. HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Missouri. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

600.    The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Mo. Stat. §§ 407.010, *et seq*.

601.    During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce and consumers.

602.    Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Missouri; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Class received lower quality and fewer services in Missouri; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Missouri.

603.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

## CLAIM XXXVII
## Violation of the Montana Consumer Protection Act
## Mont. Code Ann. § 30-14-101, *et seq*.

604.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

605.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Montana Consumer Protection Act, Mont. Code Ann. § 30-14-101, *et seq*. HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Montana. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

126

606.     The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Mont. Code Ann. § 30-14-101, *et seq.*

607.     During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

608.     Defendants' unlawful conduct had the following effects: (1) price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Montana; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Class received lower quality and fewer services in Montana; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Montana.

609.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

**CLAIM XXXVIII**
**Violation of the Nebraska Consumer Protection Act**
**Neb. Rev. Stat. § 59-1601, *et seq.***

610.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

611.     Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.* HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels

127

commission levels and home prices in Nebraska. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

612.    The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

613.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

614.    Defendants' unlawful conduct had the following effects: (1) price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Nebraska; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Class received lower quality and fewer services in Nebraska; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Nebraska.

615.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

## CLAIM XXXVIX
### Violation of the Nevada Deceptive Trade Practices Act
### Nev. Rev. Stat. §§ 598.0903, *et seq.*

616.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

617.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.* HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged

Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Nevada. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

618.    The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq*.

619.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce and consumers.

620.    Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Nevada; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Class received lower quality and fewer services in Nevada; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Nevada.

621.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

### CLAIM XL: Violation of the New Hampshire Consumer Protection Act
### N.H. Rev. Stat. § 358:1, *et seq*.

622.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

623.    Beginning at least in the 1990s, Defendants willingly and knowingly engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation

of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358:1, *et seq*. HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in New Hampshire. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

624.    The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.H. Rev. Stat. §§ 358-A, 1, et seq., in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Class and the prices they paid for their homes and broker services as forth in  N.H. Rev. Stat. §§ 358-A, 1, *et seq*. Plaintiffs and members of the Class were not aware of Defendants' conspiracy and Defendants misrepresented their services as free such that Plaintiffs and members of the Class were unaware that they were being unfairly and illegally overcharged. There was also gross disparity of bargaining power since Defendants agreed to and followed rules that severely limited buyers' ability to negotiate broker commissions. Defendants' conduct including their illegal conspiracy, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of Plaintiffs and Class members.

625.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

626.    Defendants' unlawful conduct had the following effects: (1)  price competition for

buyer-broker services was restrained, suppressed, and eliminated throughout New Hampshire; (2)

broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially

high levels throughout New Hampshire; (3) Plaintiffs and members of the Class received lower

quality and fewer services in New Hampshire; and (4) Plaintiffs and members of the Class paid

supracompetitive, artificially inflated prices for their homes in New Hampshire.

627.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class

have been injured.

### CLAIM XLI: Violation of the New Jersey Consumer Fraud Act
### N.J. Stat. Ann. § 56:8-1, *et seq*.

628.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with

the same force and effect as if fully stated herein.

629.     At all relevant times material hereto, Defendants conducted trade and commerce

within the meaning of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq*.

630.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or

unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the New Jersey

Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq*. HomeServices and Douglas Elliman

knowingly and willingly agreed with their competitors to implement, enforce, and abide by the

Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated

buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker

services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and

artificially inflated levels commission levels and home prices in New Jersey. Both Douglas

Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have

131

taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

631.   The aforementioned conduct on the part of the Defendants constituted deceptive and  unfair acts or practices in violation of N.J.S.A. § 56:8-1, *et seq*.

632.   During the Class Period, Defendants' illegal conduct substantially affected New Jersey commerce and consumers.

633.   Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout New Jersey; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Class received lower quality and fewer services in New Jersey; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in New Jersey.

634.   As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

## CLAIM XLII: Violation of New York's General Business Law
## N.Y. Gen. Bus. Law § 349, *et seq.*

635.   Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

636.   Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the New York's General Business Law, N.Y. Gen. Bus. Law § 349, *et seq*. HomeServices and Douglas Elliman knowingly and willingly agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker

132

services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in New York. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

637.    The aforementioned conduct on the part of the Defendants constituted deceptive and  unfair acts or practices in violation of  N.Y. Gen. Bus. Law § 349, *et seq*.

638.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

639.    Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout New York; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class received lower quality and fewer services in New York; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in New York.

640.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

### CLAIM XLIII:
### Violation of the North Carolina Unfair and Deceptive Trade Practices Act
### N.C. Gen. Stat. §§ 75-1.1, *et seq.*

641.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

642.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq*. HomeServices and

Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in North Carolina. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

643.    Defendants committed deceptive actions, of which Plaintiffs and Class members could not possibly have been aware. Defendants mutually agreed not to divulge total commissions and misrepresented buyer-broker services as free, including through public statements posted on their websites.

644.    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

645.    The aforementioned conduct on the part of the Defendants constituted unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq.,

646.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

647.    Defendants' unlawful conduct had the following effects: (1) price competition for buyer-broker services was restrained, suppressed, and eliminated throughout North Carolina; (2)

134

broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class received lower quality and fewer services in North Carolina; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in North Carolina.

648.   As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

## CLAIM XLIV: Violation of the Oregon Trade Practices Act
## Or. Rev. Stat. §§ 646.605, *et seq*.

649.   Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

650.   Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Oregon Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq*. HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Oregon. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

651.   The aforementioned conduct on the part of the Defendants constituted unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §§ 646.605, *et seq*.

652.     During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce and consumers.

653.     Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Oregon; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Class received lower quality and fewer services in Oregon; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Oregon.

654.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

### CLAIM XLV: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
### 73 Pa. Stat. Ann. §§ 201–1, *et seq*.

655.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

656.     Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201–1, *et seq*. HomeServices and Douglas Elliman knowingly and willingly agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Pennsylvania. Both Douglas Elliman and HomeServices required their

136

agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

657.    The aforementioned conduct on the part of the Defendants constituted deceptive and  unfair acts or practices in violation of 73 Pa. Stat. Ann. §§ 201–1, *et seq.*

658.    During the Class Period, Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

659.    Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Pennsylvania; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Pennsylvania; (3) Plaintiffs and members of the Class received lower quality and fewer services in Pennsylvania; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Pennsylvania.

660.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

**CLAIM XLVI**
**Violation of the South Carolina Unfair Trade Practices Act**
**S.C. Code Ann. § 39-5-140(a), *et seq.***

661.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

662.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-140(a), *et seq*. HomeServices and Douglas Elliman agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers'

ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in South Carolina. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

663.    The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*.

664.    During the Class Period, Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

665.    Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout South Carolina; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class received lower quality and fewer services in South Carolina; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in South Carolina.

666.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

## CLAIM XLVII: Violation of the Virginia Consumer Protection Act
## Va. Code §§ 59.1-196, *et seq.*

667.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

668.    Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Virginia Consumer Protection Act, Va. Code §§ 59.1-196, *et seq.* HomeServices and Douglas Elliman

agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Virginia. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

669.    The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Va. Code §§ 59.1-196, *et seq.*

670.    During the Class Period, Defendants' illegal conduct substantially affected Virginia commerce and consumers.

671.    Defendants' unlawful conduct had the following effects: (1) price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Virginia; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Class received lower quality and fewer services in Virginia; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Virginia.

672.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

### CLAIM XLVIII: Violation of Wisconsin's Fraudulent Representations Law Wisc. Stat. § 100.18, *et seq.*

673.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

674.     Beginning at least in the 1990s, Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Wisconsin's Fraudulent Representations Law, Wisc. Stat. § 100.18, *et seq.* HomeServices and Douglas Elliman knowingly and willingly agreed with their competitors to implement, enforce, and abide by the Challenged Restraints, made unilateral offers of compensation and severely limited or eliminated buyers' ability to negotiate their brokers' commissions, and misrepresented their buyer-broker services as free, thereby affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels commission levels and home prices in Wisconsin. Both Douglas Elliman and HomeServices required their agents to adhere to the Challenged Restraints and have taken actions through involvement in NAR MLSs to implement and enforce the Challenged Restraints.

675.     The aforementioned conduct on the part of the Defendants constituted deceptive and  unfair acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*

676.     During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

677.     Defendants' unlawful conduct had the following effects: (1)  price competition for buyer-broker services was restrained, suppressed, and eliminated throughout Wisconsin; (2) broker commissions and home prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Class received lower quality and fewer services in Wisconsin; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for their homes in Wisconsin.

678.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured.

## XIII.   REQUESTED RELIEF

Plaintiffs request relief as follows:

A.   That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.   That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the state antitrust and unfair competition and consumer protection laws as set forth herein;

C.   That the Court award Plaintiffs and the other members of the Damages Class damages and/or restitution in an amount to be determined at trial;

D.   That the Court award Plaintiffs pre- and post-judgment interest;

E.   That the Court award Plaintiffs their costs of suit, including reasonable attorney's fees and expenses; and

H.   That the Court award such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: August 5, 2025

**/s/ Randall P. Ewing, Jr.**

George A. Zelcs
gzelcs@koreintillery.com
Randall P. Ewing, Jr. (Florida Bar Number: 76879)
rewing@koreintillery.com
Ryan Z. Cortazar
rcortazar@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

Steven M. Berezney
sberezney@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol O'Keefe
cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844

Vincent Briganti
vbriganti@lowey.com
Margaret MacLean
mmclean@lowey.com
Noelle Forde
nforde@lowe.com
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500

*Attorneys for Plaintiffs and the Proposed Class*