# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT; THE STATE OF
ALASKA; THE STATE OF ARIZONA; THE
STATE OF ARKANSAS; THE STATE OF
CALIFORNIA; THE STATE OF COLORADO;
THE STATE OF DELAWARE; THE DISTRICT OF
COLUMBIA; THE STATE OF FLORIDA; THE
STATE OF GEORGIA; THE TERRITORY OF
GUAM; THE STATE OF HAWAII; THE STATE
OF IDAHO; THE STATE OF ILLINOIS; THE
STATE OF INDIANA; THE STATE OF IOWA;
THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY; THE
STATE OF LOUISIANA; THE STATE OF MAINE;
THE STATE OF MARYLAND; THE
COMMONWEALTH OF MASSACHUSETTS;
THE STATE OF MICHIGAN; THE STATE OF
MINNESOTA; THE STATE OF MISSISSIPPI; THE
STATE OF MONTANA; THE STATE OF
NEBRASKA; THE STATE OF NEVADA; THE
STATE OF NEW HAMPSHIRE; THE STATE OF
NEW JERSEY; THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK; THE STATE OF
NORTH CAROLINA; THE STATE OF NORTH
DAKOTA; THE COMMONWEALTH OF THE
NORTHERN MARIANA ISLAND; THE STATE
OF OHIO; THE STATE OF OKLAHOMA; THE
STATE OF OREGON; THE COMMONWEALTH
OF PENNSYLVANIA; THE COMMONWEALTH
OF PUERTO RICO; THE STATE OF RHODE
ISLAND; THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE; THE STATE OF
UTAH; THE STATE OF VERMONT; THE
COMMONWEALTH OF VIRGINIA; THE STATE
OF WASHINGTON; THE STATE OF WEST
VIRGINIA; THE STATE OF WISCONSIN; and
U.S. VIRGIN ISLANDS,

    *Plaintiffs*,

v.

No. 3:20-cv-00802-MPS

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

    *Defendants*.

## RULING ON MOTION FOR SUMMARY JUDGMENT

In this action, the Plaintiffs, the Attorneys General of most of the States and several U.S.

territories ("the States"), allege that twenty-six pharmaceutical companies ("the Defendants")

participated in an overarching conspiracy to fix prices, allocate markets, and rig bids in the sale of

generic drugs for skin ailments, and are thus jointly and severally liable for violations of federal

and state antitrust and unfair and deceptive practices laws. The Defendants have moved for

summary judgment on certain remedies sought by the States under state laws. ECF No. 629.

For the reasons set forth below, the Defendants' motion for summary judgment is

GRANTED IN PART and DENIED IN PART. Specifically:

(1) I deny summary judgment with respect to the Defendants' argument that the States lack antitrust standing to sue, except as to claims for damages related to the States' payments of premiums to Managed Care Organizations ("MCOs"). Genuine disputes of material fact about the drug distribution chains largely preclude summary judgment. But as payors of premiums to MCOs, the States are not in the drug distribution chain at all. Thus, I grant summary judgment to the Defendants on the States' MCO claims.

(2) I deny summary judgment with respect to the Defendants' argument that adequate legal remedies preclude the States from seeking disgorgement as an equitable remedy. Although I agree with the Defendants that the principle of adequacy of legal remedies must inform my disgorgement determination, I will not be in a position to make such a determination until after any damages award and (if appropriate) an assessment of civil penalties. Only then will I be able to decide whether the legal remedies have fully captured any ill-gotten gains by the Defendants as a result of their conduct.

(3) I grant summary judgment in favor of the Defendants as to any attempt by the States to calculate civil penalties based on pharmacy-to-consumer sales. Because civil penalties are triggered only by violations by the Defendants of the state statutes involved here, the civil penalty calculation must focus on the Defendants' allegedly violative conduct, and may not be based on downstream sales by pharmacies to consumers.

(4) I deny summary judgment with respect to the Defendant's constitutional challenges to the States' claims. Because the States may not seek civil penalties under the laws of any State in which no violations took place—whether those violations be comprised of direct sales by the Defendants of price-fixed products or by conduct of the Defendants related to the formation or performance of an illegal agreement—I need not address the question whether the dormant Commerce Clause bars a State from collecting civil penalties for sales in which neither seller nor buyer was located within the State's borders. And genuine disputes of fact about the extent of each Defendant's contact with the States and whether the Defendants were reasonably on notice that their price-fixed drugs would be sold in each State preclude summary judgment under the Due Process and Full Faith and Credit Clauses.

(5) I grant in part and deny the Defendants' motion as to "deadweight loss" and damages to a State's general economy. I grant summary judgment to the Defendants as to Connecticut's claims to recover deadweight loss and consumer surplus as components of damages, but I deny summary judgment as to the ongoing losses to the State's economy resulting from consumer surplus. I also grant summary judgment to the Defendants on claims by the other States that seek deadweight loss because those States' statutes do not support such relief.

# I.    BACKGROUND

The following facts are drawn from the parties' Local Rule 56 Statements of Facts, including the States' Statement of Additional Material Facts ("SAMF"), ECF No. 632, and the record, and are undisputed unless otherwise noted.

## A.  Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of Defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other similar cases brought by private parties in a consolidated proceeding.  ECF No. 9.[1]  In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me.  ECF No. 11.  The operative complaint in this case, ECF No. 196, alleges collusion in the pricing, market allocation, and bidding for some eighty generic drugs (the "Drugs at Issue"), chiefly for dermatological applications.  The parties refer to it as "the Dermatology complaint."

The allegations in the complaint are two-fold.  First, the States allege that each Defendant is liable under federal antitrust law and various state antitrust and consumer protection laws for participating in conspiracies to fix prices and allocate the markets for the Drugs at Issue that it sold (or, for the individual Defendants, that their employer sold).  I refer to these alleged conspiracies as "single-drug conspiracies."  Second, the States also allege that each corporate Defendant is

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.  References to page numbers of documents that were filed under seal refer to the page number of the PDF file.

jointly and severally liable for anticompetitive conduct related to all of the Drugs at Issue, regardless of whether a particular Defendant ever sold or manufactured a certain drug, because each corporate Defendant had an "overarching understanding to avoid competing with each other and to instead settle for what these competitors refer to as their 'fair share'" of a given drug market. ECF No. 196 ¶ 5. I refer to this alleged conspiracy as the "overarching conspiracy." The States seek an injunction, disgorgement, and civil penalties, and also bring *parens patriae* claims for damages incurred by their residents as well as proprietary claims for damages on behalf of state agencies and related entities.

The present summary judgment motion is one of many filed by the Defendants since this case was remanded to this Court. In a previous ruling, I denied the Defendants' Joint Motion for Summary Judgment on Overarching Conspiracy Claims, ECF No. 609, finding that there is evidence in the record—chiefly testimony from cooperating witnesses—from which a reasonable jury could find that the alleged overarching conspiracy exists. *Connecticut v. Sandoz, Inc.*, No. 20-cv-802, 2025 WL 3470502 (D. Conn. Dec. 3, 2025). In concluding that there is a question of fact about whether the overarching conspiracy exists, however, I did not determine whether each corporate Defendant was a member of the overarching conspiracy, and most Defendants have filed additional summary judgment motions that contest whether a particular Defendant joined the overarching conspiracy and single-drug conspiracies. This motion concerns whether the States may obtain certain remedies under their various laws.

### B. Factual Background

In the overarching conspiracy ruling, I discussed the facts underpinning the States' claims that the Defendants conspired to fix prices, allocate markets, and rig bids related to the Drugs at Issue, and I incorporate that description here. *See Sandoz, Inc.*, 2025 WL 3470502, at *2–14. I

now address the facts relevant to the States' theories of monetary relief at issue in this motion.

The Defendant pharmaceutical companies comprise "sixteen unique corporate families": Actavis, Amneal, Aurobindo, Bausch, G&W, Glenmark, Greenstone, Lannett, Lupin, Mallinckrodt, Mylan, Perrigo, Sandoz, Taro, Teligent, and Wockhardt. *Id.* at *2 n.4. These Defendants generally did not sell the drugs they manufacture directly to individual consumers or other entities on whose behalf the States seek relief. ECF No. 632 ¶ 34. Instead, the Defendants sold to intermediaries—typically wholesalers and pharmacy chains—who resold the Defendants' products, either to other downstream intermediaries or directly to consumers. *Id.* ¶¶ 33–34, 44; *see* SAMF ¶ 6. The number of intermediaries who took title to a Drug at Issue before it reached the end-consumer varied across the thousands of transactions involved in this case. ECF No. 1172 at 19 (defense counsel noting at oral argument that whether a wholesaler takes title to a drug is "going to vary by transaction and probably vary by state and vary by purchase"); ECF No. 632 ¶ 44 (citing ECF No. 685-1 at 500 (States' expert agreeing that the consumer's price "can come about based on decisions by any number of intermediaries in the supply chain")). In many instances, the manufacturer and end-consumer are separated by multiple intermediaries. ECF No. 696-1 at 252–53 (States' expert describing the roles of "a series of intermediaries" and identifying the "most common chain" as "Drug Manufacturers → Wholesalers → Retailers → End-Payors"). The intermediaries did not transform the Defendants' products or incorporate them into other products. SAMF ¶ 20.

As a component of damages, the States seek to recover overcharges paid by consumers and other entities as a result of the Defendants' alleged anticompetitive conduct. ECF No. 632 ¶ 18. Because the intermediaries took title to Defendants' products before they reached the end consumer, the States seek only the portion of the overcharges that reflect the price increases by the

Defendant manufacturers that were "passed through" each level of the distribution chain. SAMF ¶ 5. According to empirical analysis conducted by one of the States' economic experts, Dr. Hal Singer, each intermediary passed on manufacturers' price increases to downstream purchasers at a "positive and statistically significant" rate. ECF No. 632 ¶ 33; SAMF ¶ 12. As Dr. Singer explained in his report:

> Specifically, I calculate pass-through for three separate stages to estimate the overall pricing pass-through. The first pass-through is the rate at which drug wholesalers pass through higher prices to their customers for the generic drugs at issue. The second pass-through is the rate at which retailers pass through higher prices to [Pharmacy Benefit Managers ("PBMs")] and cash payors for the generic drugs at issue. The third pass-through is the rate PBMs pass through higher prices to end-payors' health insurance plans. To measure the extent of pass-through across the entire supply chain, I calculate the cumulative pass-through rate, which is equal to the product of the wholesaler, retailer, and PBM pass-through rates.

ECF No. 696-1 at 256. In one type of analysis he conducted, Dr. Singer found that between 57 and 92 percent of Defendants' price increases to their direct customers were passed through to end payors. SAMF ¶ 10. In a second type, he found a cumulative pass-through rate of 50 percent. *Id.* ¶ 11. Using these estimated pass-through rates, Dr. Singer calculated the damages incurred by indirect purchasers in the 24 States seeking damages as between $1.62 and $1.64 billion through 2018 and $192 million from 2019–2021. SAMF ¶ 21.

The Defendants challenge Dr. Singer's analysis and contend that price increases occurred downstream and thus were not a result of the manufacturers' conduct. The Defendants contend that "resellers made independent decisions to increase prices when the resellers' prices did not increase." ECF No. 632 ¶ 35, that some direct purchasers were parties to "long-term pricing contracts, price-protection provisions, and similar mechanisms that enabled the purchasers to avoid or delay price increases," *id.* ¶ 36, and that PBMs engaged in marking up costs to consumers through the common practice of "spread pricing," in which a PBM charges the consumer more than the PBM reimburses the pharmacy for filling a prescription, *id.* ¶ 37. The States characterize

the evidence supporting these claims as speculation, *id.* ¶ 35, inconclusive, *id.* ¶ 36, and based on hearsay, *id.* ¶ 37. The States also counter that Dr. Singer's calculated pass-through rates take account of "independent" mark-up decisions by intermediaries, including those by PBMs. SAMF ¶ 13.

Dr. Singer's pass-through analysis includes overcharges in the form of increased premiums paid by state Medicaid agencies to MCOs, which "charge the States a monthly premium to provide enrollees access to healthcare coverage, including prescription drugs." ECF No. 632 ¶ 50. Dr. Singer opines that MCOs "absorbed the alleged overcharge for prescription drugs and passed on at least 100% of that cost increase in premium calculations." *Id.*; *see* SAMF ¶ 15. When an MCO manages a Medicaid program, the MCO charges the State a per-member, per-month premium that includes all covered healthcare services, including for drugs not at issue here and for non-pharmaceutical costs. ECF No. 632 ¶¶ 50, 52. The States assert that calculation of the monthly costs includes the cost of the Drugs at Issue, and that Dr. Singer does not analyze the total cost of all services covered by an MCO. *Id.* ¶ 51; SAMF ¶ 17. Once a State contracts with an MCO, the MCO reimburses pharmacies for the drugs and the State itself is removed from the distribution and payment chain. ECF No. 632 ¶ 52.

Some States also seek damages in the form of "deadweight loss," which addresses harm to consumers who did not purchase drugs because of increased prices allegedly resulting from the Defendants' conduct. ECF No. 632 ¶¶ 19–21; SAMF ¶¶ 22, 24. According to the States' experts, deadweight loss quantifies the "total welfare lost in a market that has deviated from its competitive equilibrium" and "arises when inflated prices prevent consumers from purchasing, reducing the quantity sold below the socially efficient level, causing a consumer surplus loss disproportionate to sellers' gains." SAMF ¶ 22. One of the States' experts testified, however, that assessing

whether this lost welfare led to a net loss to a particular State's economy would require conducting "a holistic analysis" of "where do the benefits go" and "what are the costs." ECF No. 632 ¶ 25. The States did not provide such an analysis. *Id.* ¶ 26.

In addition to damages, many States also seek civil penalties, though the parties disagree on the correct method by which to quantify the penalties. The States propose a consumer-sale model, arguing that they are entitled to recover a penalty for each time a retail pharmacy sold a price-fixed Drug at Issue to an end-consumer within a particular state. ECF No. 631 at 33; ECF No. 685-1 at 433. In support of this theory, Dr. Singer used data from Medicaid and PBMs to count the number of consumer transactions and concluded that "the number of transactions in the states seeking to impose penalties on a per-transaction basis is 233.8 million." ECF No. 685-1 at 434. Although the States note that the Court decides the ultimate amount of civil penalties to award, ECF No. 632 ¶ 12, Dr. Singer presented an "illustrative range" of civil penalties between $233.8 million and $233.8 billion, based on "a per-transaction fine varying from one dollar to $1,000." *Id.* at 434–35; ECF No. 632 ¶ 15. The Defendants did not attempt to estimate a total amount of civil penalties under their theory, which is based on one violation per conspiracy. ECF No. 629-1 at 17.

The States also seek disgorgement of the Defendants' net profits. ECF No. 632 ¶¶ 16–18. Another of the States' economic experts, Dr. Frederick Warren-Boulton, measured the increased prices the Defendants charged at the manufacturer level that resulted from the Defendants' allegedly conspiratorial conduct. SAMF ¶ 1. Dr. Warren-Boulton used this measure of overcharges to estimate the Defendants' net profits as a result of the alleged conspiracy, on both a nationwide basis and by individual state. *Id.* ¶¶ 2, 4; ECF No. 685-1 at 446. He concluded that the Defendants made between $5.67 and $5.68 billion in net profits through 2018, and an additional

$387 million from 2019–2021.  SAMF ¶ 3.

The States, however, are not the only claimants seeking monetary relief from the Defendants for the allegations raised in this action.  After the States' cases were remanded to this Court, the MDL court has continued to address claims against the Defendants brought by private parties.  *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724 (Rufe, J.).  According to the Defendants, "[a]lthough many claims in the MDL remain pending, direct purchasers [of the Drugs at Issue] have recouped over $390 million through court approved class settlements" in the MDL.  ECF No. 629-1 at 40 n.19.  The States have objected to proposed class settlements in the MDL, arguing that such settlements would prejudice their claims here.  No. 16-MD-2724, ECF No. 3380 at 6 n.3 ("The maximal effect of the Settlement on the State Claims is that any moneys actually recovered by consumers should be deducted from any award to consumers in connection with a judgment obtained by the States.  Given that consumers are not expected to benefit substantially from the Settlement, such an offset is expected to be minimal and easily calculable."), ECF Nos. 3548, 3583, 3947.  Despite the States' objections, the MDL court has granted final approval to end-payer plaintiffs' class settlements.  No. 16-MD-2724, ECF Nos. 3706, 3819.

To support their constitutional arguments, the Defendants provided with their motion a list of States in which each corporate Defendant sold each Drug at Issue.  ECF No. 632 ¶¶ 54–83. According to the list, at least one Defendant made sales in every State or Territory except for Montana, the U.S. Virgin Islands, and the Northern Mariana Islands.  *See id.*  This list collects only the locations in which direct sales were made by the manufacturer, based on invoices, and does not include all States to which the Defendants shipped Drugs at Issue, or where intermediaries later sold Defendants' products.  *See id.*  The States provided evidence that they contend shows that, regardless of where the sales were made, "Defendants knew they were selling nationally

across the United States, and many of them maintained teams of national account representatives or managers." SAMF ¶ 26. The States also contend that the evidence shows that the Defendants also "knew their collusive price increases would be implemented on a national level." *Id.* ¶¶ 28–29.

The Defendants also provided Defendant-specific lists of seventeen "States Where Acts in Furtherance of the Conspiracy Occurred," based on where certain employees that are alleged to have colluded with competitors lived or maintained offices. ECF No. 632 ¶¶ 84–210. The States contend that this list is incomplete because it omits in-person trade meetings and other industry events, at which the States alleged the Defendants engaged in collusive conduct. SAMF ¶¶ 30–32.

## II. LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine

dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

### A. Antitrust Standing

The Defendants argue that the States lack antitrust standing to sue. I disagree, except with respect to the States' attempt to recover premiums paid to Managed Care Organizations ("MCOs"), which they say were inflated due to the Defendants' alleged overcharges.

Antitrust standing requires two showings: "(1) '[the private plaintiff] suffered a special kind of antitrust injury' and . . . (2) '[the private plaintiff] is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws.'" *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021) (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013)). Antitrust injury is not at issue here, and so the question is whether the States are efficient enforcers of the antitrust laws, an inquiry that focuses on "the relation between the injury asserted and the injurious conduct alleged." *Id.* at 139–40.

I begin with a few considerations that shape my analysis. First, the Defendants concede that antitrust standing is not required for either statutory enforcement claims that do not seek monetary relief or civil penalties.[2] ECF No. 633 at 17 n.18. Second, each State suing for damages has an *Illinois Brick*-repealer statute, meaning those States' laws do not bar indirect purchaser

---

[2] When asked at oral argument whether all the States' civil penalty provisions dispense with any requirement that the State prove causation, counsel offered that "nearly all" do but said confirming that "may require some state law digging about whether courts have read a causation requirement into a particular statute." ECF No. 1172 at 20. But counsel did not identify any States that require proof of causation to collect a civil penalty, and I am not aware of any.

recovery.  ECF No. 631 at 21; *see Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *California v. ARC Am. Corp.,* 490 U.S. 93 (1989) (holding state *Illinois Brick*-repealer statutes are not preempted by Federal law and permitting indirect purchasers to recover from settlement).  This is important because the Defendants maintain that each State's  injury is "multiple steps removed" from the alleged anticompetitive conduct.  ECF No. 632 ¶ 33.

Where those indirect purchasers land in the distribution chain is relevant to the antitrust standing analysis.  But all agree that there is considerable variation in the distribution chains involved here, making a one-size-fits-all ruling with respect to antitrust standing impossible.  The parties neither briefed the details of these distribution chains, nor do they readily agree where any one purchaser fits in that chain.  During oral argument, I posed a hypothetical to counsel for both sides aimed at understanding the specifics.  Using UCLA as an example, I asked whether UCLA would be a direct purchaser if the university took delivery of a drug directly from the manufacturer and paid the manufacturer directly.  ECF No. 1172 at 19.  In that example, defense counsel conceded that yes, UCLA "could be a direct purchaser." *Id.*  But, before making that concession, counsel added that it "var[ies] by transaction and probably var[ies] by state and var[ies] by purchase" whether the wholesaler is taking title to the drug, including whether the wholesaler is "arranging . . . for the manufacturer to ship the drugs." *Id.*  Only once I posited "[s]uppose it doesn't [vary].  Suppose in one example it doesn't.  Is the State a direct purchaser in that example," would defense counsel agree that UCLA could be a direct purchaser in that instance. *Id.*  Defense counsel acknowledged that "the States have a stronger argument for antitrust standing with regard to . . . UCLA [in my example] than . . . as to a parens patriae claim where they're representing consumers at the end of the chain[.]" *Id.* at 18.

I intended the UCLA example to be an easy hypothetical, but even in that example the nuance involved in each drug transaction is unavoidable. Thus, the specifics of these distribution chains, which are crucial to the antitrust standing analysis, present genuine issues of material fact precluding summary judgment, except with respect to the claim for premiums paid to MCOs. Nonetheless, to provide guidance to the parties, I analyze antitrust standing below on the assumption that with respect to their damages claims, the States are uniformly indirect purchasers.

1. Whether Antitrust Standing Applies to State Attorneys General

The States seek to avoid the antitrust standing analysis altogether because they submit that the doctrine applies only to those categorized as "private attorneys general." As actual attorneys general, they argue, the test serves no purpose because they are necessarily the "most efficient enforcers" of the antitrust claims. The States argue that they should be treated the same as federal enforcers of federal antitrust law (*e.g.*, the Department of Justice) because the States, they say, are acting as government enforcers rather than as private parties.

I disagree that the States should be exempt from antitrust standing scrutiny as to all of their claims. Although there is little case law addressing whether antitrust standing applies when State Attorneys General sue for violations of state antitrust laws, I find that whether the State Attorneys General are acting as sovereign enforcers depends on the type of relief sought. Specifically, the type of relief each State is seeking—for example, whether it is seeking civil penalties or damages on behalf of a state agency—determines the capacity in which the State is suing, and the capacity in which the State sues determines whether antitrust standing rules should apply.

a. *Parens Patriae*

Although the parties have cited no binding precedent on point with respect to *parens patriae* damages and antitrust standing, I find the reasoning of *State of Conn. v. Levi Strauss & Co.*, 471 F. Supp. 363 (D. Conn. 1979), instructive. In *Levi Strauss*, then-District Judge Newman

13

considered a *parens patriae* claim for damages under Connecticut's antitrust statute in deciding whether there was diversity of citizenship and thus whether the Court had diversity jurisdiction over the case.  There, he said, "[i]f Connecticut were suing as Parens patriae for the benefit of all of its citizens, its capacity would be essentially sovereign, and it would not be a citizen for diversity purposes.  But it has long been recognized that a state can act as Parens patriae for a circumscribed group of its citizens."  *Id.* at 370–71.  He added, "[w]hen Connecticut claims refunds to be distributed to identifiable purchasers, the citizen status of the purchasers rather than the sovereign status of their benefactor controls for diversity purposes."  *Id.* at 371.

This reasoning, which I find persuasive, suggests that when a State sues for *parens patriae* damages on behalf of state residents who have paid overcharges as a result of cartel behavior, the State steps into the shoes of these residents.  In this case, the States are seeking *parens patriae* damages on behalf of identifiable purchasers, rather than in the States' capacity as a sovereign. Just as the court looks past the States' sovereign status to focus on the identifiable purchasers on whose behalf the State sues when it decides whether there is diversity jurisdiction, a court should focus on the identifiable purchasers on whose behalf the State sues for damages when deciding whether there is antitrust standing.  In other words, because the State is acting in a representative rather than a sovereign capacity, the same rules apply as if the represented persons (here, mostly consumers) had brought suit themselves.  *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 219 (1990) (federal statute allowing states to sue as *parens patriae* for antitrust violations on behalf of injured persons did not permit states to bring claims on behalf of indirect purchasers due to the rule of *Illinois Brick*; and holding that federal *parens patriae* provision "did not establish any new substantive liability, but simply created a new procedural device"—*parens patriae* actions by

14

states on behalf of their consumers—"to enforce existing rights of recovery under" federal antitrust law).

So, I conclude that antitrust standing applies to the States' claims for *parens patriae* damages.

### b. Proprietary Damages

I reach the same result with respect to the States' claims for proprietary damages. Although not an antitrust standing case, the Supreme Court in *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251 (1972), considered the impact of a state's suit for proprietary damages under federal antitrust law. In doing so, the Court distinguished a state's "sovereign interests" from its "proprietary functions," *id.* at 265, finding that the Clayton Act authorized states to sue for economic harm to their "commercial interests and enterprises" but not for economic harm to their sovereign interests, *id.* at 264–65 (noting by analogy that the Clayton Act authorized the federal government to sue for damages "only for those injuries suffered in its capacity as a consumer of goods and services"). The States have not cited case law indicating that any state's courts have found that the antitrust standing doctrine should not apply to proprietary claims by the States. The States' claims for proprietary damages are not transformed into sovereign remedies simply because the States are bringing them. Rather, the States are seeking recovery for injuries flowing from their "proprietary" functions, i.e., they are seeking recovery for injuries to their business or property, just as a private antitrust plaintiff would. I therefore find that the antitrust standing doctrine applies to claims for proprietary damages, too.

### c. Disgorgement

I agree with the States, however, that disgorgement is not subject to antitrust standing rules.

The Second Circuit has said that "disgorgement is not available primarily to compensate victims." *S.E.C. v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) (internal quotation marks

15

omitted).  Instead, courts use disgorgement "to prevent wrongdoers from unjustly enriching themselves through violations, which has the effect of deterring subsequent fraud."  *Id.* Disgorgement is a feature of a federal court's equitable powers under Section 11 of the Judiciary Act, which gives federal courts jurisdiction over "all suits . . . in equity."  1 Stat. 73, 78 (1789).

Disgorgement focuses not on harm to victims, but instead on stripping wrongdoers of their ill-gotten gains.  *See Cavanagh*, 445 F.3d at 117 ("A district court order of disgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court.").  For this reason, disgorgement does not implicate the concerns about directness of injury, proximate cause, and excessive complexity that animated the Supreme Court's seminal antitrust standing decision, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535, 540–43 (1983) ("*AGC*"), which concerned "[t]he class of persons who may maintain a private damage action under the antitrust laws," *id.* at 529.  There is nothing indirect or excessively complex about seizing a wrongdoer's profits from illegal activity. Disgorgement's concern with ill-gotten gains in the hands of a defendant as opposed to the injury suffered by a plaintiff removes it from the coverage of the antitrust standing doctrine.  Thus, as with civil penalties, antitrust standing is inapposite.

This conclusion is arguably in tension with Judge Rufe's conclusion in the MDL case. Although she did not rely on the antitrust standing doctrine, Judge Rufe determined that allowing disgorgement damages for a federal antitrust claim would function as an end-run around the direct purchaser rule of *Illinois Brick*.  *See In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d 672, 679 (E.D. Pa. 2022).  The Defendants argue that the same reasoning should extend to state antitrust laws that follow *Illinois Brick*, especially when those States' relevant antitrust statutes include provisions directing harmonization with federal antitrust law.  Because I conclude that

16

disgorgement is a remedy focused on the profits of the defendant, no matter where the harm was felt along the distribution chain, I do not share the concern that permitting disgorgement would raise the concerns about duplicative recovery and complexity of proof that animated *Illinois Brick*. Therefore, I conclude that the States' claims for disgorgement for violations of state antitrust law, even when the rule of *Illinois Brick* applies, are not subject to antitrust standing analysis.

### 2. *AGC* Factors

I next turn to the application of the antitrust standing doctrine to the States' proprietary and *parens patriae* damages claims. With antitrust injury out of the equation, the analysis is limited to whether the States are "efficient enforcer[s] of the antitrust laws." *DirecTV, LLC v. Nexstar Media Grp., Inc.*, 162 F.4th 295, 310 (2d Cir. 2025). Under federal law, the test turns on four factors identified by the Supreme Court in *AGC*, 459 U.S. at 540–45 (the "*AGC* factors"):

> (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*DirecTV, LLC*, 162 F.4th at 310 (quoting *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 259 (2d Cir. 2023)); *Am. Express*, 19 F.4th at 138. The parties debate whether each of the States has adopted the *AGC* factors in applying its own antitrust and consumer protection laws, but I conclude that I need not decide whether any particular state's courts has adopted these factors. For purposes of the analysis below, I assume that each state's court has adopted or would adopt the *AGC* factors but would modify them to fit this case, as I explain below. I do not, however, assume that any State has adopted (or would adopt) the *AGC* factors in my analysis of premiums paid to MCOs.

17

All of the States that are bringing damages claims here have enacted *Illinois Brick*-repealer statutes, except Connecticut, which brings a claim for "general economy damages" (discussed below) based on events that occurred before Connecticut adopted its *Illinois Brick*-repealer legislation. Strict application of the *AGC* factors here would render those States' *Illinois Brick*-repealer statutes meaningless. So, I agree with those courts that have determined that a modified, flexible *AGC* analysis should apply in such states. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 698 (E.D. Pa. 2014) ("It would be inconsistent for a state to allow indirect purchasers to bring antitrust claims, only for the courts to cursorily dismiss those claims on antitrust standing grounds simply because they have been brought by indirect purchasers."), *on reconsideration in part*, No. 13-MD-2445, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015).

I therefore consider the factors flexibly, giving due weight to the policy choice of States that permit suits by indirect purchasers.

### a. Directness of the Injury

With respect to the first factor, the Defendants submit that the evidence does not show that the States purchased directly from the Defendants.

"[F]or the purposes of antitrust standing, proximate cause is determined according to the so-called 'first-step rule,'" whereby only "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior." *Sullivan v. UBS AG*, 149 F.4th 206, 224 (2d Cir. 2025) (quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC (Schwab II)*, 22 F.4th 103, 122 (2d Cir. 2021). The Second Circuit "clarified that '[t]he first-step rule and traditional proximate cause considerations require drawing a line between those whose injuries resulted from their direct transactions with the [defendants] and those whose injuries stemmed from their deals with third parties.'" *Id.* (quoting *Schwab II*, 22 F.4th at 122).

Strictly applying that principle here would ignore the States' policy choice permitting indirect purchaser recovery. Further, as I said above, both parties acknowledge there is variation in the States' positions along the distribution chain—and factual disputes about these positions. For these reasons, the first *AGC* factor does not support granting the Defendants' motion for summary judgment on antitrust standing grounds.

b. Motivation

The second *AGC* factor considers the existence of "more direct victims" or "[t]he existence of an identifiable class . . . whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *AGC*, 459 U.S. at 542, 545. This "second factor simply looks for a class of persons naturally motivated to enforce the antitrust laws." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009). In *DDAVP*, the Second Circuit rejected the defendants' argument that "their competitors are the parties most motivated to enforce the antitrust laws, because the competitors were most directly impacted by the alleged anticompetitive behavior." *Id.* at 688. The Court emphasized that the "motivation" inquiry asks whether "the plaintiff was an entity most motivated by self-interest, not *the* entity most motivated by self-interest." *Id.* (emphasis in original).

The States' joinder of their damages claims with their claims for civil penalties and disgorgement is relevant to this issue. Although I have concluded that the States are akin to private parties when pursuing their damages claims, I cannot ignore that they are also acting as sovereign enforcers of their antitrust laws with respect to their claims for civil penalties and disgorgement. They are obviously adequately motivated to take discovery and develop evidence needed to support their sovereign claims, and mostly the same evidence will be used to advance their damages claims. It would thus be incongruous, under the circumstances of this case, to find that

19

the States were anything but highly motivated to pursue their claims, including their damages claims.

It is true, as the Defendants point out, that there are direct purchaser suits in the MDL proceeding that assert the same liability claims the States are asserting here, and direct purchasers are generally considered more efficient antitrust enforcers than indirect purchasers. Again, however, the existence of *Illinois Brick*-repealer legislation in essentially all of the States seeking damages forecloses giving much weight to this consideration. In fact, there are also indirect purchaser claims pending in the MDL; it is not apparent why the States would be worse enforcers of the antitrust laws than the indirect purchasers in the MDL.

At oral argument, defense counsel pointed out that there has been at least one class settlement between two Defendants and a consumer class, which would include indirect purchasers of drugs on whose behalf the States are bringing *parens patriae* claims. While this circumstance may be relevant to any defense of release or to equitable considerations the Court might take into account at trial or post-verdict, it does not speak to the concern animating the second efficient enforcer factor, which is whether there are "plaintiffs who are better situated to vindicate the antitrust laws." *Am. Express*, 19 F.4th at 141 (internal quotation marks and citation omitted). The consumers who have settled with Sandoz and Fougera are not "better situated to vindicate the antitrust laws" than the States are, even considering only the States' damages claims.

c. Highly Speculative Claim for Damages

The third factor considers whether the claims for damages are highly speculative. "Under this factor, we ask whether there would be 'a high degree of speculation in a damages calculation.' When an injury is 'derivative' rather than direct, the potential recovery is often 'highly speculative.'" *DirecTV, LLC*, 162 F.4th at 313 (quoting *Am. Express*, 19 F.4th at 141). "We also

20

consider whether the 'alleged effects on the [plaintiff] may have been produced by independent factors.'" *Id.* (quoting *Am. Express*, 19 F.4th at 141).

Here, the Defendants argue that it is fatal that various intermediaries (*e.g.*, wholesalers, retailers, PBMs) made independent pricing decisions, which, they say, proves any potential recovery is highly speculative.  ECF No. 633 at 20.

In response, the States offer Dr. Hal Singer, an expert economist on "pass-through" damages, whose analysis considers each link in the distribution chain in determining putative damages.  ECF No. 631-5 ¶ 44; ECF No. 963-1 ¶ 60.  Dr. Singer opines that overcharges were passed through the distribution chain to indirect purchasers, such as consumers, resulting in harm to the end-payors.  ECF No. 963-1 ¶ 59.  Dr. Singer quantified a pass-through rate by analyzing sales and cost data, which "[v]arious third parties in this case produced  . . . allowing [him] to calculate pass-through at each stage of the generic pharmaceutical supply chain."  *Id.* ¶ 67.  Using these data "[t]o measure the extent of pass-through across the entire supply chain," Dr. Singer "calculate[d] the cumulative pass-through rate, which is equal to the product of the wholesaler, retailer, and PBM pass-through rates."  *Id*. ¶ 68.

In his reply report, Dr. Singer explained that his "multi-stage pass-through analysis measures the pricing decisions for each wholesaler, retailer, and PBM that produced data in this litigation usable for purposes of estimating pass-through.  These data cover a large and representative set of intermediaries engaged in the generic pharmaceutical supply chain, thus providing a reasonable sample of generic transactions to draw inferences regarding pass-through applicable to the products and Plaintiffs in this case."  ECF No. 737-2 ¶ 34.  Dr. Singer's analysis is generally logical and coherent, and it appears to be based on adequate data.  These data consider the intermediaries' pricing decisions and therefore alleviate the risk of highly speculative damages.

In a separate ruling, I deny the Defendants' motion to exclude Dr. Singer's opinion on this basis, as I do not share the Defendants' concern that Dr. Singer's "damages calculation rests on multiple layers of speculation." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 67 (2d Cir. 2019).

I conclude that, for most of the claims at issue, Dr. Singer's analysis is enough at least to raise a genuine dispute of fact about whether the States' damages claims are overly speculative.

> #### d. Avoiding Duplicative Recoveries or Complex Apportionment of Damages

The fourth factor "reflects the importance of 'avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'" *DirecTV, LLC*, 162 F.4th at 314 (quoting *Am. Express*, 19 F.4th at 142). "This factor 'guards against pass-on theories that would require a court to divide damages from the same violation among multiple plaintiffs.'" *Id.* (quoting *Platinum & Palladium*, 61 F.4th at 261) (internal quotation marks omitted).

Again, because of the States' *Illinois Brick*-repealer statutes, this factor should not receive much weight. "[I]nclusion of indirect plaintiffs necessarily creates a risk of duplicative recovery, but 'where states have explicitly rejected *Illinois Brick*, this Court is reluctant to undermine what the state legislatures have condoned.'" *In re Fragrance Direct Purchaser Antitrust Litig.*, No. 2:23-02174, 2025 WL 579639, at *16 (D.N.J. Feb. 21, 2025) (quoting *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. CIV. 12-169, 2013 WL 5503308, at *18 (D.N.J. Oct. 2, 2013)). In deference to the States' policy choices to adopt *Illinois Brick*-repealer statutes, I give little weight to this concern.

In all, I deny the Defendants' motion for summary judgment on the basis of antitrust standing with respect to all of the States' damages claims, except the claims for premiums paid to MCOs, which is discussed below.

### 3. Managed Care Organizations

The States also seek as damages the premiums they paid to MCOs during the period of the alleged conspiracy. MCOs are healthcare organizations with which some States contract to "provide coverage of medical health services to Medicaid beneficiaries." ECF No. 963-1 ¶ 42. When an MCO manages a Medicaid program, it pays or reimburses providers and pharmacies and charges the State a per-member, per-month premium (*i.e.*, a capitation rate). ECF No. 632 ¶¶ 50, 52; ECF No. 963-1 ¶¶ 38, 42. As noted above, I do not assume for this part of my discussion that the States would adopt the *AGC* factors when analyzing this issue. I rely instead for this portion of the discussion on well-established, common-law limitations on remote recovery that stem from the doctrine of proximate cause. The States have not suggested, and I am not aware, of any statute invoked in the Complaint that does not require proof of proximate cause for damages. *See, e.g.*, *Schnellman v. Roettger*, 627 S.E.2d 742, 745-46 (Ct. App. 2006) ("[T]o recover pursuant to the [South Carolina Unfair Trade Practices Act] one must prove . . . : 1) a violation of the Act [by the commission of an unfair or deceptive act in trade or commerce], 2) proximate cause, and 3) damages.") (internal quotations marks and citation omitted); *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. Dist. Ct. App. 2008) ("[I]t is well recognized in this state that a claim for damages under [the Florida Deceptive and Unfair Trade Practices Act] has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."); *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1077 (2010) (referring to "antitrust causation" with respect to the Cartwright Act and noting that "to have an antitrust claim one must establish a causal nexus between one's injury and the alleged unlawful restraint of trade"); *Pope v. Intermountain Gas Co.*, 646 P.2d 988, 1009

(Idaho 1982) ("Consequently, not only proof of an antitrust violation is required for a plaintiff to prevail under [Idaho Competition Act (Awards to Attorneys General)], but also proof of individual injury, proximate cause, and damages."); *Mason v. Mortg. Am., Inc.*, 792 P.2d 142, 147 (Wash. 1990) ("The five elements of a private [Washington] Consumer Protection Act action include: (1) an unfair or deceptive act or practice; (2) in the conduct of trade or commerce; (3) which impacts the public interest; (4) injury to the plaintiffs in their business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered.").  Proximate cause imposes some of the same restrictions on recovery that the *AGC* factors do; indeed, the Supreme Court relied on proximate cause, in part, in *Associated General Contractors*, 459 U.S. at 532 (referring to "proximate cause" as one of the "judge-made rules" that informed the Congress that enacted the Sherman Act: "[T]he frequent references [in debates surrounding adoption of the Sherman Act] to common-law principles imply that Congress simply assumed that damages litigation would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation"); *see also Ganim v. Smith and Wesson Corp.*, 258 Conn. 313, 364-65 (2001) (denying standing to Mayor and City to sue gun manufacturer under Connecticut Unfair Trade Practices Act, finding the harms complained of "too remote from the defendants' misconduct" and noting that "the policy considerations behind the remoteness doctrine are much the same as those involved in the questions of proximate cause and duty"); *Am. Express*, 19 F.4th at 144 (concluding that "the lack of proximate cause in this case means that the [plaintiffs] cannot state a claim under the Cartwright Act"); *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 851 (6th Cir. 2003) (in cost recovery action against tobacco companies, affirming district court's dismissal of the plaintiffs' claims under the Tennessee Trade Practices Act because the injury was too remote and the plaintiffs failed to satisfy proximate cause by showing that they were proximately injured by the defendants'

conduct); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 303 (Neb. 2006) (concluding that, "because appellants' injuries are derivative and remote, they lack standing to bring their antitrust claims" under Nebraska's Junkin Act).  So in this part of the ruling, I assume that all the States seeking damages require some proof of proximate cause to permit recovery of damages.  If any State believes that its law does not require some proof of proximate cause to recover damages under one of its statutes involved in this case, it should file a motion to reconsider the ruling with respect to it.

As payors of premiums to MCOs, the States are not in the drug distribution chain at all. They are paying for services from the MCO, and the MCO itself is reimbursing pharmacies and providers (such as hospitals) for the drugs.  *See* ECF No. 631-5 ¶ 52 (the States admitting that "where a state contracted with an MCO to manage a Medicaid program, the MCO paid for the drugs and charged the state agency a per-member, per-month premium").

The MCO is a supplier of services to the States, and courts have held that the pricing of those services via premiums is generally prospective as opposed to retrospective.  These courts have found that "there is no evidence that premiums are backward looking, instead of forward looking, and hence they are not relevant to the assessment of damages."  *See, e.g.*, *In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 3011624, at *1 (N.D. Cal. Apr. 18, 2023). Judge Rufe reached the same conclusion in the MDL proceeding.  *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, ECF No. 3226 at 4 (Jan. 7, 2025) ("With regard to damages, courts have held that insurance premiums are not a pass on of alleged overcharges because premiums are set by anticipating future *projected* costs, not to recover money that insurers paid in the past.") (citing cases; internal quotation marks omitted).  A declaration submitted by the States from the Deputy Director of the Health Care Financing program in the California Department of

Health Care Services confirms that the capitation rates at issue here reflect future expected costs rather than past costs incurred, which might include overcharges. ECF No. 738-7 ¶ 13 ("The pharmacy component of the capitation rates is developed to include the reasonable, appropriate, and projected costs of providing pharmacy benefits to Medicaid enrollees." (emphasis added)). While the declaration goes on to say that the "pharmacy component of the capitation rates incorporates the historical utilization and unit cost of prescription drugs . . . ," it also states that the "pharmacy component" incorporates a "future projection of pharmacy costs," which "assesses how the historical utilization and unit costs of prescription drugs is expected to trend." *Id.* ¶ 14.

The States' claim here, then, is that even though they never purchased the Drugs at Issue, they should be allowed to recover the future projected costs of the MCO's services because the MCOs themselves reimbursed pharmacies that purchased the Drugs at Issue. I find that this is a bridge too far, *i.e.*, that the chain of proximate causation from a manufacturer's overcharge to the *future* projected costs of services by an MCO is too tenuous.

The States acknowledged at oral argument that they have found no authority suggesting that the payment of higher insurance premiums as a consequence of a conspiracy to fix the price of an upstream product constitutes compensable antitrust damages. ECF No. 1172 at 51–52. This is not surprising given the remote distance between the antitrust defendant's conduct and this particular downstream consequence. The distance between the allegedly illegal conduct and the injury asserted is even further here than in *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735 (7th Cir. 2018), another case in which the court found that remoteness concerns precluded recovery. In that case, the Seventh Circuit considered the antitrust standing of indirect purchasers suing under state antitrust laws, most of which had *Illinois Brick*-repealer statutes. *Id.* at 743. Those purchasers alleged an antitrust conspiracy in the domestic steel industry, specifically

related to steel that the plaintiffs purchased "as . . . one among many components of other more complex products," such as "clothes washers," "refrigerators," "microwave ovens," and other consumer products. *Id.* at 740, 744. Between the steel producers and the plaintiffs, however, those products had "gone through numerous manufacturing alterations and lines of distribution." *Id.* at 744. The Court agreed with the district court that those claims were too remote, even considering the *Illinois Brick*-repealer statutes at play. *Id.* ("It is one thing to say that a state is willing to allow someone other than a direct purchaser to have the opportunity to shoulder the burden of showing proximate causation; it is quite another thing to say that the state has thrown both the direct-purchaser rule *and* proximate causation out the window.").

Also weighing against allowing the States to recover premiums paid to MCOs is the complexity of apportionment of damages—which is not only an *AGC* factor, but also one of the concerns behind common law, proximate cause limitations on recovery by remote plaintiffs. *See, e.g.*, *Vacco v. Microsoft Corp.*, 260 Conn. 59, 88 (2002) ("[N]otwithstanding the broad language and remedial purpose of CUTPA, we have applied traditional common-law principles of remoteness and proximate causation to determine whether a party has standing to bring an action under CUTPA."); *Ganim*, 258 Conn. at 353 ("[R]ecognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries."). To be sure, I must tolerate some degree of complexity to respect the damages-seeking States' policy choices to allow recovery by indirect purchasers, but the States in this context are not indirect purchasers of the Drugs at Issue; rather, they purchased the services of a payor that provided reimbursement for the Drugs at Issue. That step outside of the distribution chain entails additional complexity in tracing the impact of the alleged overcharges.

The increased complexity is apparent from the analysis of Dr. Singer, the States' damages "pass-through" expert. In addition to calculating a pass-through rate for each step in the drug distribution chain, Dr. Singer sought to calculate the extent to which the States' MCO premiums were influenced by the alleged overcharges for the Drugs at Issue. He could not do this by himself, however, because the MCO premiums were calculated by actuaries contracted by the States; specifically, Dr. Singer relied on the "actuarial adjustments" provided in data from the States of California and Massachusetts. The States do not have an actuarial expert who can testify exactly how the premiums were calculated. And Dr. Singer acknowledges that the impact of the alleged overcharges on these premiums was neither a 1:1 relationship nor, as was the case with the drug distribution chains, something less than 1:1, which reflected some cost absorption at different steps in the chain. Instead, for the premiums, Dr. Singer determined that the effect of the actuarial adjustments—which no one with relevant expertise will explain to the jury—was to magnify the overcharge, creating a 1:1.21 ratio. ECF No. 963-1 ¶¶ 94–95.[3] This is not surprising because, unlike the wholesalers and other intermediaries in the drug distribution chain, the MCOs are not passing on a good the price of which was fixed further up the distribution chain. They are not selling a good at all. They are, instead, providing a service—insurance coverage—to the States, one that involves actuarial expertise and an entirely different economic calculus—the pricing of risk—than the simple pass-through of a good from seller to next-in-line buyer. Even if it is true, as the States insist, that MCO premiums (*i.e.*, capitation rates) must, by law, be based in part on "actual cost experience,"[4] they must also be "actuarially sound," which means they involve the

---

[3] For States other than Massachusetts and California—which provided no actuarial data for his analysis—Dr. Singer assumed a "100 percent absolute pass-through." ECF No. 963-1 ¶ 98.

[4] The Defendants' argument that these MCO premiums consider overall projected healthcare costs (as opposed to solely past spending) aligns with the Actuarial Standards Board Actuarial Standards of Practice. *See* Actuarial Standards Board, "Medicaid Managed Care Capitation Rate

application of actuarial skill, not just a mark-up or the addition of other components as in the distribution chain of a product. Further, no one who will testify in this case—and, if oral argument was an indication, no lawyer involved in this case—can adequately explain the actuarial adjustments involved in the determination of MCO premiums.

To make matters even more complicated, Dr. Singer apparently used information from the California and Massachusetts Medicaid agencies that was developed specifically for this case, rather than being created or kept in the ordinary course of business. His report states, "[t]he documents from California's Medicaid agency and Massachusetts's Medicaid agency provided annual premium expenditures specific to Drugs at Issue." *Id.* ¶ 97. It is not clear how they did that, as a declaration from California's agency strongly suggests that the agency creates and maintains expenditure data for *all* prescription drugs, and uses those data to set capitation rates. ECF No. 738-7 ¶¶ 12–14, 18–19 (describing derivation of the "pharmacy component of the capitation rate"). Dr. Singer's report does not explain—and counsel could not explain at oral argument—how cost data on only the part of the "pharmacy component of the capitation rate" compromised of Drugs at Issue may be isolated and properly used to calculate damages when the California Medicaid agency apparently does not use such a narrow slice of cost data in the ordinary course of its business. And it is not clear—given that Dr. Singer is not an actuary and does not have personal knowledge of the workings of the California Medicaid agency—how Dr. Singer

---

Development and Certification," effective date Aug. 1, 2015, available at https://www.actuarialstandardsboard.org/asops/medicaid-managed-care-capitation-rate-development-and-certification/ (last accessed Feb. 4, 2026). These standards reflect that "[m]edicaid capitation rates are 'actuarially sound' if . . projected capitation rates and other revenue sources provide for all reasonable, appropriate, and attainable costs." *Id.* "For purposes of this definition, costs include, but are not limited to, expected health benefits, health benefit settlement expenses, administrative expenses, the cost of capital, and government-mandated assessments, fees, and taxes." *Id.*

could explain this. This brief foray into the weeds of his analysis illustrates the level of complexity that allowing the MCO premium claim would inject into a trial in this case.

I find that the States have failed to raise a genuine dispute of material fact about whether any increases in MCO premiums were proximately caused by the Defendants' conduct. I grant summary judgment on the claims for damages arising from increased MCO premiums.

In sum, I deny summary judgment with respect to antitrust standing, except for claims for damages related to MCOs.

### B. Adequate Legal Remedies

"[B]efore equitable relief will be granted, plaintiffs must show that they have no adequate remedy at law." *Brown v. Sandimo Materials*, 250 F.3d 120, 127 (2d Cir. 2001); *see Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99, 164 (D. Conn. 2024) (dismissing claims for monetary equitable relief where "Plaintiffs have not pled any facts to suggest that monetary damages are inadequate or to demonstrate that they are entitled to any form of equitable relief" (citing *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)). The States seek damages, civil penalties, and equitable relief including disgorgement, where such relief is available under a particular state statute.[5] The Defendants argue that the States cannot bring claims for monetary equitable relief under state laws because they have not shown that the available legal remedies— the sum of damages and civil penalties—would be inadequate. The States contend that disgorgement is available in addition to damages and civil penalties because the Defendant's profits exceed the amount sought by legal remedies, because disgorgement serves a distinct purpose, and because the States have adopted statutes authorizing such relief.

---

[5] The States also seek injunctive relief under some state laws, as well as the Clayton Act, but the Defendants' motion does not target the States' request for injunctive relief.

1.   Federal Courts' Equitable Powers

"Section 11 of the Judiciary Act gave federal courts jurisdiction over 'all suits . . . in equity.'" *Cavanagh*, 445 F.3d 117 (quoting the Judiciary Act of 1789, 1 Stat. 73, 78). The equity jurisdiction conferred by the Judiciary Act "is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Id.* (quoting *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 318).

In *Sonner*, the Ninth Circuit analyzed federal courts' authority to award equitable relief and noted that "the Supreme Court has never repudiated its statements . . . that state law can neither broaden nor restrain a federal court's power to issue equitable relief." 971 F.3d at 841. As the *Sonner* court explained, the Supreme Court, since *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), "has instructed that a federal court's equitable authority remains cabined to the traditional powers exercised by English courts of equity, even for claims arising under state law." 971 F.3d at 840 (citing *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 104–07 (1945)). In *York*, the Supreme Court held that, in accordance with these traditional equitable powers, "even if a state authorizes its courts to provide equitable relief when an adequate legal remedy exists, such relief may be unavailable in federal court because equitable remedies are subject to traditional equitable principles unaffected by state law." *Id.* at 841 (citing *York*, 326 U.S. at 105–06). The *Sonner* court concluded that "federal courts must apply equitable principles derived from federal common law to claims for equitable restitution under California's" consumer protection laws. *Id.* at 837.

*Sonner* dealt with restitution claims, but disgorgement, the type of monetary equitable relief sought here, is also an equitable remedy bound by traditional equitable principles.[6]  The Second Circuit has held that because disgorgement was a traditional equitable remedy available to the English Court of Chancery, "federal courts possess authority under the Constitution and the Judiciary Act to impose the equitable remedy of disgorgement."  *Cavanagh*, 445 F.3d at 118–21.  In practice, federal courts have awarded disgorgement as an equitable remedy since *S.E.C. v. Tex. Gulf Sulphur Co.*, 446 F.2d 1301, 1307–08 (2d Cir. 1971), which held that "the SEC may seek other than injunctive relief in order to effectuate the purposes of the [Exchange] Act, so long as such relief is remedial relief and is not a penalty assessment."  More recently, the Supreme Court has noted that a remedy resides in the "heartland of equity" when it "restores the status quo."  *Liu v. S.E.C.*, 591 U.S. 71, 80 (2020).

As the States point out, disgorgement and damages serve distinct purposes.  Unlike damages, disgorgement "is not available primarily to compensate victims"; rather, "disgorgement has been used by the SEC and courts to prevent wrongdoers from unjustly enriching themselves through violations, which have the effect of deterring subsequent fraud."  *Cavanagh*, 445 F.3d at 117.  "The primary purpose of disgorgement is not to compensate [plaintiff]" but rather to "forc[e] a defendant to give up the amount by which he was unjustly enriched.  The emphasis on public protection, as opposed to simple compensatory relief, illustrates the equitable nature of the remedy."  *Id.* at 119.  Thus, while damages are measured by the harm suffered by the plaintiffs, disgorgement is calculated by reference to "the amount by which [the defendant] was unjustly enriched."  *S.E.C. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014).

---

[6] At oral argument, the States confirmed that they no longer assert separate claims for restitution and unjust enrichment because the functions served by those equitable remedies are already being served by the States's damages and disgorgement claims.  ECF No. 1172 at 72–73.

The Second Circuit has stated that an award of disgorgement may be appropriate "even if it exceeds actual damages to victims." *Cavanagh*, 445 F.3d at 117; *see also S.E.C. v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) ("'[O]nce the [Securities and Exchange] Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement without inquiring whether, or to what extent, identifiable private parties have been damaged by [the] fraud.' . . . Whether or not any investors may be entitled to money damages is immaterial." (quoting *S.E.C. v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985))).[7]

Thus, in cases where the defendant's ill-gotten profits exceed damages, the equitable remedy of disgorgement may still be necessary to restore the status quo. *S.E.C. v. Govil*, 86 F.4th 89, 103 n.14 (2d Cir. 2023) ("In some cases, the fraudster's ill-gotten gains will be less than the harm done to victims, meaning the status quo cannot be restored. In other cases, the ill-gotten gains will exceed the harm, and the victim may recover his loss and more."). But because disgorgement is remedial, rather than punitive, a court may not order disgorgement above "the amount of money acquired through wrongdoing," plus interest. *Cavanagh*, 445 F.3d at 116 & n.2 (citing *Gulf Sulphur*, 446 F.2d at 1307–08); *see Tull v. United States*, 481 U.S. 412, 422 (1987) ("Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity."). Accordingly, to restore the status quo here, the States may seek disgorgement in an amount that is sufficient to strip from the Defendants any ill-gotten profits, but no more.

---

[7] That much of the Second Circuit's jurisprudence on disgorgement has come in SEC cases is immaterial, because, as *Cavanaugh* makes clear, the historical pedigree of disgorgement makes it an equitable remedy that is part of a federal court's arsenal in every case.

2.  <u>Availability of Disgorgement in This Case</u>

It is not yet clear whether the Defendants' allegedly ill-gotten gains will exceed the amount the States might collect through legal remedies.  Under the States' damages theory, consumers were harmed each time they purchased a drug at a price that was higher than it would have been in the absence of any conspiracy.  But because intermediaries absorbed a portion of these overcharges before they reached the end-consumer, the profits that the Defendants realized as a result of the conspiracy exceeded any damages to the end-consumer by around $4 billion, at least according to the States' experts.  *Compare* SAMF ¶ 21 (calculating damages of about $1.6 billion) *with* SAMF ¶ 3 (calculating disgorgement around $5.7 billion).  Thus, while damages alone would compensate consumers, they would not deprive the Defendants of the fruits of their illegal conduct.  *See Cavanagh,* 445 F.3d at 119.  The analysis in this instance is further complicated by two factors: the States' claims for civil penalties in this action and the claims by private parties in the MDL.

In their reply brief, the Defendants do not refute the States' projections but argue instead that the States offer no evidence that damages *plus* civil penalties would be inadequate to accomplish the same purposes as disgorgement.  In other words, the Defendants argue that if the total of damages and civil penalties exceed the amount of the Defendants' ill-gained profits, then the States may not seek additional monetary awards via equitable relief.  On this point, I agree with the Defendants.

A civil penalty is a legal, not an equitable remedy.  *Tull*, 481 U.S. at 422–24 (noting that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law" and that an "action for disgorgement of improper profits, traditionally considered an equitable remedy," "is a poor analogy" for a suit enforcing civil penalties under the Clean Water Act); *S.E.C. v. Jarkesy*, 603 U.S. 109, 124 (2024) (considerations in determining civil penalties that "tie the availability of civil penalties to the perceived need to punish the defendant rather than to restore

the victim . . . are legal rather than equitable"). The civil penalties available here are plainly punitive and serve a purpose separate from compensating consumers, as the States admit. *See* ECF No. 631 at 20 ("Civil penalties serve a separate punitive function, ensuring accountability in addition to any compensatory remedies."). Thus, any civil penalties available to the States are a legal remedy. As such, they must be considered in addition to damages when determining whether the legal remedies available are adequate.

The Defendants do not attempt to estimate the potential amount of civil penalties, and the States' expert presents only an "illustrative range," while acknowledging that the Court will ultimately decide the amount of civil penalties. ECF No. 632 ¶ 12; ECF No. 685-1 at 434–35. Many of the state statutes involved permit the court to consider various factors, such as the Defendant's willfulness, which the parties have not briefed. *See, e.g.*, Conn. Gen. Stat. § 42-110o; N.C. Gen. Stat. § 75-15.2 (considering "the extent of the harm caused by the conduct constituting a violation, the nature and persistence of such conduct, the length of time over which the conduct occurred, the assets, liabilities, and net worth of the person, whether corporate or individual, and any corrective action taken by the defendant"); *Nationwide Biweekly Admin., Inc. v. Superior Ct.*, 462 P.3d 461, 488 (Cal. 2020) (noting that under California's Unfair Competition Law, "the court is afforded broad discretion to consider a nonexclusive list of factors that include the relative seriousness of the defendant's conduct and the potential deterrent effect of such penalties"). At this stage, I need not determine an exact dollar figure for potential civil penalties in this case to determine whether the total legal remedies would be adequate. Rather, I need find only that, on the record before me, there is a genuine factual dispute about whether the total amount of damages plus civil penalties will exceed the amount of the Defendants' allegedly ill-gained profits. I find that there is.

For the purpose of this analysis I will adopt the States' expert's opinion that "the conspiracy caused between $1.62 and $1.64 billion in damages through 2018 to indirect purchasers, to indirect purchasers in the 24 States and Territories seeking damages, and $192 million from 2019–2021." SAMF ¶ 21. Only about a third of these States seek treble damages where available under state law. ECF No. 196 ¶¶ 1883, 1901, 1919, 1934, 1991, 2013, 2090, 2118–19. The state statutes also authorize civil penalties between $2,000 and $500,000 per violation. *See* ECF No. 629-1 at 27–28.[8] But these are maximum penalties, and as noted, many statutes afford the Court discretion to award less than the maximum based on various factors.

Further, disputes about the manner of quantifying violations remain. For example, the Defendants suggest that "to the extent a statute mandates a penalty 'per violation,' [a defendant's] involvement in the price fixing conspiracy constitutes a single violation." *Id.* at 17 (quoting *In re Elec. Books Antitrust Litig.*, 11-MD-2293, 2014 WL 2535112, at *3 (S.D.N.Y. June 5, 2014)). Finding each defendant liable for only a single violation per conspiracy would greatly reduce the total of the civil penalties awarded. Thus, construing these facts in the way most favorable to the States, as I must on summary judgment, it is possible that the sum of damages and civil penalties will not exceed the Defendant's alleged ill-gotten gains, which the States' expert calculated to be about $5.7 billion. SAMF ¶ 3. If the Defendants are found liable and the jury determines damages, the Court will be in a position, after trebling any state-specific damages award as required by the state's law, to assess civil penalties and then to decide if these legal remedies outweigh the Defendants' profits attributable to the alleged conspiracies. If at that time it is apparent that the

---

[8] Other statutes refer to the total amounts of civil penalties and fines. *See, e.g.*, Alaska Stat. § 45.50.578(b) (permitting civil penalties of up to $50 million); N.Y. Gen. Bus. Law. § 341 ("a fine of not exceeding one million dollars"). Maryland law provides for a $10,000 civil penalty for each violation and notes that "[e]ach day that a violation of . . . continues is a separate violation." Md. Com. Law. Code Ann. § 11-209(a)(4).

combined legal remedies do not meet or exceed the Defendants' profits attributable to the alleged conspiracies, then I will determine if it would be equitable to award disgorgement based on traditional equitable principles.

In deciding whether to award disgorgement, I will likely also have to consider other claims on the Defendant's allegedly ill-gotten profits—for example, from settlements in the MDL.  The Defendants point out that "[a]lthough many claims in the MDL remain pending, direct purchasers have recouped over $390 million through court approved class settlements" in the MDL, and assert that the claims are "exact duplicates of claims" here.  ECF No. 629-1 at 40 n.19, 42.  But neither the existence of other claimants in the MDL nor the availability to the States of damages in this case is a reason to foreclose the States' disgorgement claims.  In the securities law context, the SEC regularly seeks disgorgement at the same time as private litigants pursue damages against the same defendant(s).  Courts have treated these other claims as credits the court may use to offset the amount of profits disgorged to the SEC.  *E.g.*, *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) ("It was well within the court's discretion to give defendants credit for the $5 million paid out to reimburse victims of their frauds and to require defendants to disgorge the rest of those profits."); *S.E.C. v. Penn Cent. Co.*, 425 F. Supp. 593, 599 (E.D. Pa. 1976) ("To the extent that defendants have made restitution, the amounts paid would serve to offset part or all of a judgment for disgorgement.  In the event that we deem disgorgement appropriate, defendants will have the opportunity to prove that they have already relinquished their ill-gotten gains.").  Thus, after any verdict in this case finding them liable, the Defendants will have the opportunity to argue that their payments to claimants in the MDL should serve as offsets to the States' disgorgement claims here.

The Defendants' argument that the mere existence of a legal remedy deprives a federal court of its ability to award monetary equitable relief, *see* ECF No. 1172 at 135, ignores whether the remedy is adequate and conflates restitution and disgorgement. Whether a legal remedy is adequate must depend in part on whether it fulfills the function of the equitable remedy the plaintiff is seeking. Although restitution and disgorgement are both governed by equitable principles derived from federal common law, they serve different functions. "[R]estitution at equity was defined as a claim for constructive trust or equitable lien where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. . . . [Restitution seeks] to restore to the plaintiff particular funds or property in the defendant's possession." *Yoon v. Fordham Univ. Fac. & Administration Ret. Plan*, No. 99 CIV.11042, 2004 WL 3019500, at *11 (S.D.N.Y. Dec. 29, 2004) (internal quotation marks omitted), *aff'd sub nom. Yoon v. Fordham Univ. Fac.*, 173 F. App'x 936 (2d Cir. 2006). By contrast, as noted, "[t]he primary purpose of disgorgement is not to compensate [plaintiff]" but rather to "forc[e] a defendant to give up the amount by which he was unjustly enriched." *Cavanagh*, 445 F.3d at 117. What is an "adequate" substitute for restitution is not necessarily an adequate substitute for disgorgement because, while a damages remedy may return to a plaintiff all the property that belongs to him, it may leave the defendant with profits earned from its illegal conduct.

Ignoring this distinction, the Defendants rely on cases involving restitution to argue that "a larger recovery for disgorgement than damages does not show that legal remedies are inadequate." ECF No. 633 at 8 n.3 (citing *Ketayi v. Health Enrollment Grp.*, No. 20-CV-1198, 2021 WL 2864481, at *10 (S.D. Cal. July 8, 2021)). In *Ketayi*, the court noted that just because "claims for restitution and damages often will result in different recoveries," this difference does not make

damages any less adequate; rather, the court found, "an adequate legal remedy need not be an identical legal remedy." 2021 WL 2864481, at *10. Neither *Ketayi* nor the Ninth Circuit's decision in *Sonner* on which it relies addressed disgorgement, although subsequent district court rulings in the Ninth Circuit have, in dicta, mentioned "disgorgement" alongside "restitution" in discussing the adequacy of legal remedies, without analyzing the differences between the two remedies. *Turrey v. Vervent, Inc.*, No. 20-CV-697, 2023 WL 6390620, at *4 (S.D. Cal. Sept. 29, 2023) ("[D]isgorgement, restitution, and damages are distinct forms of recovery, but that distinction is irrelevant for purposes of determining equitable jurisdiction. The *existence* of an adequate legal remedy is what deprives a federal court of jurisdiction to address an alternative equitable claim." (footnote omitted)); *Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247, 262 (S.D. Cal. 2023) ("[W]here monetary damages provide[] an adequate remedy, a federal court may not consider the merits of equitable claims for restitution, disgorgement, or injunctive relief." (internal quotation marks omitted)).

None of these cases involved a claim for disgorgement, and to the extent they equate disgorgement and restitution, they erroneously expand the rule set out in *Sonner*, which dealt with a plaintiff that strategically dismissed its damages claims and pursued only restitution in order to avoid a jury trial. 971 F.3d 834, 838 ("[W]hy would Sonner voluntarily abandon an ostensibly viable claim on the eve of trial after more than four years of litigation? The answer is also obvious: to request that the district court judge award the class $32,000,000 as restitution, rather than having to persuade a jury to award this amount as damages."). *Ketayi*, *Turrey*, and *Hall*—like *Sonner*— all involved plaintiffs attempting to substitute or supplement their damages claims with restitution

claims.[9]  None had occasion to address whether damages or another legal remedy was adequate to fulfill the distinct purpose of depriving the Defendants of ill-gotten gains.  Because the California district court decisions on which the Defendants rely do not address the distinction between restitution and disgorgement, I respectfully disagree with any suggestion in these cases that disgorgement is automatically unavailable whenever a damages remedy exists.

The States, meanwhile, argue that no consideration of damages, civil penalties, or other payments is necessary where disgorgement is authorized by state statute, which, they suggest, frees the Court from the restraints imposed by traditional equitable principles.  ECF No. 641 at 32 (citing Cal. Bus. & Prof. Code § 17205 ("[R]emedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state."); ECF No. 1172 at 83 (arguing that "when disgorgement is specifically identified . . . statutorily, it isn't bound by the equitable restraints" of federal courts).  I disagree.  As the Ninth Circuit explained in *Sonner*, "[i]t has been a fundamental principle for well over a century that state law cannot expand or limit a federal court's equitable authority."  971 F.3d at 841; *see id.* at 842 ("a state statute does not change the nature of the federal courts' equitable powers").  That fundamental principle forecloses any notion that a state statute could bestow on a federal court the power to grant relief that functioned the same as a traditional equitable remedy but was not restricted by traditional equitable principles.  As the Supreme Court held in *York*:

---

[9] *See Ketayi*, 2021 WL 2864481, at *9 ("Plaintiffs argue that they have pleaded an entitlement to restitution in a greater amount than their damages claim, and thus damages are insufficient."); *Turrey*, 2023 WL 6390620, at *3 ("Plaintiffs ignore that they *had* a legal remedy under RICO, *i.e.*, the potential to recovery more than $51 million in damages, and instead argue that the *amount* awarded by the jury rendered the remedy inadequate."); *Hall*, 344 F.R.D. at 262–63 ("Plaintiffs seek money damages to recover the amounts they paid in resort fees.  With their equitable claims, Plaintiffs request restitution for the same amounts—a refund of resort fees.  Plaintiffs cannot recover this amount twice, first as damages and then as restitution.").

> Equitable relief in a federal court is of course subject to restrictions: the suit must be within the traditional scope of equity as historically evolved in the English Court of Chancery; a plain, adequate and complete remedy at law must be wanting; explicit Congressional curtailment of equity powers must be respected; [and] the constitutional right to trial by jury cannot be evaded. That a State may authorize its courts to give equitable relief unhampered by any or all such restrictions cannot remove these fetters from the federal courts.

326 U.S. at 105–06.

Despite this clear statement, the States point to a statement in the Second Circuit's decision in *Govil*, which described a Fifth Circuit case, *S.E.C. v. Hallam*, 42 F.4th 316 (5th Cir. 2022), as creating a rule under which "[d]isgorgement understood as a legal remedy would not be limited by the equitable constraints identified in *Liu*." *Govil*, 86 F.4th at 103 n.13. At issue in *Hallam* (and *Govil*), however, was a *federal* statute that Congress amended to provide "disgorgement" as an additional remedy to "equitable relief." *Id.* at 99. The Circuits are currently split about whether this additional provision affects the SEC's ability to seek disgorgement under certain conditions. *Cf. S.E.C. v. Sripetch*, 154 F.4th 980, 982 (9th Cir. 2025), *cert. granted,* No. 25-466 (U.S. Jan. 9, 2026). But even if Congress may broaden a federal court's power to issue an equitable remedy by eliminating traditional restrictions on the court's equity powers, that does not suggest that a state may do so.

In short, I agree with the Defendants that the principle of adequacy of legal remedies must inform my determination of disgorgement; but I find that that determination must await the numerical inputs only a verdict and (if appropriate) the Court's assessment of civil penalties can supply. I therefore must deny the Defendant's motion for summary judgment.

### C. Pharmacy sales

The Defendants next seek summary judgment "on any claim seeking to base civil penalties or fines on the number of prescriptions filled" in a particular state. ECF No. 629-1 at 16. The Defendants argue that downstream, third-party actions, such as pharmacy sales to consumers in

this case, cannot constitute violations of the state antitrust and consumer protection statutes involved here, and thus cannot serve as a basis for imposing civil penalties. *Id.* at 16–17. I agree.

Although the distribution chain for generic drugs varies, even the States' expert agrees that the pharmacy-to-consumer transaction is the final link in a typically two- or three-transaction chain that usually begins with a sale from the manufacturer to a wholesaler. *See* ECF 696-1 at 225–36, 252–53. All of the Defendants in this case are drug manufacturers that operate at the first link of the chain. Because civil penalties are generally triggered by "violations" of the States' antitrust and consumer protections laws, the natural focus of civil penalties should be on the conduct of the alleged violator, i.e., the Defendants, which occurred, as noted, at the first link in the distribution chain. *See, e.g.*, Cal. Bus. & Prof. Code § 17206 ("Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed [$2,500] for each violation . . . ."); Colo. Rev. Stat. § 6-1-112(1)(a) ("[A]ny person who violates or causes another to violate any provision of this article 1 shall forfeit and pay to the general fund of this state a civil penalty of not more than [$20,000] for each violation. . . . [A] violation of any provision constitutes a separate violation with respect to each consumer or transaction involved."); Conn. Gen. Stat. § 42-110o(a) (authorizing the Attorney General to "recover, on behalf of the state, a civil penalty of not more than five thousand dollars for each violation" where "[t]he party committing the violation knew or should have known that his conduct was a violation of section 42-110b"); N.J.S.A. 56:8-13 ("Any person who violates any of the provisions of the act . . . shall, in addition to any other penalty provided by law, be liable to a penalty of not more than $10,000 for the first offense and not more than $20,000 for the second and each subsequent offense."); Utah Code § 76-16-509(5) ("A person, other than an individual, who violates this act is subject to a civil penalty of not more than $500,000 for each violation.").

The Supreme Court reached a similar conclusion in *United States v. Bornstein*, 423 U.S. 303, 312–13 (1976), which held that for purposes of determining civil penalties under the federal False Claims Act, the number of violations should reflect the three fraudulent invoices that the defendant subcontractor issued to the general contractor, and not the thirty-five invoices that the general contractor subsequently billed to the government. This distinction was critical, the Court said, "to distinguish between the acts committed by [the defendant subcontractor] and the acts committed by the [general contractor]" because the statute "penalizes a person for his own acts, not for the acts of someone else." *Id.* at 312. The Court held that "[a] correct application of the statutory language requires . . . that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." *Id.* at 313.

Although *Bornstein* involved the False Claims Act, the same principle applies here, where the States attempt to calculate civil penalties based on the sales made by a downstream third party, rather than on the conduct of the Defendants that allegedly violated the state statutes invoked in the complaint. In a case alleging that Sandoz had reported false Average Wholesale Prices to Mississippi's Medicaid agency, where such prices were "a key data factor in the federally supervised formula" used by the agency "to reimburse pharmacies serviced by Sandoz," the Supreme Court of Mississippi held that the "per violation" language of the Mississippi Consumer Protection Act (among the statutes at issue here), referred "to the number of occasions that Sandoz improperly set an [Average Wholesale Price] during the relevant damages period" rather than the number of occasions that the State's Medicaid division had to reimburse a claim at an improperly set price. *In re Mississippi Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 833, 847 (Miss. 2015); *see also State v. Abbott Lab'ys*, 816 N.W.2d 145, 173–74 (Wis. 2012) ("whatever legal significance one chooses to place upon the number of times Medicaid overpaid

for Pharmacia drugs, that number cannot represent the number of times Pharmacia made or caused to be made any representations" alleged to have violated the  Wisconsin Deceptive Trade Practices Act (internal quotation marks omitted)).

While the number of pharmacy-to-consumer sales made at a conspiracy-related price may be relevant to calculating compensatory damages, the proper measure of the number of violations for the purpose of calculating civil penalties must be based on the conduct of the Defendants.  As the Wisconsin Supreme Court found in a case similar to *Mississippi Medicaid*, "[t]he number of times pharmacies were overpaid is merely a consequence of the alleged fraud, not the fraudulent conduct itself."  *Abbott Laby's,* 816 N.W.2d at 174; *accord Mississippi v. China,* No. 1:20-CV-168, 2025 WL 3252405, at *30 (S.D. Miss. Nov. 14, 2025) (citing *Mississippi Medicaid*); *see also State v. Minnesota School of Business, Inc.*, No. 27-CV-14-12558, 2017 WL 4220967, at *3 (Minn. Dist. Ct. Jan. 4, 2017) ("civil penalties are not designed to be restitutionary, which is essentially what the State is requesting the Court do in assessing civil penalties" based on the number of individual students affected by the Defendant's fraudulent practices).

The States largely do not attempt to differentiate the language in the various state laws invoked in the complaint.  To the contrary, the States assert that twenty-eight of the thirty-one States that seek civil penalties do so "pursuant to their state versions of the FTC Act (or "Little FTC Acts") or other similar consumer protection statutes," and three States do so "under a statute tracking the Sherman Act."  ECF No. 631 at 34, 37 n.6.  *See also In re Elec. Books Antitrust Litig.*, 2014 WL 2535112, at *12 (finding that many of the state antitrust and consumer protection laws at issue here were "congruent with the . . . elements for a violation of Section 1 of the Sherman Act").  The one statute the States do point to in their brief, the Colorado Consumer Protection Act, provides that "a violation of any provision constitutes a separate violation with respect to each

consumer or transaction involved."  Colo. Rev. Stat. § 6-1-112(1)(a).  But this language does not alter the conclusion that the number of violations must focus on the conduct of the Defendant; it just requires that the Defendants' conduct be assessed separately with respect to "each consumer or transaction."  Here, it suggests that the court may assess a civil penalty on each sale *by a Defendant* at a conspiracy-fixed price.  The "consumer" language would not apply because the Defendants generally did not interact with consumers; their violations (if they occurred) took place upstream from the consumer.  Moreover, in analyzing this provision of the Colorado Consumer Protection Act in a deceptive advertising case, the Supreme Court of Colorado has similarly noted that "the focus of the proscription is on the act of publishing, disseminating, or soliciting and not on how the consumer acts upon the misleading information."  *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 975 (Colo. 1993).[10]  The States have failed to demonstrate that any of the state laws at issue support their theory of grounding civil penalties on the number of end-consumer transactions of the Defendants' products, rather than on the transactions directly involving the Defendants.

The States contend it would be premature to determine the proper method for calculating the number of violations in this case, as the Defendants on this motion seek only to bar the States' "attempt to base civil penalties and fines on the number of sales by pharmacists."  ECF No. 629 at 1.  I agree.  Genuine issues of fact remain that will affect the calculation of the number of violations

---

[10] In the other cases the States cite for the prospect of awarding penalties on a "per consumer" basis, ECF No. 631 at 35, the courts awarded penalties only for conduct directed at consumers with whom the defendants in those cases actually interacted and did not address indirect purchasers.  They thus do not help the States here.  Meanwhile, the Defendants chiefly rely on *In re Electronic Books Antitrust Litig.*, 2014 WL 2535112, which analyzed many statutes at issue here to determine if they were "congruent with the . . . elements for a violation of Section 1 of the Sherman Act."  This ruling, however, only indicated that the Court had already determined that the conspiracy constituted a single violation, and it provided no explanation for that decision.  The case is thus unhelpful to the analysis here.

in this case, such as whether a particular communication or set of communications between Defendants constituted a violation and/or whether the Court should treat each direct sale by a Defendant at an (allegedly) conspiracy-fixed price as a single violation.  These issues will also affect the determination of whether *any* violations occurred in a particular State.[11]  I leave those determinations to another day.

For the reasons stated above, I find that the States' proposal that the Court impose a civil penalty for each sale of a Drug at Issue by a pharmacy to a consumer is not supported by the state laws at issue, and therefore I grant summary judgement to the Defendants on this ground.

## D.  Constitutional Arguments

### 1.  Dormant Commerce Clause

The Constitution's Commerce Clause grants Congress the power to regulate interstate commerce.  U.S. Const. art. I, § 8, cl.  Implicit in this grant is that the States lack the ability to regulate interstate commerce; this implied doctrine is known as the "dormant" Commerce Clause. *Department of Rev. v. Davis*, 553 U.S. 328, 337 (2008).  The Defendants argue that the dormant Commerce Clause prohibits the States from holding a Defendant liable for civil penalties under any of the antitrust and consumer protection laws of States in which that Defendant made no sales. ECF No. 629-1 at 19–25.  I find that it is unnecessary to decide this issue at this time.

---

[11] The Defendants list States where direct sales took place and "States Where [a] Defendant allegedly entered purported conspiracies" based on the Defendant's principal place of business and where employees allegedly involved in the conduct were based.  ECF No. 629-1 at 22, 29–30; *see* ECF 631-5 at 40-69.  But the States dispute that these lists are complete, contending, for example, that "Defendants improperly limited their analysis of 'sales' only to where drugs were invoiced, not where they were shipped," ECF No. 631 at 49, and that the Defendants' collusive conduct "included in-person communications made at industry events throughout the United States," *id.* at 52.  Whether any specific participant in the overarching conspiracy violated a particular State's law is also unnecessary to determine at this stage because each conspirator defendant is liable for the acts of its co-conspirators.  *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253–54 (1940) ("For a conspiracy is a partnership in crime; and an 'overt act of one partner may be the act of all without any new agreement specifically directed to that act.").

As I found in the previous section, the state laws at issue here do not support claims for civil penalties for "violations" of a State's laws that are grounded solely on downstream sales that occurred in that State. It follows from that analysis that the States may seek civil penalties for violations of laws only of the States in which a Defendant engaged in some conduct, either by participating in a transaction that occurred at least in part in that State or by furthering the conspiracy in that State, such as through a collusive communication with a competitor. *See* ECF No. 1172 at 69–70 (the States suggesting at oral argument that alternative bases for civil penalties could include the Defendants' transactions with direct purchasers or conspiratorial communications between Defendants that resulted in price increases for those initial transactions).

The Defendants' Commerce Clause challenge seeks to bar the States from "seek[ing] to impose civil fines and penalties against Defendants based on extraterritorial sales." ECF No. 629-1 at 20. Because I have already decided that civil penalties under the States' laws may be imposed only for actions of a Defendant, the States are already barred from seeking civil penalties under the laws of any State in which no direct sales or other violative conduct took place. During a supplemental oral argument with the parties, the States acknowledged that, if they could not impose civil penalties based on pharmacy-to-consumer sales, they would not otherwise seek to impose civil penalties under the laws of any State where there was no conduct related to the formation of an agreement (such as a phone call, text message, or email between competitors) and no sales by a Defendant from or into that State.[12] In light of this, the Defendants' dormant Commerce Clause challenge appears to be moot. Moreover, it is well settled that courts should

---

[12] I make no finding in this motion as to how to define whether a "sale" occurred in a particular State, including whether the definition should be based solely on locations shown in invoices, as the Defendants suggest, or should also include all States into which the Defendants shipped the Drugs at Issue, as the States contend. *See supra* n.11.

"avoid reaching constitutional questions when they are unnecessary to the disposition of a case." *Anobile v. Pelligrino*, 303 F.3d 107, 123 (2d Cir. 2002); *see also Hutchinson v. Proxmire*, 443 U.S. 111, 122 (1979) ("Our practice is to avoid reaching constitutional questions if a dispositive nonconstitutional ground is available."). I therefore do not reach the Defendants' dormant Commerce Clause arguments.

At the supplemental oral argument, the Defendants argued that the States may later seek to impose civil penalties on the basis of out-of-state conduct that might not violate the Sherman Act but might violate a State's little FTC act, such as a single communication between competitors. As I informed the parties, at this stage, that possibility is not before me and I express no opinion about it. If the Defendants believe in the future that the States are seeking to impose civil penalties on the basis of such conduct, the Defendants are not precluded from asserting a dormant Commerce Clause challenge at that time.

### 2. Due Process and Full Faith and Credit Clauses

The Defendants next contend that the Constitution's Due Process and Full Faith and Credit Clauses bar the States from seeking civil penalties under the laws of States other than those where the Defendants allegedly entered into conspiratorial agreements. ECF No. 629-1 at 26–30. This argument fails because genuine issues of fact exist about whether the Defendants expected that the laws of each State would apply to their conspiratorial agreements.

The Defendants ask me to apply a two-part test from *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985), a class action in which the district court applied Kansas law to gas leases involving land in eleven states. In that case, the Court first determined whether the Kansas law "conflicts in any material way with any other law which could apply." *Id.* at 816. The Court found conflicts with other relevant state laws because the Defendants faced greater potential liability under some state laws than others. *Id.* at 818. The Court then asked whether the Kansas law had

"a significant contact or significant aggregation of contacts to the claims asserted . . . , contacts creating state interests, in order to ensure that the choice of Kansas law is not arbitrary or unfair." *Id.* at 821–22 (internal quotation marks omitted). The Court concluded that Kansas lacked any interest in claims arising from land located outside the state. *Id.* at 822. Here, the States concede that there are material differences between the state laws, which provide for different amounts of civil penalties, *see* ECF No. 629-1 at 27–28, but argue that sufficient contacts exist for each State, ECF No. 631 at 50.

As an initial matter, I note that *Shutts* is distinguishable because the States here do not attempt to apply the law of one State to the exclusion of any other; rather, they seek to hold the Defendants liable for violating multiple laws. Even if two laws provide for differing amounts of civil penalties, this does not create a conflict if the States can simply obtain relief under both laws. For instance, if employees of Defendants seated in New Jersey and Ohio reached an agreement over the phone to allocate the market for a particular drug, nothing in the Due Process or Full Faith and Credit Clauses would prevent New Jersey from seeking relief under the New Jersey Antitrust Act while Ohio seeks relief under its antitrust law, the Valentine Act. And if those Defendants sold price-fixed drugs to a wholesaler or retailer in New Mexico, New Mexico could then seek civil penalties under the New Mexico Antitrust Act. Because the Defendants have not shown how the application of multiple States' laws would create any conflict, it is unclear whether *Shutts* should apply at all. Nevertheless, as the States appear to concede that the first step in the *Shutts* test is satisfied, I will also address the second step, whether a State has sufficient contact with the claims to ensure that the application of its law is not so arbitrary and unfair as to exceed constitutional limits.

"When considering fairness in this context, an important element is the expectation of the

parties." *Shutts*, 472 U.S. at 822. In *Shutts*, the Court found that "[t]here is no indication that when the leases involving land and royalty owners outside of Kansas were executed, the parties had any idea that Kansas law would control." *Id.* The Defendants here contend that, as in *Shutts*, there is no indication that any alleged conspirator expected that laws of any State would govern their conduct except for those in which they allegedly reached their agreement. ECF No. 629-1 at 29. But the States have presented sufficient evidence to create a genuine issue of fact that the Defendants were reasonably on notice that their agreements would have a national reach. The alleged drug-specific arrangements to fix prices and allocate markets applied to all of the Defendants' customers, as the agreements required firms to move in lockstep across the board to avoid price erosion. *See Connecticut v. Sandoz, Inc.*, 2025 WL 3470502, at *4 ("if a supplier declines to follow an initial price increase in an attempt to increase its market share, it risks triggering a 'race to the bottom' in which prices erode as suppliers compete for customers"); *Connecticut v. Sandoz, Inc.*, No. 20-cv-802, 2026 WL 75851, at *4 (D. Conn. Jan. 9, 2026) (wholesaler Cardinal requesting "a cost adjustment" from Aurobindo after learning that another customer was paying less). More broadly, there is evidence that parties to the overarching conspiracy agreed to act "responsibly," "rationally," and "play nice in the sandbox" on any drug in which they overlapped. *See, e.g.*, ECF No. 693-5 at 1247–48 (testimony that Sandoz's agreement with Taro "encompasse[d] any product where Sandoz and Taro overlapped" as well as any new product launches by either firm).

Further, the individuals allegedly involved in these agreements frequently had titles such as "director of national accounts," ECF No. 698-2 at 53, 66, 78–79, "national account manager," *id.* at 96, "national accounts executive," *id.* at 244, or "AVP, National Accounts/Field Sales," *id.* at 446. *See generally* SAMF ¶ 26. At Aurobindo, for example, the "director of national accounts"

had "responsibilities for some national account customers," including "gathering market information." ECF No. 698-2 at 43. At Fougera, a national account executive "made suggestions about price." *Id.* at 124. At Sandoz, a national account director had "responsibility for key customers. They changed sometimes, but it would be large national accounts. It really drove the business, made a definite impact on sales . . . ." *Id.* at 197; *see also id.* at 156 (Sandoz employee Bihari distinguishing "[w]holesaler pricing" from "[r]egional customers" in competitive information obtained from Taro and Perrigo); ECF No. 698-1 at 1199 (Bihari's notebook). Records of communications with customers regarding price changes did not differentiate by region and instructed customers to "contact your National Account" manager or representative with questions. ECF No. 681-1 at 1252, ECF No. 698-2 at 512; *see generally* SAMF ¶ 27. At Taro, when a customer questioned price increases in 2014 in light of "lower priced alternatives," Defendant Ara Aprahamian instructed a colleague in 2014 to "call [the customer] and explain national increase." ECF No. 698-1 at 1180–82.

Finally, in describing the generic pharmaceutical landscape, the States' expert, Dr. Warren-Boulton, noted that the Defendants were largely unable to offer national customers prices that varied by region. ECF No. 698-1 at 1252 ("Direct customers (wholesalers and large retail pharmacies) tend to be nationwide, and I have seen no evidence of the ability of manufacturers being able to price discriminate on a regional basis."). If the Defendants could only set prices at the national level, as Dr. Warren-Boulton contends, they could reasonably expect that every agreement they reached to fix prices necessarily had a national impact.

When viewed as a whole, the evidence permits the inference that the Defendants operated almost entirely on a national scale. It is therefore unlikely that any alleged conspirator had the impression that any agreement with a competitor was limited to whatever State they happened to

be in at the time. But that is a determination for the jury. For now, the evidence is sufficient to raise a genuine dispute of fact about whether those involved in the conspiracies "knew their collusive price increases would be implemented on a national level," as the States contend. SAMF ¶ 28. Thus, a genuine dispute of fact exists about whether the Defendants were reasonably on notice that their price-fixed drugs would be sold in each State when they were dealing with national distributors and retailers. A reasonable jury could find that these facts constitute a "a significant contact or significant aggregation of contacts" to ensure that the enforcement of each State's laws is not arbitrary or unfair under the Constitution. *Shutts*, 472 U.S. at 821. The motion for summary judgement on this ground must be DENIED.

### E. Deadweight Loss and General Economy Damages

The Defendants next seek to bar (1) Connecticut, California, and the U.S. Virgin Islands from seeking damages for "deadweight loss," which is what economists call the loss to consumer welfare from foregone purchases caused by the supra-competitive prices charged by a cartel, and (2) Connecticut from seeking damages for other types of losses to the state's general economy.[13]

#### 1. Connecticut

Connecticut seeks recovery for two distinct types of loss that allegedly harmed its general economy: loss from consumer surplus and deadweight loss. Consumer surplus addresses harms to consumers who purchased drugs at supra-competitive prices, while deadweight loss addresses harm to consumers who did not purchase drugs because of supra-competitive prices. *See* SAMF ¶ 24.

---

[13] The States concede that an earlier ruling in this case precludes Puerto Rico from seeking deadweight loss or indirect purchaser damages under Puerto Rico law. ECF No. 631 at 21 n.2.

a. Consumer Surplus

According to one of the States' economic experts, Dr. Fred Carstensen, consumer surplus is "the aggregate of additional coerced spending by consumers above what they would spend with the competitive price that they would enjoy in the absence of collusive pricing." ECF No. 339-4 at 8. Connecticut counts only the aggregate of additional spending by uninsured consumers on Drugs at Issue in the consumer surplus it is seeking. Dr. Carstensen opines that because the consumer surplus ultimately benefited out-of-state companies, i.e., the Defendants, Connecticut's economy suffered because the consumers had less money to spend on other goods. *Id.* In addition to seeking to recover the overcharges paid by consumers, Connecticut also seeks damages for "ongoing losses from consumer surplus," made up of "future impacts on the Connecticut economy of the foregone consumer benefits." *Id.* at 12. I find that the version of the Connecticut Antitrust Act applicable to the States' claims does not permit recovery of overcharges under the provision authorizing claims for damages to the State's general economy.

The Connecticut Antitrust Act authorizes the Attorney General to bring *parens patriae* claims for damages in two subparagraphs:

> as (1) parens patriae for persons residing in the state with respect to damages sustained by such persons, or, if the court finds in its discretion that the interests of justice so require, as a representative of a class or classes consisting of persons residing in the state who have been damaged; or (2) parens patriae with respect to damages to the general economy of the state or any political subdivision thereof; provided that such damages shall not be duplicative of those recoverable under subdivision (1) of this subsection.

Conn. Gen. Stat. § 35-32(c). In 2017, the state legislature amended the Connecticut Antitrust Act to repeal *Illinois Brick*'s ban on indirect purchaser recovery—which the Connecticut Supreme Court had found to be incorporated into Connecticut's Antitrust Act in *Vacco*, 260 Conn. 59—by adding Conn. Gen. Stat. § 35-46a. In its opposition brief, Connecticut noted that it "did not, and cannot," bring a *parens patriae* claim under § 35-32*(c)(1)*, permitting actions for damages suffered

53

by state residents, because Connecticut did not repeal *Illinois Brick*'s ban on indirect purchaser recovery until 2017, after most of the alleged conduct in this case had occurred. ECF No. 631 at 43. As a result, Connecticut seeks to recover overcharges paid by residents under § 35-32*(c)(2)* only as a component of damages to the State's general economy.

The *Illinois Brick*-repealer statute, however, applies to both provisions. *See* Conn. Gen. Stat. § 35-46a ("In *any action brought under subsection (c)* of section 35-32 . . . a defendant . . . [m]ay not assert as a defense that the defendant did not deal directly with the person on whose behalf the action is brought.") (emphasis added). If Connecticut could have recovered the overcharges paid by indirect purchasers under the general economy provision before the enactment of the *Illinois Brick*-repealer amendment, then there would have been no need for the amendment at all and, in any event, there would have been no need to make the amendment applicable to subsection (c)(2).[14] The adoption of the amendment and, in particular, the legislature's decision to make the amendment applicable to both subsections (c)(1) and (c)(2) suggest that under the prior version of the statute—the one applicable here—the direct purchaser rule of *Illinois Brick* barred indirect purchaser recovery of overcharges under either provision.

---

[14] The States do not argue that the amendment merely clarified the meaning of the statute; to the contrary, as noted, they take the position that it worked a substantive change, arguing that because most of the conduct at issue here occurred before the amendment, they "cannot" bring a *parens patriae* claim under Section 35-32(c)(1) due to the fact that Connecticut consumers of the Drugs at Issue were indirect purchasers. ECF No. 631 at 43. Discussion of the bill that became Connecticut's *Illinois Brick*-repealer statute also suggests that legislators saw the bill as necessary to change—not clarify—existing law. *See, e.g.*, Leg. Hist. P.A. 17-241 (60 S. Proc., Pt. 4, 2017 Sess., p. 28, remarks of Senator Martin M. Looney on S.B. 445 ("[W]ithout this change, in many cases the people who would be the actual injured parties would not be able to bring the claim.")); *Brown v. Hartford Healthcare Corp.*, No. X03-CV-22-6152239-S, 2023 WL 7150051, at *7 (Conn. Super. Ct. Oct. 26, 2023) ("The legislature's adoption of § 35-46a must be understood as a rejection of the proposition that the Court's concerns in *Illinois Brick* and *Hanover Shoe* warrant a bar on antitrust suits by indirect purchasers.")

Further, the States cite no case law suggesting that the pre-amendment version of subsection (c)(2) permitted the recovery of overcharges paid by indirect purchasers, and such an interpretation would be inconsistent with the respect Connecticut courts have paid to *Illinois Brick* and the policies animating it. As noted, in *Vacco*, the Connecticut Supreme Court held that the Connecticut Antitrust Act incorporated the direct purchaser rule of *Illinois Brick* and that the indirect purchaser plaintiff in that case could not bring his claim under Connecticut's consumer protection statute, CUTPA, either, because CUTPA barred claims for injuries that were too remote based on considerations, such as the danger of multiple recoveries and difficulties in apportioning damages, that were "similar to those on which the direct purchaser rule of *Illinois Brick* rests." 260 Conn. at 89–90. Especially because CUTPA has "broad language" and a "remedial purpose," *Soto v. Bushmaster*, 331 Conn. 53, 93 (2019), it would be incongruous to interpret the pre-amendment version of subsection (c)(2) of Section 35-32, which said nothing about indirect purchasers, to permit an end-run around *Illinois Brick* when a statute as broad as CUTPA does not. I conclude that Connecticut may not seek "consumer surplus," i.e., overcharges, as a component of general economy damages.

This conclusion, however, does not affect the "ongoing harm" to Connecticut's economy that the States' experts attribute to these overcharges. ECF No. 339-4 at 12. Unlike the overcharges themselves, which are typically recoverable under § 35-32(c)(1), the "future impacts on the Connecticut economy," ECF No. 339-4 at 12, are the type of damages to the state economy that are recoverable under § 35-32(c)(2).[15] *See State v. Marsh & McLennan Cos.*, 286 Conn. 454, 473–74 (2008) (denying motion to strike the State's "'multiplier' theory of damages, under which

---

[15] At oral argument, I referred to this subset of relief as a "multiplier effect." ECF No. 1172 at 130. Dr. Carstensen referred to it in his report as the "NPV [net present value] of Losses from Smaller Economy." ECF No. 339-4 at 14 tbl. 4.

each dollar of an overcharge that actually affected a Connecticut business is alleged to have resulted in more than a dollar's worth of harm to the state's economy," where the State alleged that "the damage to Connecticut's general economy is separate and apart from the direct damage companies sustained by payment of [the defendants'] inflated price"). The States have presented evidence in Dr. Carstensen's expert report that the "ongoing harm" damages are distinct from the overcharges themselves. ECF No. 339-4 at 12. Thus, Connecticut may still seek to recover for the ongoing losses to the economy from the consumer surplus, as identified by Dr. Carstensen in his report. *See Marsh*, 286 Conn. at 475–76 ("It is well settled that antitrust injury and damages may be determined by statistical models explained by expert testimony.").

b. Deadweight loss

Apart from consumer surplus, the States also contend that a second component of damage to Connecticut's general economy is deadweight loss, which "addresses lost welfare when prices are set above the competitive level, such as the loss when consumers forego purchases of drugs they need because they cannot afford them." ECF No. 631 at 38. The States' deadweight loss theory purports to quantify the negative effect on the economy created by those who chose not to pay for drugs because of the higher prices resulting from the alleged conspiracies. The States' damages expert, Dr. Singer, explained in his report that deadweight loss can be quantified by estimating a competitive price for a drug and then calculating the "quantity that would have been purchased at the competitive price when the industry is not monopolized." ECF No. 737-1 at 79.

The States cite no case in which a court has made an award of deadweight loss after a contested proceeding (i.e., outside the context of a settlement) but instead rely on law review articles that advocate the general inclusion of deadweight loss as a measure of antitrust damages. *E.g.*, Christopher R. Leslie, *Antitrust Damages and Deadweight Loss*, 51 ANTITRUST BULL. 521, 535 (2006) (arguing that deadweight loss is a genuine harm to society widely recognized by

antitrust economists and that its unavailability in antitrust actions to date results in less-than-optimal deterrence).  But regardless of the utility of deadweight loss in quantifying lost consumer welfare from cartel behavior, to be cognizable under Connecticut's statute, deadweight loss must reflect a loss to the state's *economy*.  The States have submitted no evidence that would allow a reasonable juror to find that it does.

As the Defendants point out, money that Connecticut consumers chose not to spend on drugs cannot necessarily be counted as damage to Connecticut's economy because that same money "could [have been] redirected to other local activities, such as dining at a local restaurant or buying a product made in the state."  ECF No. 629-1 at 32.  Dr. Carstensen agreed during his deposition that the consumers' foregone purchases in response to price increases could have increased the "funds available to circulate" in Connecticut.  ECF No. 632 ¶ 24.  And because none of the Defendants are headquartered in Connecticut, purchases of their drug products would ultimately have sent money out of state—at least according to the States' other expert, Dr. Singer, who opines that the allegedly illegal overcharges by Defendants were substantially passed through to Connecticut pharmacies.  SAMF ¶¶ 5–6.  So it is at least plausible that the foregone purchases that comprise deadweight loss actually benefited Connecticut's economy more than had purchases been made at competitive prices—leaving no net loss to Connecticut's economy at all.  The critical point for purposes of Defendants' motion for summary judgment, however, is that the States have submitted no evidence to rebut that plausible scenario.  Although Dr. Carstensen testified that assessing any injury to Connecticut's economy could be done by conducting "a holistic analysis" of "where do the benefits go" and "what are the costs," ECF No. 632 ¶ 25, the States concede that no such analysis was done,  *id.* ¶ 26.

Without such an analysis, the States focus only on one side of the equation.  The reports of Dr. Singer and Dr. Carstensen do not attempt to calculate the net drain on the economy, but rather seek to explain that deadweight loss is "an approximation of what we think the damage is" and "why it should be properly included." *Id.* ¶ 25.  Similarly, while much of the States' argument is devoted to explaining why recognizing deadweight loss is good policy, they do not explain how they would demonstrate whether the deadweight loss they measured here led to any net loss  to Connecticut's  economy.   It is black-letter law that where the fact of damages is uncertain or speculative, no damages are recoverable.  *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) ("the rule that precludes the recovery of uncertain and speculative damages . . . applies only to situations where the fact of damage is itself uncertain"); *see Montreal Trading, Ltd. v. Amax, Inc.*, 661 F.2d 864, 866–68 (10th Cir. 1981) (considering "whether the fact of a party's injury, as opposed to the amount, would be inherently speculative" in determining that non-purchaser lacked standing to bring damages claim based on its "inability to purchase because defendants limited production as part of a price fixing conspiracy").  Because the States have submitted no evidence that  Connecticut's economy suffered a net loss due to the foregone purchases, Connecticut may not recover deadweight loss under its authority to seek damages to the general economy.

In sum, under Conn. Gen. Stat. § 35-32(c)(2), Connecticut may seek relief for any ongoing harms resulting from consumer surplus, but it may not seek to recover any consumer surplus itself (*i.e.*, the overcharges paid by uninsured consumers) or any deadweight loss.[16]  The motion  for summary judgment on this issue is thus granted in part and denied in part.

---

[16] To put this into the terms Dr. Carstensen used in his summary of the losses to Connecticut's general economy, Connecticut may seek the "NPV of Losses From Smaller Economy," but it may not seek "Deadweight Losses" or "Consumer Surplus for uninsured."  ECF No. 339-4 at 14 tbl.4.

2. <u>California and U.S. Virgin Islands</u>

California and the U.S. Virgin Islands also seek to recover deadweight loss under their antitrust laws. The Virgin Islands, like Connecticut, seeks to recover deadweight loss as a component of harm to its general economy, while California seeks to recover deadweight loss as damages to consumers in its *parens patriae* capacity. ECF No. 631-5 ¶ 19; *see* Cal. Bus. & Prof. Code § 16760(a)(1) ("The Attorney General may bring a civil action . . . as parens patriae on behalf of natural persons residing in the state . . . to secure monetary relief as provided in this section for injury sustained by those natural persons to their property by reason of any violation of this chapter."); 11 V.I.C. § 1507(2) ("Any person who has been injured in his business or property, or is threatened with such injury, by a violation of section 1503 of this chapter may maintain an action in the District Court for damages . . . against any person who has committed such violation. . . . The Government of the United States Virgin Islands and the United States, shall be considered a person having standing to bring an action under this subparagraph."). In essence, the States ask me to find that California and the Virgin Islands would permit a reading of their statutes that include deadweight loss as a component of compensatory damages. I decline to do so for the following reasons.

First, the States fail to point to any case law from either California or the U.S. Virgin Islands holding that their respective antitrust laws include deadweight loss as a component of injury to business or property. Rather, the States point to a few California cases that declined to rule out such claims as part of settlements or in earlier stages of litigation, as well as to the California Supreme Court's decision in *Clayworth*, which contemplated only that damages could embrace "the primary, secondary, and tertiary consequences" of an antitrust injury, 233 P.3d at 1075 (noting that California's antitrust law, the Cartwright Act, "says only that a party must have been 'injured' by a Cartwright Act violation and may recover the resulting 'damages sustained'; it says nothing

about how the injury or damages are to be quantified.  In the antitrust context, one might measure the damages from a violation any number of ways.").[17]  And as the Defendants point out, none of these cases include analysis of the possibility of deadweight loss.  ECF No. 633 at 15 n.14.  Without any such analysis, the inclusion of deadweight loss does not fit with the California Supreme Court's interpretation of "damages"  in an antitrust price-fixing case, where "the presumptive measure of damages is the amount of the overcharge paid by the plaintiff."  *Clayworth*, 233 P.3d at 1086.  As noted, the reports of Dr. Singer and Dr. Carstensen assert that deadweight loss is a distinct calculation that should be included on top of the overcharges.  But no court has yet agreed after analyzing the issue.

Second, the California and U.S. Virgin Islands statues authorize recovery on behalf of natural persons only for injuries to "property" (for the Virgin Islands, to "business and property"). Deadweight loss, which represents the loss of market efficiency and its effect on consumer welfare when prices are set above the competitive level, cannot be characterized as such.  In his article advocating for deadweight loss as a component of damages, Professor Leslie does not suggest that deadweight loss harms any individual's business or property.  *See* Leslie, *Antitrust Damages and Deadweight Loss*, *supra*.  And it is hard to see how a foregone drug purchase could do so.  The decision not to purchase a drug would not harm any individual's "business," unless the business itself was a drug supplier, in which case the business—but not the individual—might be able to

---

[17] *Clayworth* analyzed the language in Cal. Bus. & Prof. Code § 16750 authorizing "[a]ny person who is injured in his or her business or property" to bring claims for "three times the damages sustained by him or her."  California here brings *parens patriae* claims authorized under § 16760, which authorizes the attorney general to seek damages "for injury sustained by [] natural persons to their property."  Despite the slight difference in language, I find the court's rationale in *Clayworth* to be equally applicable to both provisions, with the only significant difference being that § 16750 permits claims for injuries to "business or property," while § 16760 permits *parens patriae* claims for injuries to natural persons' "property" alone.

construct a claim, but the State of California could not bring a claim on behalf of the business because its *parens patriae* statute restricts the Attorney General to suits on behalf of "natural persons." Cal. Bus. & Prof. Code § 16760(a)(1). It is also hard to see how a foregone drug purchase would harm any individual's "property." The person's property would be worth no less after the foregone purchase than it was before; to the contrary, as a result of the foregone transaction, the person would have more money in his or her wallet than if the transaction had been consummated at the competitive price. The person's health or utility (happiness) might have been harmed, but neither the California nor the U.S. Virgin Islands statute authorizes the State to recover for such harms incurred by consumers. And so the language of these statutes does not permit recovery of deadweight loss.

Third, to the extent that California or the Virgin Islands is pursuing deadweight loss as damages to either's economy, they are foreclosed from doing so not only for the same reasons Connecticut is but also because their laws do not authorize the Attorney General of either sovereign to seek such damages. There is no express authorization for general economy damages in the statutes of either. Plus, both jurisdictions treat as persuasive authority federal antitrust law,[18] which bars the recovery of general economy damages. *Standard Oil*, 405 U.S. at 264 (states may not sue for damages to their general economies for federal antitrust violations because "[a] large

---

[18] Under California law, "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1195, 292 P.3d 871, 877 (2013). Although the Virgin Islands' antitrust act includes a harmonization provision, one territorial court has noted that "federal precedent constructing provisions of federal antitrust law that are similar to provisions of the Virgin Islands Antimonopoly Act is merely persuasive authority in the Superior Court." *Yearwood Enters., Inc. v. Antilles Gas Corp.*, No. ST-17-CV-77, 2017 WL 2709831, at *3 (V.I. Super. Ct. June 21, 2017). Thus, I view *Standard Oil* as persuasive, but not binding, authority on the question whether these states may seek general economy damages.

and ultimately indeterminable part of the injury to the 'general economy,' as it is measured by economists, is no more than a reflection of injuries to the 'business or property' of consumers"). And the States do not cite any California or Virgin Islands case law that permits the recovery of general economy damages for antitrust violations.

For these reasons, I conclude that the antitrust laws of California and the U.S. Virgin Islands do not permit them to seek deadweight loss as a component of damages. The motion for summary judgment on this issue is granted.

## IV. MOTIONS TO SEAL

The Motions to Seal briefs and exhibits related to this motion for summary judgment—ECF Nos. 694, 697, and 714—are all granted, substantially for the reasons set forth in the motions.

## V. CONCLUSION

The Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Specifically, as to the Defendants' challenges to the States' antitrust standing, the motion is DENIED except that it is GRANTED as to monetary claims arising from increased premiums paid to MCOs. As to the Defendants' attempt to bar the States' claims for disgorgement because of the existence of legal remedies, the motion is DENIED. As to the States' attempt to base civil penalties or fines on the number of pharmacy-to-consumer drug sales in a particular State, the motion is GRANTED. As to the Defendants' constitutional challenges, the motion is DENIED based on the current record. As to the States' claims for damages for deadweight loss, the motion is GRANTED. As to Connecticut's claims for damages for consumer surplus, the motion is GRANTED as to overcharges but DENIED as to any ongoing losses to the State's economy resulting from consumer surplus.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
February 12, 2026